**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Clifford W. Taylor      Michael F. Cavanagh
                        Elizabeth A. Weaver
                        Marilyn Kelly
                        Maura D. Corrigan
                        Robert P. Young, Jr.
                        Stephen J. Markman

FILED JULY 31, 2006

GRIEVANCE ADMINISTRATOR,

Petitioner-Appellant,

v                                            No.  127547

GEOFFREY N. FIEGER,

Respondent-Appellee.

BEFORE THE ENTIRE BENCH

TAYLOR, C. J.

As a preliminary matter, this opinion addresses the issues raised on appeal in this case. By a separate opinion in this case, the signers of this majority opinion, Chief Justice Taylor, Justice Corrigan, Justice Young, and Justice Markman, respond to the allegations of Justice Weaver regarding our suitability to sit in this case.

In this case, we conclude that certain remarks by attorney Geoffrey N. Fieger about the appellate judges who were hearing his client's case violated MRPC 3.5(c) (which prohibits undignified or discourteous conduct toward the tribunal) and MRPC 6.5(a) (which requires a lawyer to treat with courtesy and

respect all persons involved in the legal process), and that those rules (sometimes referred to as "courtesy" or "civility" rules) are constitutional. Accordingly, we reverse the opinion and order of a divided Attorney Discipline Board (ADB) that incorrectly concluded the rules were unconstitutional and remand for the imposition of the agreed-to professional discipline, a reprimand, on Mr. Fieger.

## I. Facts and Proceedings Below

In 1997, a jury in the Oakland Circuit Court returned a $15 million verdict in a medical malpractice action in which Mr. Fieger represented the plaintiff Salvatore Badalamenti. On appeal, the defendants hospital and physician claimed that the verdict was based on insufficient evidence and that they had been denied their constitutional right to a fair trial by Mr. Fieger's intentional misconduct. After hearing argument, a three-judge panel of the Court of Appeals, Jane Markey, Richard Bandstra, and Michael Talbot, unanimously ruled on August 20, 1999, that the defendants were entitled to judgment notwithstanding the verdict because the plaintiff had failed to provide legally sufficient evidence that would justify submitting the case to the jury.[1] The panel also held that Mr. Fieger's repeated misconduct by itself would have warranted a new trial. In particular, the Court of Appeals indicated that Mr. Fieger (1) without any basis in fact, accused defendants and their witnesses of engaging in a conspiracy, collusion, and perjury to cover up malpractice, (2) asserted without any basis in fact that defense witnesses had

---

[1] *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 284; 602 NW2d 854 (1999).

2

destroyed, altered, or suppressed evidence, and (3) insinuated without any basis in fact that one of the defendants had abandoned the plaintiff's medical care to engage in a sexual tryst with a nurse. The panel described Mr. Fieger's misconduct as "truly egregious" and "pervasive" and concluded that it "completely tainted the proceedings." *Id.* at 289, 290.

Three days later, on August 23, 1999, Mr. Fieger, in a tone similar to that which he had exhibited during the *Badalamenti* trial and on his then-daily radio program in Southeast Michigan, continued by addressing the three appellate judges in that case in the following manner, "Hey Michael Talbot, and Bandstra, and Markey, I declare war on you. You declare it on me, I declare it on you. Kiss my ass, too." Mr. Fieger, referring to his client, then said, "He lost both his hands and both his legs, but according to the Court of Appeals, he lost a finger. Well, the finger he should keep is the one where he should shove it up their asses."

Two days later, on the same radio show, Mr. Fieger called these same judges "three jackass Court of Appeals judges." When another person involved in the broadcast used the word "innuendo," Mr. Fieger stated, "I know the only thing that's in their endo should be a large, you know, plunger about the size of, you know, my fist." Finally, Mr. Fieger said, "They say under their name, 'Court of Appeals Judge,' so anybody that votes for them, they've changed their name from,

you know, Adolf Hitler and Goebbels, and I think—what was Hitler's—Eva Braun, I think it was, is now Judge Markey, she's on the Court of Appeals."[2]

Subsequently, Mr. Fieger filed a motion for reconsideration before the same panel. After that motion was denied, this Court denied Mr. Fieger's application for leave to appeal on March 21, 2003.[3]

On April 16, 2001, the Attorney Grievance Commission (AGC), through its Grievance Administrator, filed a formal complaint with the ADB, alleging that Mr. Fieger's comments on August 23 and 25, 1999, were in violation of several provisions of the Michigan Rules of Professional Conduct, including MRPC 3.5(c), MRPC 6.5(a), and MRPC 8.4(a) and (c).[4] While the complaint was pending, the parties entered into a stipulation. In return for Mr. Fieger's agreement not to contest that his remarks had violated MRPC 3.5(c) and MRPC

---

[2] The three appellate judges did not respond to Mr. Fieger during this period. Code of Judicial Conduct Canon 3(A)(6) states that a judge should abstain from public comments about a pending or impending proceeding in any court. The rationale for this rule is, as we stated in *In re Hocking*, 451 Mich 1, 18; 546 NW2d 234 (1996), the avoidance of a media war of words that may erode public confidence in the judiciary.

[3] *Badalamenti v William Beaumont Hosp-Troy*, 463 Mich 980 (2001).

[4] The ADB is this Court's adjudicative arm for discharging our responsibility to supervise and discipline Michigan attorneys. MCR 9.110(A). MRPC 3.5(c) provides that a lawyer shall not "engage in undignified or discourteous conduct toward the tribunal." MRPC 6.5(a) provides that "[a] lawyer shall treat with courtesy and respect all persons involved in the legal process." MRPC 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another[.]" MRPC 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice[.]"

4

6.5(a), the charges alleging a violation of MRPC 8.4(a) and (c) would be dismissed. The parties further stipulated the sanction of a reprimand. The agreement was specifically conditioned on Mr. Fieger's being allowed to argue on appeal, while the discipline was stayed, both the applicability and the constitutionality of MRPC 3.5(c) and MRPC 6.5(a). Mr. Fieger maintained that the rules were inapplicable because his remarks were made after the case was completed and were not made in a courtroom. Further, he maintained that the two rules were unconstitutional because they infringed his First Amendment rights.[5]

On appeal to the ADB, with one member recused, the remaining eight members of the ADB issued three opinions. The lead opinion, signed by board members Theodore J. St. Antoine, William P. Hampton, and George H. Lennon, concluded that MRPC 3.5(c) and MRPC 6.5(a) did not apply to Mr. Fieger's comments because they were made outside the courtroom in a case they regarded as completed. They further observed that, if the rules did apply, then they were in violation of the First Amendment. A second opinion, signed by members Lori McAllister and Billy Ben Baumann, agreed that Mr. Fieger's comments were protected by the First Amendment, but dissented from the lead opinion's conclusion that the rules only apply to remarks made within the courtroom. A third opinion, agreeing in part with the second opinion, and signed by members

---

[5] The First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that the government "shall make no law . . . abridging the freedom of speech . . . ." US Const, Am I.

5

Marie E. Martell, Ronald L. Steffens, and Ira Combs, Jr., held that Mr. Fieger's remarks, even though made outside the courtroom, were prohibited by the rules, and that the remarks were not protected by the First Amendment.

The sum of all this was that a majority (albeit not the same majority for each issue) concluded that the two rules applied to Mr. Fieger's out-of-court statements, while a different majority concluded that those rules were in violation of the First Amendment.[6]

The AGC, through its Grievance Administrator, sought leave to appeal in this Court. We granted leave to appeal to consider whether the remarks by Mr. Fieger, although uncontestedly discourteous, undignified, and disrespectful, nevertheless did not warrant professional discipline because they were made outside the courtroom and after the Court of Appeals had issued its opinion. We also granted leave to appeal to consider whether the ADB possesses the authority to decide issues of constitutionality and whether the two rules in question are constitutional.[7]

---

[6] We disagree with Justice Cavanagh's claim that the ADB did not find the rule unconstitutional. Reading all three opinions issued by the ADB shows that one majority found the rules applied to Mr. Fieger's conduct, but a different majority found that the Constitution forbids sanctioning Mr. Fieger for violating the rules. This is tantamount to declaring the rules unconstitutional.

[7] 472 Mich 1244 (2005). Mr. Fieger then filed a notice of removal on June 8, 2005, removing the case to federal court. Because Mr. Fieger could not "meet his burden to show removal is proper," the federal district judge granted the Grievance Administrator's motion to remand the case back to this Court on October 19, 2005. *Grievance Administrator v Fieger*, 409 F Supp 2d 858, 865 (ED Mich, 2005). Mr. Fieger appealed to the Sixth Circuit Court of Appeals. On

(continued…)

## II. Standards of Review

We typically review the ADB's factual conclusion that an attorney has violated a rule of professional conduct for proper evidentiary support on the whole record. *In re Freedman*, 406 Mich 256; 277 NW2d 635 (1979); *In re Grimes*, 414 Mich 483; 326 NW2d 380 (1982). Yet, review of the record for evidentiary support of the factual conclusions is unnecessary here because Mr. Fieger's plea agreement did not contest that the remarks were "undignified, discourteous, and disrespectful." The remaining issues to be resolved are questions of law. We decide de novo the legal issues concerning the ADB's authority, construction of the rules of professional conduct, and the constitutionality of these rules. *Grievance Administrator v Underwood*, 462 Mich 188, 193-194; 612 NW2d 116 (2000).

## III. Attorney Licensure and Discipline in Michigan

Const 1963, art 6, § 5[8] and MCL 600.904[9] give this Court the duty and responsibility to regulate and discipline the members of the bar of this state.

---

(…continued)
March 10, 2006, the Sixth Circuit summarily affirmed the district court, concluding that "there is no conceivable basis to support removal of the action" under 28 USC 1443(1). Unpublished order, entered March 10, 2006 (Docket No. 05-2572).

[8] Const 1963, art 6, § 5 provides that "[t]he supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state."

[9] MCL 600.904 provides:

The Supreme Court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, the discipline, suspension, and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar.

*Grievance Administrator v Lopatin*, 462 Mich 235, 241; 612 NW2d 120 (2000).

Most obviously, this responsibility entails concern for the competence, character, and fitness of attorneys, but historically also has included the issuance of rules regulating the manner in which lawyers communicate to the public about other participants in the legal system, primarily judges and other lawyers. While many other professions are regulated with the goal of ensuring competence and fitness, it is only the legal profession that also has imposed upon its members regulations concerning the nature of public comment. The First Amendment implications are easily understood in such a regulatory regime and this Court, like other courts of last resort including the United States Supreme Court, has attempted to appropriately draw the line between robust comment that is protected by the First Amendment and comment that undermines the integrity of the legal system.

Indeed, whether this line can be drawn anywhere to take cognizance of the interests of the legal system is the central issue in this case. The proposition asserted by Mr. Fieger is that, under the First Amendment of the United States Constitution, there can be no courtesy or civility rules at all of this sort and that judges and other lawyers assailed verbally, as public figures, have the same remedies any other public figures have in libel and slander law.[10] As the opinions

---

[10] Mr. Fieger does not address the rule restraining judicial speech regarding a pending case. Code of Judicial Conduct, Canon 3(A)(6). See footnote 2 of this opinion.

of the ADB suggest, the absolutism of this argument is not without some allure.[11]

Yet, respect for the wisdom of those who have preceded us in the judiciary in this country and the traditions of the legal process counsel that narrow and carefully tailored regulations of the sort set forth in MRPC 3.5(c) and MRPC 6.5(a) are necessary adjuncts to a responsible legal system and are compatible with the First Amendment. It is first necessary to outline why such regulations are necessary at all. That is, what substantial interests are these courtesy and civility rules designed to further? In particular, are there some interests that such rules further beyond merely protecting judges from the robust criticism that is sometimes a part of the give-and-take of the democratic process? Do such rules merely insulate judges from the inconvenience of being held accountable from their public actions? In establishing rules designed to deter and sanction uncivil and discourteous conduct on the part of lawyers, we believe that this Court is doing far more than protecting the sensitivities of judges; rather, we believe that we are upholding the integrity of that which is being carried out by the judicial branch of government.

The performance of these responsibilities requires a process in which the public can have the highest sense of confidence, one in which the fairness and integrity of the process is not routinely called into question, one in which the

---

[11] For a discussion of the "absolutist" view of the First Amendment and its problems see Stanford Law Professor John Hart Ely's *Democracy and Distrust; a Theory of Judicial Review* (Cambridge, Mass: Harvard University Press, 1980) pp 109-112.

ability of judges to mete out evenhanded decisions is not undermined by the fear of vulgar characterizations of their actions, one in which the public is not misled by name-calling and vulgarities from lawyers who are held to have special knowledge of the courts, one in which discourse is grounded in the traditional tools of the law—language, precedents, logic, and rational analysis and debate. To disregard such interests in the pursuit of a conception of the First Amendment that has never been a part of our actual Constitution would in a real and practical sense adversely affect our rule of law, a no less indispensable foundation of our constitutional system than the First Amendment.

These interests in a responsible legal process heretofore have been unquestioned and have been thought to justify a lawyer discipline system in this state that encompasses rules on courtesy and civility toward others. Accordingly, in cases such as *Attorney General v Nelson,* 263 Mich 686, 701; 249 NW 439 (1933), and more recently in *In re Chmura*, 461 Mich 517, 535; 608 NW2d 31 (2000) (*Chmura I*), we have recognized that in order to preserve the integrity of our legal process, it is of utmost importance that the people have confidence in this process. We have recognized that rules of the sort at issue here have as their purpose considerably more than protecting the sensitivities of judges, but are designed to maintain public respect for a rule of law that is dependent on such public respect. In *Ginger v Wayne Circuit Judge*, 366 Mich 675, 679; 116 NW2d 216 (1962), we indicated that a lawyer's duty to maintain a respectful attitude toward the courts is "'not for the sake of the temporary incumbent of the judicial

10

office, but for the maintenance of its supreme importance.'" (Citation omitted.)  In furtherance of this, the law has reposed special stewardship duties on lawyers on the basis of the venerable notion that lawyers are more than merely advocates who happen to carry out their duties in a courtroom environment, they are also officers of the court.  In this exclusive role, lawyers have special responsibilities in their relations with other officers of the court.[12]

In discussing the scope of this obligation in the 19th century, the United States Supreme Court stated that attorneys are under an implied "obligation . . . to maintain at all times the respect due to courts of justice and judicial officers.  This obligation . . . includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts."  *Bradley v Fisher*, 80 US (13 Wall) 335, 355; 20 L Ed 646 (1872).

More recently, the United States Supreme Court elaborated on this unique status:

---

[12] See, e.g., *Ex parte Garland*, 71 US (4 Wall) 333, 378; 18 L Ed 366 (1867) (describing attorneys as "officers of the court," to whom the court awards that status upon a showing of their "legal learning and fair private character"), and *Goldfarb v Virginia State Bar*, 421 US 773, 792; 95 S Ct 2004; 44 L Ed 2d 572 (1975) (noting the historical treatment of lawyers as officers of the courts).

That a lawyer's role as an officer of the court is distinct and has been recognized as such can be seen, for example, in the frequent discussions of the standards of ethical behavior in the regular columns of the President of the Michigan State Bar in  the *Michigan Bar Journal*.  As merely one illustration of this recognition, in the March 2006 edition, the current President, Thomas W. Cranmer, asserts that "[l]awyers operate under strict ethical rules, and the rules are enforced" and "[o]ur disciplinary system is rigorous and active."  Cranmer, *Defending Lawyers*, 66 Mich B J 14 (March, 2006).

As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice. [*In re Snyder*, 472 US 634, 644-645; 105 S Ct 2874; 86 L Ed 2d 504 (1985).]

Michigan has statutorily recognized this status in MCL 600.901, which provides:

The members of the state bar of Michigan are officers of the courts of this state, and have the exclusive right to designate themselves as "attorneys and counselors," or "attorneys at law," or "lawyers." No person is authorized to practice law in this state unless he complies with the requirements of the supreme court with regard thereto.

It is to this end that our bar entrance requirements look to character as well as competence, and the bar admissions process culminates in a way unprecedented in other professions with the taking of an oath pursuant to MCL 600.913. This oath provides that the lawyer will, upon being accorded the privileges provided by membership in the bar,[13] (1) maintain the respect due to courts of justice and judicial officers, (2) abstain from all offensive personality,

---

[13] The fact that membership in the bar is a privilege subject to conditions was reiterated in *Gentile v State Bar of Nevada*, 501 US 1030, 1066; 111 S Ct 2720; 115 L Ed 2d 888 (1991), in which the Court stated, "'Membership in the bar is a privilege burdened with conditions,' to use the oft-repeated statement of Cardozo . . . ." (Citation omitted.)

and (3) conduct himself or herself personally and professionally in conformity with the high standards of conduct imposed on members of the bar as conditions for the privilege to practice law in Michigan.  State Bar Rule 15, § 3(1).

Moreover, MCR 9.103(A) provides:

> The license to practice law in Michigan is, among other things, a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters and to aid in the administration of justice as an attorney and counselor and as an officer of the court.  It is the duty of every attorney to conduct himself or herself at all times in conformity with standards imposed on members of the bar as a condition of the privilege to practice law.  These standards include, but are not limited to, the rules of professional responsibility and the rules of judicial conduct that are adopted by the Supreme Court.

As contemplated by this rule, this Court has promulgated the Michigan Rules of Professional Conduct.  Of immediate interest is MRPC 3.5(c), which does not preclude criticism by a member of the legal profession, of even the most robust character, but precludes only "undignified or discourteous conduct toward the tribunal."  The comment on MRPC 3.5 elaborates:

> The advocate's function is to present evidence and argument so that the cause may be decided according to law.  Refraining from undignified or discourteous conduct is a corollary of the advocate's right to speak on behalf of litigants.  A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate.  An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

Similarly, MRPC 6.5(a) provides only that "[a] lawyer shall treat with courtesy and respect all persons involved in the legal process."  The comment on MRPC 6.5 explains:

13

A lawyer is an officer of the court, who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly. It is increased when the obligation is met.

As should be clear, these rules are designed to prohibit only "undignified," "discourteous," and "disrespectful" conduct or remarks. The rules are a call to discretion and civility, not to silence or censorship, and they do not even purport to prohibit criticism. The wisdom of such rules was recognized by United Stated Supreme Court Justice Potter Stewart in his concurring opinion in *In re Sawyer*, 360 US 622, 646; 79 S Ct 1376; 3 L Ed 2d 1473 (1959), in which he remarked, "A lawyer belongs to a profession with inherited standards of propriety and honor, which experience has shown necessary in a calling dedicated to the accomplishment of justice. He who would follow that calling must conform to those standards."

Equally pertinent is the Preamble to our Rules of Professional Conduct, "A lawyer should demonstrate respect for the legal system and for those that serve it, including judges, other lawyers and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also the lawyer's duty to uphold legal process."

It is in this historical and professional context that Mr. Fieger's remarks must be reviewed.

14

IV. Analysis of the Applicability of the Rules

A. Were Mr. Fieger's remarks made after the conclusion of the case?

Mr. Fieger asserts that the remarks in controversy were made after the *Badalamenti* case was concluded. This matter is consequential because greater restraint, if indeed any is constitutionally allowed, is permissible when a case is ongoing than when it is completed. As the United States Supreme Court said in *Gentile, supra* at 1070, "'When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied.'" (Citation omitted.) Accordingly, "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press . . . ." *Id.* at 1074.

The obvious question here is whether the *Badalamenti* case was actually "pending" at the time of Mr. Fieger's comments. In answering this question, we are guided both by the Michigan Court Rules and by the ordinary definition of "pending." MCR 7.215(F)(1)(a)[14] states that a Court of Appeals decision

---

[14] Similarly, under MCR 7.210(H), the Court of Appeals does not treat a case as disposed of (and so does not return the record to a lower court) until the period for application for leave to appeal before our Court expires and no motion for reconsideration or other special request remains pending in the Court of Appeals.

We note that MCR 7.317(C) and (D), rules applicable in this Court, similarly distinguish between entry of an order or opinion and issuance—i.e., the effectiveness—of the same. This distinction further suggests that time may

(continued…)

15

generally does not become effective until "after the expiration of the time for filing an application for leave to appeal to the Supreme Court, or, if such an application is filed, after the disposition of the case by the Supreme Court.". Thus, at a minimum, a decision in the Court of Appeals is still "pending" until the expiration of the period for filing an application for leave to appeal that decision in this Court.[15] At all times pertinent,[16] the period for filing such an application was 21 days from the date of the mailing or filing appealed from, or if a timely motion for rehearing was filed in the Court of Appeals, 21 days from the mailing of an order denying the motion. MCR 7.302(C)(2)(c). Moreover, Black's Law Dictionary (6th ed), defines "pending" as follows:

> Begun, but not yet completed; during; before the conclusion of; prior to the completion of; unsettled; undetermined; in process of settlement or adjustment. Awaiting an occurrence or conclusion of action, period of continuance or indeterminancy. Thus, an action or

---

(…continued)

intervene between when an order or opinion enters and when it reaches finality. Indeed, our own appellate court practice is not to remit the record to the lower court until this time has elapsed. See, e.g., *Luscombe v Shedd's Food Products Corp*, 212 Mich App 537, 538-541; 539 NW2d 210 (1995) (describing how a trial court did not technically regain jurisdiction over a case until the Court of Appeals remitted the record back to the trial court); see also Black's Law Dictionary (6th ed) (defining "remittitur of record" as "[t]he returning or sending back by a court of appeal of the record and proceedings in a cause, after its decision thereon, to the court whence the appeal came . . ."). Only after the remittitur does our clerk treat a case as disposed of.

[15] We express no opinion about whether a decision of a lower court is still "pending' for attorney speech purposes after an appellate court has taken the case on appeal. It is also unnecessary for us to decide, and we do not decide here, the limits our civility rules place on lawyers after a case has been completed.

[16] MCR 7.302(C) now provides than an application must be filed within 42 days in civil cases, or within 56 days in criminal cases.

16

suit is "pending" from its inception until the rendition of final judgment.

Mr. Fieger made his remarks on August 23 and 25, 1999, three days and five days, respectively, after the Court of Appeals issued its decision, when the time for filing either for rehearing in the Court of Appeals or an application for leave to appeal in this Court had not yet expired. Indeed, Mr. Fieger ultimately did file a timely motion for rehearing in the Court of Appeals on September 10, 1999.

Because the Court of Appeals decision had not yet become effective as of the date of Mr. Fieger's comments, and because the Court of Appeals, by granting a motion for reconsideration or rehearing, could still have affected the substantial rights of his client, we conclude that the *Badalamenti* case was "begun, but not yet completed" that Mr. Fieger's comments were made "during," "before the conclusion of," and "prior to the completion of" that case. Moreover, the case was "awaiting an occurrence or conclusion of action"—namely, the running of the aforementioned periods for filing. During this interim, then, the case was in a "period of continuance or indeterminancy."

Thus, the *Badalementi* case was clearly still pending when Mr. Fieger made his remarks.[17]

_____

[17] The dissents contend that the *Badalamenti* case was not "pending" because nothing remained undecided at the time Mr. Fieger made his statements. This position is incorrect and fails to give full meaning to MCR 7.215(F)(1)(a) and MCR 7.302(C)(2)(a) and (b), which make it clear that a Court of Appeals decision does not become effective until after the expiration of the time for filing an application for leave to appeal in this Court. The dissents claim there is a difference between when a case is no longer pending and when it is effective. But,

(continued…)

B. Do the rules only apply to comments made in a courtroom?

Mr. Fieger next asserts that MRPC 3.5(c) and MRPC 6.5(a) only apply to comments within a courtroom or its immediate environs. We disagree.

MRPC 3.5(c) provides that a lawyer shall not "engage in undignified or discourteous conduct *toward* the tribunal." (Emphasis added.) We note that the rule does not provide a definition of the word "toward." It is well established that if a term in a court rule is not defined, we interpret the term in accordance with its everyday, plain meaning. See, e.g., *People v Petit*, 466 Mich 624, 627; 648 NW2d 193 (2002). *Random House Webster's College Dictionary* (1997) lists several definitions of the preposition "toward," including "in the direction of" and "with respect to; as regards."

In light of this definition, we disagree with Mr. Fieger's argument that the rule is inapplicable to his statements because those statements were directed toward an audience and outside a courtroom, and, therefore, not toward a tribunal. Mr. Fieger made remarks about (a) the three judges (b) who comprised the panel

---

(…continued)
the opposite of "pending" is generally understood as "final" and there is no question that the case was not final when Mr. Fieger made his remarks. Indeed, the fact that Mr. Fieger filed a motion for rehearing in the Court of Appeals after making his comments demonstrates the case was still pending. The Court of Appeals could have changed its mind after considering the motion for rehearing. The fact that Mr. Fieger filed an application for leave to appeal in this Court, after the Court of Appeals denied the motion for rehearing, also demonstrates that the case was still pending, i.e., awaiting rendition of a final judgment. This Court could have taken summary action or action after granting leave to appeal that would have changed the Court of Appeals judgment. Thus, the *Badalamenti* case was indisputably pending when Mr. Fieger made his remarks.

(c) that ruled against his client (d) with regard to the content and value of that judgment, (e) which remarks aired on a public broadcast. Even though made outside a courtroom, Mr. Fieger's statements attacked the judges in their capacity as judges and in a forum designed to reach both the public and these judges (who were included among the members of the community who could receive this broadcast). Because such comments were "in the direction of" and "with respect to" these judges, they were necessarily comments made "toward the tribunal."

There is nothing in this phrase "toward the tribunal" that limits the applicability of the rule only to remarks made in a courtroom.[18] Mr. Fieger's construction of the rule would effectively insert the requirement that the conduct "actually disrupt the proceeding." Yet this language, which is in the American Bar Association version of this rule, is absent from our rule. Further, if MRPC 3.5(c) applies only when an attorney is in a courtroom, the rule would be largely superfluous, and of little practical utility, given that a court's contempt power, enforceable by fine or incarceration pursuant to MCL 600.1711(1), is always

---

[18] The dissents would limit the phrase "toward the tribunal" to comments made in a courtroom. But there is no warrant for such a limitation in the wording of MRCP 3.5(c), which contemplates a broader prohibition. Moreover, Mr. Fieger called the judges by name. Surely this demonstrates that the remarks were made "toward the tribunal." Notwithstanding Justice Kelly's assertion that this opinion "necessarily chills comment," *ante* at 10, it will only "chill," those comments that are properly "chilled" among members of a profession who are bound to conduct themselves in a courteous and civil manner. In contrast with the dissents, we have no difficulty concluding that the interests of the rule of law, one of the towering achievements of our society, outweighs the interests of an officer of the court in uttering vulgar epithets toward a judge in a pending case.

available to restore or maintain order when the offending conduct or remarks occur before the judge in the courtroom.

The construction of the rule asserted by Mr. Fieger fails to accord consideration to the importance the courtesy and civility rules serve as a vehicle for preserving the public's confidence in the integrity of the legal process. Most significantly, however, it is a construction that is not in accord with the actual language of the rule. Thus, we agree with the conclusion of the majority of the ADB that MRPC 3.5(c) applies to Mr. Fieger's remarks.

MRPC 6.5(a) provides that "[a] lawyer shall treat with courtesy and respect all persons involved in the legal process." Mr. Fieger argues that somehow this rule does not apply to a lawyer's use of abusive language directed toward judges in the context of a radio program. Again, we disagree. MRPC 6.5(a) applies in this instance because, as the previous discussion makes obvious, the Court of Appeals judges were "persons involved in an ongoing legal process."[19]

Therefore, we conclude that the comments made by Mr. Fieger are in violation of both MRPC 3.5(c) and MRPC 6.5(a).

---

[19] Mr. Fieger also asserts that this rule has only been applied in situations involving assaultive, threatening, or obstructive direct behavior. In this regard we point out that in *Grievance Administrator v Vos*, 466 Mich 1211 (2002), we specifically stated that MRPC 3.5(c) and MRPC 6.5(a) address discourteous behavior and "do not require proof of threatening behavior or statements."

V. Can the ADB Declare a Rule Unconstitutional?

The AGC, through its Grievance Administrator, asserts that the ADB has no authority to declare unconstitutional a rule of professional conduct. We agree.

A disciplinary proceeding in Michigan commences upon the filing of a formal complaint and is heard before a panel of three lawyers. Appeals are then taken to the ADB. The ADB is an administrative body, comprised of nine individuals appointed by this Court, three of whom are not attorneys.[20] While the ADB, like all other governmental entities, must operate in accord with the Constitution, for example, on questions such as compelled witness self-incrimination,[21] it does not possess the power to hold unconstitutional rules of professional conduct that have been enacted by this Court. As we said in *Wikman v Novi*, 413 Mich 617, 646-647; 322 NW2d 103 (1982), administrative agencies generally do not possess the power to declare statutes unconstitutional because this is a core element of the "judicial power" and does not belong to an agency that is not exercising this constitutional power. The power of judicial review is one that belongs exclusively to the judicial branch of our government. *Lewis v Michigan*, 464 Mich 781, 788-789; 629 NW2d 868 (2001). Const 1963, art 3, §

---

[20] See *State Bar Grievance Administrator v Estes*, 390 Mich 585, 592; 212 NW2d 903 (1973), where this Court held that the power of the ADB's predecessor was "administrative and quasi-judicial in nature" rather than judicial.

[21] See MCR 9.113(B)(3).

21

2.  See, also, *Richardson v Secretary of State*, 381 Mich 304, 309; 160 NW2d 883 (1968).[22]

Should any attorney appearing before the ADB believe a rule itself to be unconstitutional, such as in this case, resort must be made to an appeal to this Court, and, if we concur in this assessment, it is our responsibility to declare such rule unconstitutional.  See MCR 9.122(A)(1) and *Fieger v Thomas*, 74 F3d 740, 747 (CA 6, 1996).[23]

VI.  Are MRPC 3.5(c) and MRPC 6.5(a) Unconstitutionally Vague?

Mr. Fieger next argues that whatever the other constitutional shortcomings of MRPC 3.5(c) and MRPC 6.5(a), they are unconstitutionally vague because a lawyer cannot know ahead of time which of his or her remarks might run afoul of the rules.  Such a challenge cannot be successfully advanced here because there is no question that even the most casual reading of these rules would put a person clearly on notice that the kind of language used by Mr. Fieger would violate MRPC 3.5(c) and MRPC 6.5(a).  To invite the sodomization of a judge, with a

---

[22] The dissents would hold that the ADB, although none of its members is a judge, and although some of its members are not even lawyers, may declare unconstitutional a rule of professional conduct enacted by this Court.  We disagree for the reasons already stated.  The power of judicial review belongs only to the judicial branch of government and nothing within our Constitution has extended this power to the ADB.  Given that only judges can exercise the core judicial power of declaring a statute or rule unconstitutional, there is no basis for the dissents' assumption that this Court could delegate this power to an agency we have created that is not composed of judges.

[23] It is also the case that a lawyer may institute an original action in the Michigan Supreme Court to implement the Court's superintending control over the

(continued…)

22

client's finger, a plunger, or his own fist, and to invite a judge to kiss one's ass are statements that do not come close to the margins of the "civility" or "courtesy" rules.[24] While MRPC 3.5(c) and MRPC 6.5(a) are undoubtedly flexible, and the AGC will exercise some discretion in determining whether to charge an attorney with violating them, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. *Ward v Rock Against Racism*, 491 US 781, 794; 109 S Ct 2746; 105 L Ed 2d 661 (1989). A statute or rule is not required to define an offense with "mathematical certainty." *Grayned v City of Rockford*, 408 US 104, 110; 92 S Ct 2294; 33 L Ed 2d 222 (1972). Because statutes and rules are presumptively valid, they "'are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.'" *Parker v Levy*, 417 US 733, 757; 94 S Ct 2547; 41 L Ed 2d 439 (1974) (citation omitted).

---

(…continued)
ADB. MCR 7.304(A). A lawyer may also raise constitutional challenges in a complaint seeking mandamus in this Court. *Fieger v Thomas*, *supra* at 747.

[24] Justice Kelly's dissent states a concern that our rules of professional conduct might be arbitrarily or discriminatorily enforced by the AGC. Yet, we note that *any* validly enacted rule, regulation, or statute carries with it the risk of arbitrary or discriminatory enforcement. Such concerns, when they arise, are typically addressed on a case-by-case basis, and Justice Kelly's dissent offers no reason to believe that alleged violations of MRPC 3.5(c) or MRPC 6.5(a) could not be handled in such a manner. Moreover, neither respondent nor Justice Kelly points to a single case in which an attorney was charged with violating our courtesy or civility rules for inconsequential behavior.

If "civility" and "courtesy" rules can *ever* satisfy constitutional muster, as we believe they can, it is beyond peradventure that the comments at issue in this case clearly violated such rules.

Mr. Fieger also argues that his remarks are political speech and thus fit within the protection afforded campaign speech in *In re Chmura (After Remand)*, 464 Mich 58, 72-73; 626 NW2d 876 (2001) (*Chmura II*). In *Chmura II* we considered the propriety of a variety of remarks made by an incumbent judge during a reelection campaign that had served as the basis for sanction by the Judicial Tenure Commission of our state. We concluded in light of the First Amendment that the judge's statements were all constitutionally protected.[25] But, the *Chmura II* political context is entirely missing here. There was no political campaign underway nor was Mr. Fieger attempting by his comments to participate in such a campaign.[26] Thus, *Chmura II* offers no safe harbor for Mr. Fieger. See, also, *In re Palmisano*, 70 F3d 483, 487 (CA 7, 1995) (courts may require attorneys to speak with greater care and civility than is the norm in political campaigns).

---

[25] The later holding of the United States Supreme Court in *Republican Party of Minnesota v White,* 536 US 765; 122 S Ct 2528; 153 L Ed 2d 694 (2002), is, we believe, harmonious with *Chmura II.*

[26] None of the three Court of Appeals judges who were the target of Mr. Fieger's comments was up for reelection until November 2002 for a six-year term beginning January 1, 2003.

Not only was Mr. Fieger's speech not campaign speech, it was not political speech of any kind. In discussing political speech, the United States Supreme Court has stated:

> "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." [*Thornhill v Alabama*, 310 US 88, 101-102; 60 S Ct 736; 84 L Ed 1093 (1940).] The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v United States*, 354 U. S. 476, 484 [77 S Ct 1304; 1 L Ed 2d 1498] (1957). [*Meyer v Grant*, 486 US 414, 421; 108 S Ct 1886; 100 L Ed 2d 425 (1988).]

To invite the sodomization of a judge, with a client's finger, a plunger, or one's own fist, and to invite a judge to kiss one's ass can hardly be considered an "interchange of ideas for the bringing about of political and social changes." "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . . ." *Cantwell v Connecticut*, 310 US 296, 309-310; 60 S Ct 900; 84 L Ed 1213 (1940).[27]

---

[27] In discussing cases that have given vulgar and offensive speech First Amendment protection, the dissents lose sight of the fact that we are dealing here, not with the general context of the right of citizens to speak freely, but with the very specific context of the right of attorneys, who are licensed in terms of character and fitness and who serve as officers within our legal system, to engage in such speech in the course of their professional responsibilities. In conflating these two contexts, the various dissents lose sight of the governing legal standard. In *Gentile,* the United States Supreme Court supplied the standard for a First Amendment challenge to a professional conduct rule. The Court concluded that the state had an interest in the integrity of its judicial system and that the regulation at issue there was narrowly tailored, viewpoint neutral, and left open alternative avenues for expression. *Gentile, supra* at 1071-1076. Although First Amendment jurisprudence contains a plethora of colorful cases, including *Cohen v*

(continued…)

Mr. Fieger further urges that his remarks should receive the same broad protection the First Amendment was found to provide in *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964). We disagree because this is an attorney discipline matter and more restrictive rules are permissible in such a circumstance. In *Sullivan,* the United States Supreme Court created a high standard of proof for a public official seeking civil damages for defamation. Damages can only be recovered if the public figure can prove by clear and convincing evidence that the offending statements were made with knowledge that they were false or with reckless disregard of their falsity. Yet here, we deal with a matter of professional discipline. There is no civil action, and, thus, *Sullivan* is inapplicable.[28] Nor are the interests that prompted *Sullivan* at all in evidence here. Whereas *Sullivan* was designed to further robust public discussion in the press, and to avoid the chilling effects on the media of defamation or libel lawsuits predicated upon mere mistakes or inaccuracies in reporting, neither of these constitutional concerns is implicated by court rules allowing the sanctioning

(…continued)
*California*, 403 US 15; 91 S Ct 1780; 29 L Ed 2d 284 (1971), and *Fed Communications Comm v Pacifica*, 438 US 726; 98 S Ct 3026; 57 L Ed 2d (1978), we need not address every imaginable argument that could be marshaled from them. As in *Chmura I*, we are bound to apply the governing standard of *Gentile*, rather than consider and dispose of every possible objection that may be found in more "general" First Amendment jurisprudence.

[28] In *Garrison v Louisiana*, 379 US 64, 74; 85 S Ct 209; 13 L Ed 2d 125 (1964), overruled on other grounds by *Curtis Publishing Co v Butts*, 388 US 130, 134 (1967), the United States Supreme Court extended the *Sullivan* standard to criminal defamation cases. But, there are no criminal charges at issue here.

26

an attorney for crude or vulgar language directed against a judge in a pending proceeding.

Further, that the First Amendment is not offended by Michigan's disciplinary rules is suggested by *Gentile v State Bar of Nevada*, *supra* at 1071, where the United States Supreme Court stated:

> It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. *Even outside the courtroom*, a majority of the Court in two separate opinions in the case of *In re Sawyer*, 360 U.S. 622, 3 L. Ed. 2d 79, S. Ct. 1376 (1959), observed that *lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be.* [Citations omitted; emphasis added.]

*Gentile, supra* at 1073, also held that in analyzing whether an ethics rule violates a lawyer's First Amendment rights, the court must engage "in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue." These state interests include promoting the respect of the courts by the citizenry and maintaining the integrity of the judicial process so as to enhance compliance with adjudications. Further, in a system with hundreds of judges, each of whom is subject to popular election, the state also has an interest in limiting attorney comment that takes the form of personal attacks on judges, because a system in which intimidating attacks are permitted fosters the risk of eventually realizing the intended effect of such attacks: a potentially cowed judiciary.

In *Sawyer*, the United States Supreme Court considered an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. The plurality opinion, which found the discipline to be improper, concluded that the comments had not in fact impugned the judge's integrity. But Justice Stewart, who provided the fifth vote for reversal of the sanction, observed in his concurring opinion that he could not join any possible "intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct . . . ." *Sawyer, supra* at 646. He concluded that "[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech." *Id*. at 646-647.

As observed, pursuant to *Gentile, supra* at 1073, to assess the constitutionality of a rule of lawyer discipline, a court must weigh the state's interests in support of the rule against an attorney's First Amendment interests in the kind of speech at issue. In this case, we must balance Mr. Fieger's right to criticize judges as he did, using foul and vulgar language, against the state's interest in the maintenance of a system of lawyer discipline that imposes some measure of limitation on such language.

Before undertaking this balancing process, it may be appropriate to consider this Court's demonstrated solicitude for lawyer speech, and in particular this lawyer's freedom of speech, by reviewing how we struck the balance with Mr. Fieger in an earlier professional disciplinary matter. In *Grievance*

28

*Administrator v Fieger*, 469 Mich 1241 (2003), we declined to review a dismissal by the ADB of an AGC claim that Mr. Fieger had violated MRPC 8.2(a) when he accused a county prosecutor of covering up a murder because the ADB arguably had considered Mr. Fieger's accusations to constitute a comment or opinion on the office holder's performance of his duties. As a result, Mr. Fieger was found not to be subject to sanction for his statement. Although Mr. Fieger's comment was an irresponsible and baseless comment, and altogether unfair to the prosecutor,[29] this Court gave every benefit of the doubt to Mr. Fieger in its interpretation of what he had meant to communicate by his statement. However, there can be no similar benefit to any doubt in the current case in which Mr. Fieger has uttered the crudest and most vulgar statements concerning judges in a pending lawsuit. As the United States Supreme Court stated in *Chaplinsky v New Hampshire*, 315 US 568, 572; 62 S Ct 766; 86 L Ed 1031 (1942), quoting *Cantwell v Connecticut*, *supra* at 309-310, "'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . . .'"

---

[29] Justice Cavanagh stated the following in his concurring statement:

> This order should not be construed as signaling any reduced interest on the part of this Court in upholding standards of professional civility and in enforcing attorney discipline when allegedly libelous or slanderous remarks are made by attorneys. I believe that the respondent's remarks here were irresponsible and reprehensible, but ultimately I would defer to the judgment of the Attorney Discipline Board that they were not sanctionable . . . . [469 Mich 1241.]

29

There is no reasonable construction of Mr. Fieger's remarks that could lead to the conclusion that these were mere comment on the professional performance of these three judges of the Court of Appeals. To call a judge a "jackass," a "Hitler," a "Goebbels," a "Braun" and to suggest that a lawyer is "declar[ing] war" on them and that the judge should "[k]iss [the lawyer's] ass," or should be anally molested by finger, fist, or plunger, is, to say the least, not to communicate information; rather, it is nothing more than personal abuse. We conclude that such coarseness in the context of an officer of the court participating in a legal proceeding warrants no First Amendment protection when balanced against this state's compelling interest in maintaining public respect for the integrity of the legal process. *United States v O'Brien,* 391 US 367, 377; 88 S Ct 1673; 20 L Ed 2d 672 (1968).

MRPC 3.5(c) and MRPC 6.5(a) did not preclude Mr. Fieger from expressing disagreement with the judges in his case, and they did not preclude criticism, even strong criticism, from being directed toward these judges; rather, they only precluded him from casting such disagreement and criticism in terms that could only bring disrepute on the legal system. The limited restriction placed by the rules on Mr. Fieger's speech is narrowly drawn and is no greater than is necessary to maintain this state's longstanding and legitimate interests in the integrity of its legal system. *Chmura I, supra.*

As the United States Supreme Court stated in *In re Snyder, supra* at 647:

> All persons involved in the judicial process—judges, litigants, witnesses, and court officers—owe a duty of courtesy to all other

30

participants. The necessity for civility in the inherently contentious setting of the adversary process suggests that members of the bar cast criticisms of the system in a professional and civil tone.

It is also the case that our civility and courtesy rules serve to vindicate this Court's interest in the good moral character of the lawyers it has licensed to serve as officers of the court.[30] Implicit in being an officer of the court is the recognition that "'obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech.'" *Gentile, supra* at 1071 (citation omitted).[31]

Mr. Fieger's comments then are not protected under his various theories of vagueness, of political speech, or of public-figure comment. It is important, however, to reiterate that we are not now, nor have we ever in the past, suggested

---

[30] Judges are also subject to courtesy or civility rules and may be sanctioned for violating such rules upon recommendation of the Judicial Tenure Commission. Canon 2(B) of the Michigan Code of Judicial Conduct similarly requires judges to treat others with courtesy. MCR 9.205(B)(1) also requires judges to treat others with courtesy and respect. We have not ignored this requirement. See, e.g., *In re Moore*, 464 Mich 98, 122, 131-133; 626 NW2d 374 (2001), in which we suspended a judge after we concluded, among other things, that he had violated Code of Judicial Conduct, Canon 2(B) and 3(A) by making abusive, berating, and sarcastic comments to jurors, defendants, and attorneys. See, also, *In re Del Rio*, 400 Mich 665, 716-722; 256 NW2d 727 (1977), in which we sanctioned a judge after we concluded that he had violated Canons 2(B) and 3(A) by making crass comments, engaging in extended tongue-lashings, and making threats of retaliation against attorneys who appeared in his courtroom.

[31] This Court explained over 100 years ago in *In re Mains*, 121 Mich 603, 608-609; 80 NW 714 (1899), that an attorney has no right to so conduct himself or herself as to dishonor his or her profession or to bring the courts of this state into disrepute.

that judges are beyond criticism.[32]  As we stated in *Attorney General v Nelson, supra* at 701:

> An attorney owes devotion to the interests of his clients. He should be zealous in the maintenance and defense of their rights, and should be in no way restrained in the discharge of such duty by fear of judicial disfavor. But at the same time he should be at all times imbued with the respect which he owes to the court before whom he is practicing.  It is of the utmost importance to the preservation of our system of government that our people have confidence in the integrity of our courts.

The point is that lawyers have an unquestioned right to criticize the acts of courts and judges.  *In re Estes*, 355 Mich 411, 414; 94 NW2d 916 (1959). Moreover, there is no prohibition on a lawyer engaging in such criticism even during the pendency of a case.  There are limitations only on the form and manner of such criticism, limitations that serve compelling interests within our constitutional and legal systems.[33]

Because Mr. Fieger does not contest that MRPC 3.5(c) and MRPC 6.5(a) were in fact violated if the questions he has raised on appeal are decided unfavorably to him, given our answers to these questions, he must now be viewed as having violated both rules.

_____

[32] Indeed, we believe that even a casual observer of Michigan government will not fail to recognize that there have been many full-throated and aggressive comments made in recent years by some members of the State Bar of Michigan concerning the performance of the courts of this state, including this Court.

[33] Justice Kelly inexplicably suggests that under our opinion, the "mere utterance of dissatisfaction could subject an attorney to harmful sanctions." *Post* at 26.  This is entirely baseless, as we have clearly indicated that judge's are not beyond criticism.

We close by quoting the following remarks of the Ohio Supreme Court nearly a century ago when faced with the same duty to deal with a misbehaving lawyer as we are today:

> When a man enters upon a campaign of vilification he takes his fate into his own hands and must expect to be held to answer for the abuse of the privilege extended to him by the constitution. An attorney of more than twenty years' standing at the bar must be presumed to know the difference between respectful, fair and candid criticism, and scandalous abuse of the courts which gave him the high privilege, not as a matter of right, to be a priest at the altar of justice. [*In re Thatcher,* 80 Ohio St 492, 669; 89 NE 39 (1909).]

It is for all these reasons that we conclude that Mr. Fieger's vulgar and crude attacks on three members of our Court of Appeals were not constitutionally protected and that he is subject to professional discipline for having made them.

## VII. Response to Justice Kelly's and Justice Cavanagh's Dissents

In their repudiation of "courtesy" and "civility" rules, the dissents would usher an entirely new legal culture into this state, a Hobbesian legal culture, the repulsiveness of which is only dimly limned by the offensive conduct that we see in this case. It is a legal culture in which, in a state such as Michigan with judicial elections, there would be a permanent political campaign for the bench, pitting lawyers against the judges of whom they disapprove. It is a legal culture in which rational and logical discourse would come increasingly to be replaced by epithets and coarse behavior, in which a profession that is already marked by

declining standards of behavior would be subject to further erosion, and in which

public regard for the system of law would inevitably be diminished over time.[34]

By allowing a lawyer to say anything short of libel under *New York Times v Sullivan,* the position of the dissents would also necessarily and inevitably require that judges—persons who are periodically subject to popular reelection under our Constitution—be allowed to engage in the same kind of "free speech" to which attorneys are entitled—if only for the purposes of electoral self-defense.[35] Further, such a required loosening of the canons of judicial conduct would also likely have other lamentable effects that could quickly jeopardize even the freedom of speech lawyers currently enjoy. It is hard to imagine the lawyer who would want to test the proposition of how much effect a judge's

---

[34] Given the position advanced by the dissenting justices in this case and in *Maldonado v Ford Motor Co,* 476 Mich ___; ___ NW2d ___ (Docket No. 126274, decided July 31, 2006), one wonders whether the dissenting justices would simply surrender the legal process to the least-restrained and worst-behaved members of the bar. With increasingly little need to adhere to the rules necessary to ensure public confidence in the integrity of the legal process, the dissenters would create a world in which legal questions come increasingly to be decided, not by a fair and rational search for truth, but by bullying and uncivil behavior, personal abuse, one-upmanship, and public exhibitionism on the part of those who are custodians of this system, the bar. Justice under the law cannot flourish within such a system.

[35] For a glimpse into the likely future, see Ill Sup Ct R 67, which provides:

(3) A candidate for a judicial office:

\* \* \*

(e) may respond to personal attacks or attacks on the candidate's record as long as the response does not violate subsection A(3)(d).

34

retaliatory comment adverting to the lawyer's lack of competence, character, or the like would have on the lawyer's practice. Thus, the newly given lawyer right of speech the dissent would recognize would perversely conduce to a situation where lawyers would be silenced. While surely all would hope judges would not use this new opportunity to intimidate the bar, the history of how authority is eventually used by those empowered is not encouraging. The dissents accord virtually no consideration to these ramifications of their position. To the majority, however, such consequences are of grave concern.

## VIII. Conclusion

For the reasons set forth in this opinion, we reverse the opinion and order of the ADB and remand to the ADB for entry of the agreed-to order of reprimand.

> Clifford W. Taylor
> Maura D. Corrigan
> Robert P. Young, Jr.
> Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

GRIEVANCE ADMINISTRATOR,

      Petitioner-Appellant,

v                                       No. 127547

GEOFFREY N. FIEGER,

      Respondent-Appellee.

_____

TAYLOR, C. J., and CORRIGAN, YOUNG, and MARKMAN, JJ.

      With her dissent, Justice Weaver completes a transformation begun five years ago, when all six of her colleagues voted not to renew her tenure as Chief Justice of this Court. This transformation is based neither on principle nor on "independent" views, but is rooted in personal resentment. This transformation culminates today in irresponsible and false charges that four of her colleagues are "bias[ed] and prejudice[d]" against attorney Geoffrey Fieger and therefore must be disqualified from hearing his cases—a call that Justice Weaver, who has received Mr. Fieger's political support, seems to believe that she is uniquely privileged to make. See *post* at 1. But just as troubling, Justice Weaver's personal agenda causes her to advance arguments—adopted wholesale from Mr. Fieger's past disqualification motions—that would lead to nonsensical results, affecting every judge in Michigan and throwing the justice system into chaos. We have addressed these arguments on a number of occasions, but we do so again here in light of Justice Weaver's unwarranted accusations.

In essence, Justice Weaver would create an environment within this state that would affect every judge and that would prove utterly untenable. A judge could run for election, but could not campaign. A judge could be sued, but could not defend himself or herself. A judge could witness misconduct, but could not report it. Judges could be removed from cases at the option of attorneys and litigants, who could instigate public attacks and lawsuits against judges to force their disqualification. Judges would be intimidated, subtly and not so subtly, from carrying out their constitutionally ordained duties.

In Justice Weaver's view, only justices who have received Mr. Fieger's support—as she has—can decide whether Mr. Fieger's public statements (suggesting the sodomization of judges who rule against his client and characterizing such judges as "assholes") violate Michigan's standards of attorney conduct. Judges who have been the object of his opposition would not be allowed to participate. It is interesting that Justice Weaver largely grounds her arguments of "bias and prejudice" in statements that occurred between six and ten years ago. And, until very late in the process of handling this case, Justice Weaver—who was well aware of these statements through prior disqualification motions from Mr. Fieger—did not take the position that those statements required our disqualification. One can measure the sincerity of Justice Weaver's accusations today by her own conduct in this case. She claims today that she was compelled to publish her belief that our bias disqualifies us to participate in this case because Mr. Fieger is a "party." But Mr. Fieger has always been a party in this case.

2

Moreover, in two sets of disqualification motions filed by Mr. Fieger in this case, not once did Justice Weaver ever state in the statements she filed in response to those motions that we were disqualified from participating in this case. As late as last month, when Mr. Fieger's last motion to disqualify was rejected, Justice Weaver declined to participate and failed to state that any of the Fieger accusations she now adopts compelled our disqualification. See *Grievance Administrator v Fieger*, 475 Mich 1211 (2006). Nothing has changed since June 1, 2006.

It is deeply troubling that a member of this Court would undertake so gratuitously, and so falsely, to impugn her colleagues. This is a sad day in this Court's history, for Justice Weaver inflicts damage not only on her colleagues, but also on this Court as an institution. However, we do not intend to be deterred by false accusations from carrying out our constitutional duty to hear cases, including those in which Mr. Fieger is involved, and to decide these cases fairly and evenhandedly, as we have always done in the past. In particular, we invite public scrutiny of this Court's record in cases in which Mr. Fieger, personally, and his clients have been involved.

In making her charges of "bias and prejudice" Justice Weaver essentially adopts verbatim arguments made by Mr. Fieger in various disqualification motions that each of us has already considered and rejected. However, in light of Justice Weaver's unwarranted characterization of our positions, we explain here why we did so.

3

## I. STATEMENTS CONCERNING MR. FIEGER

Justice Weaver first focuses on statements made during the campaigns of three of us in 2000. (It is puzzling that Justice Weaver has never before cited these statements as a basis for our disqualification, given that Mr. Fieger has repeatedly cited the same statements in earlier disqualification motions that he has brought since 2000.) None of these statements properly serves as a basis for disqualifying any of us; indeed, such statements merely reflect the reality of Michigan's constitutionally mandated system of democratically electing its judiciary.

Under our Constitution, candidates for the Supreme Court are nominated at party conventions and run for election. Const 1963, art 6, § 2. In 1998, Mr. Fieger ran for Governor of Michigan on the Democrat ticket. As such, in 2000, he was the most visible member and the titular head of the Michigan Democrat Party, which was then channeling millions of dollars in opposition to our election campaigns. Mr. Fieger was outspoken, particularly about his views of our state's legal and judicial systems, and his statements received a great deal of exposure through both the media and opposition campaign communications. In addition, Mr. Fieger himself contributed substantial amounts of money in opposition to our campaigns while also being highly vocal in his political opposition.

These were Mr. Fieger's prerogatives. Yet under Justice Weaver's analysis, neither we nor our supporters could exercise our own prerogatives to ever mention these facts in our campaigns. That is, despite our individual

4

judgments that references by our campaigns to Mr. Fieger's opposition would assist the public in understanding our judicial positions, and would effectively contrast these positions with those of the candidates running against us, Justice Weaver would preclude judicial candidates from communicating truthful statements to the public. In her view, statements concerning the identity of political opposition could never be uttered lest a judicial candidate be forever precluded from hearing cases involving such persons. The public would not benefit by having less, rather than more, information about a judicial candidate. A highly visible and outspoken public figure, who is an integral part of the political opposition to a judicial candidate, cannot be insulated from mention, or even criticism, in a judicial campaign because he also happens to be a lawyer. Yet this follows if every such mention, or criticism, of political opposition requires judicial disqualification. Even more troubling, Justice Weaver's approach to disqualification would sharply skew the campaign process. Her approach would silence judicial candidates criticized by those with regular contact with the legal system—e.g., lawyers—while permitting forceful responses from judicial candidates whose opposition comes from different quarters. Justice Weaver would tie the hands of some—but only some—judicial candidates in defining themselves and in characterizing their judicial philosophies, not only to the detriment of those candidates, but to the detriment of the public's ability to intelligently distinguish between candidates for judicial office.

5

In perhaps her most troubling premise, Justice Weaver suggests that a judicial candidate is biased with regard to individuals or organizations identified as *opposing* his or her candidacy. Yet Justice Weaver fails to recognize that the reverse would then also be true. Would not a judicial candidate who has received the public support or endorsement of an individual or organization be, by the same token, "biased or prejudiced" in favor of those parties? "Bias or prejudice" is not a one-way street. "Bias or prejudice" can be shown either in favor of or in opposition to an individual or organization. Judges in this state (including each of the justices of this Court) who have run for election have sought, and garnered, support from individuals and organizations, both in the form of financial assistance and endorsements. Examples of those who have offered support include labor unions, businesses and business organizations, lawyer organizations, trade associations, interest groups, prominent citizens, political leaders, and the like. Moreover, judges in this state (including, again, each of the justices on this Court) have routinely communicated such support through campaign advertising, public speeches, newspaper interviews, and fund-raising efforts.[1]

---

[1] There is no reason why the *absence* of support or opposition cannot also be viewed as triggering respectively negative or affirmative "biases or prejudices." Surely, for example, if support or opposition from some person or organization that has traditionally been directed toward a candidate nominated by one political party does not occur in a particular instance, there is no reason why such a candidate could not, under Justice Weaver's analysis, be viewed as "biased or prejudiced."

6

Indeed, to apply her own rule to herself, Justice Weaver would certainly be precluded from participation in the instant case in light of the fact that she received financial contributions—the most compelling form of all endorsements—from Mr. Fieger in her most recent campaign. [2]

In short, Justice Weaver's position has far-reaching implications for judicial selection in Michigan, which the people of this state, through their Constitution, have placed into the political process. None could contest—and tellingly, Justice Weaver herself does not contend—that any of the statements she cites in support of her allegation that we are "bias[ed] and prejudice[d]" was untrue. It shows no inherent "bias or prejudice" to point out Mr. Fieger's opposition. Similarly, it shows no "bias or prejudice" to identify the number of cases Mr. Fieger had on appeal at the time as a possible explanation for his interest in who sat on this Court. Such reference states no animus toward him, but only suggests the obvious: that Mr. Fieger is supporting and opposing candidates at least in part because he wants judges who will be most philosophically predisposed toward his

---

[2] Justice Weaver dismisses Mr. Fieger's $400 contribution as "the only 'support' that Mr. Fieger gave my campaign committee," *post* at 18, as if somehow a financial contribution does not constitute *real* support for a judicial candidate. Moreover, a financial contribution has meaning beyond the dollar amount. It expresses, in a very public and concrete way, the contributor's confidence in the candidate and legitimizes the candidate within the area of the contributor's influence; that expression of confidence becomes all the more meaningful when the contributor enjoys a certain stature or is emblematic of some point of view. Precisely because of these considerations, Mr. Fieger's support of Justice Weaver, and her acceptance and public announcement of that contribution, communicates far more than simply the dollar amount of the contribution.

7

cases.  These statements, in our judgment, as well as identifying whom Mr. Fieger supported and whom he opposed, were a reasonable way of explaining his active participation in our campaigns and drawing relevant and comprehensible distinctions between us and our opponents.  In this regard, the United States Supreme Court has observed:

> [O]pposition [to judicial elections] may be well taken (it certainly had the support of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about. "The greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance.  If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." [*Republican Party of Minnesota v White*, 536 US 765, 787-788; 122 S Ct 2528; 153 L Ed 2d 694 (2002).]

In Michigan, and in other states with an elected judiciary and  competitive and well-financed judicial campaigns, statements of the sort referenced by Mr. Fieger and Justice Weaver must be permissible to help the people make informed choices among judicial candidates of differing philosophies.

The statements that were made in 2000 were accurate, relevant, and, we believe, entirely fair commentary on aspects of that year's judicial election.  As was noted in *Adair v Michigan*, 474 Mich 1027, 1042 (2006) (statement by Taylor, C.J., and Markman, J.), if a judge does that which the law and the standards of conduct permit, such action cannot ordinarily serve as the basis for

8

disqualification.  To hold otherwise would be to make the law into a "snare" for those who are operating well within its boundaries.

There is nothing in these statements made in 2000 that would suggest that Mr. Fieger cannot obtain a fair hearing in our courtroom.  We believe that this is underscored by this Court's treatment of cases in which Mr. Fieger was counsel, as well as cases in which he was a party himself, over the past seven years.  We are content to maintain Michigan law as it has always been;  a judge is not automatically disqualified from hearing a case involving those who have been either the judge's campaign supporters or opponents.

## II. "ENMESHMENT" WITH MR. FIEGER

Justice Weaver next focuses on the lawsuits that Mr. Fieger has filed against us as justices of this Court.  Here, Justice Weaver again essentially adopts verbatim Mr. Fieger's novel theory that a judge becomes "enmeshed" with one who sues him and that, as a result, that judge necessarily must be tempted to "vent his spleen" against the person.  Under Justice Weaver's reasoning, a judge becomes "enmeshed" at the sole option of the person who sues the judge.  As one of us recently wrote in response to Mr. Fieger's  "enmeshment" argument:

> [Such "enmeshment" exists] only because [Mr. Fieger] by his own actions, specifically by initiating a series of federal lawsuits against me and other Justices of this Court, has so "enmeshed" me. It cannot be that a judge can be required to disqualify himself or herself simply on the basis of such lawsuits. *Grace v Leitman*, 474 Mich 1081 (2006); *People v Bero*, 168 Mich App 545, 552 [425 NW2d 138] (1988).  To allow [Mr. Fieger's] lawsuits to constitute a basis for my disqualification because I have thereby become "enmeshed" with him would simply be to incentivize such lawsuits

9

on the part of any attorney or litigant desirous of excluding a disfavored judge from participation in his or her case. [*Grievance Administrator v Fieger*, 475 Mich 1211, 1212 (2006) (statement by Markman, J.).]

Moreover, Justice Weaver's argument that a judge cannot defend himself or herself against a frivolous lawsuit, or attempt to deter future frivolous lawsuits, by seeking sanctions when such lawsuits are brought would merely encourage frivolous lawsuits against judges. Indeed, if anyone can force a judge's disqualification merely by suing that judge, then any litigant would have an easy method of judge-shopping, eliminating disfavored judges until the desired judge has been obtained. The destructive effect of such a rule is too obvious to require further elaboration.

In the same "enmeshment" vein, Justice Weaver cites several occasions on which Mr. Fieger has called us names or impugned us (e.g., "stupid," never "practiced law," has a "political agenda"), and again asserts that this has predisposed us against him. Again, Justice Weaver's reasoning makes disqualification available at the instigator's sole option. But, it is clearly the law that a lawyer cannot precipitate a basis for disqualification by being a provocateur. *People v Bero*, *supra* at 552. As one of us wrote earlier in response to Mr. Fieger when he originally raised this same argument:

> [Mr. Fieger] argues that I have been a "target of personal abuse" from him and cannot be fair toward him. Whatever "abuse" respondent may or may not have directed toward me, I have never once called into question the propriety of his conduct. I have never questioned his right to direct any public criticism toward me or to undertake any financial contributions against me in the course of my

10

campaigns for judicial office.  Once again, it cannot be that a judge can be required to disqualify himself or herself on the basis of "abuse" that he has allegedly received from an attorney or litigant. To allow such conduct to constitute a basis for my disqualification would again simply be to incentivize such conduct on the part of any attorney or litigant desirous of excluding a disfavored judge from participation in his or her case.  [*Grievance Administrator v Fieger, supra* at 1212 (statement by Markman, J.).]

It may sometimes be the case that, under circumstances such as these, a judge must conclude that he or she cannot decide a matter impartially.  But, for the first 169 years of this Court's existence, that decision has always belonged to the justice alone.

## III. LETTER REFERENCING MR. FIEGER

Justice Weaver next focuses on a statement from a fund-raising letter, sent by former Michigan Governor John Engler, that mentions Mr. Fieger's name.[3]

---

[3] The complete letter is as follows:

One of my proudest legacies as Governor was having the honor of first appointing, then supporting jurists like Justice Maura Corrigan.  Justice Corrigan has worked to recast the Michigan Supreme Court into a nationally recognized court.  Today, the MSC is one of the most important voices of judicial restraint and limited government.  So esteemed is Justice Corrigan that she has twice been on President Bush's short list for the U.S. Supreme Court.

Justice Corrigan was elected to the Michigan Supreme Court in 1998 and served two terms as Chief Justice from 2001-2004.  This November, she is seeking reelection to another eight-year term. Justice Corrigan has proven unequivocally by her record that Michigan will benefit from her continuing service on our state's highest court.  We must work to retain our best and brightest.

In Michigan, we no longer have a Court where judges think that it is their prerogative to decide important policy questions.  The

(continued…)

However, far from showing any "bias or prejudice" on any judge's part, this letter again merely bespeaks the reality of our state's system of democratic judicial elections. In order for candidates for the Supreme Court to successfully run statewide campaigns for judicial office, their campaign committees must raise sufficient funds to pay for campaign advertising and other campaign costs.

Indeed, as this letter indicates, the need for such funds has recently become substantially more intense. Judicial campaigns have become considerably more expensive as an increasing range of interest organizations have come to participate

_____

(…continued)

> majority on the Court understands the constitutional role of the judiciary.
>
> Naturally, judicial activists in Michigan have been unhappy with our Supreme Court. They had grown accustomed to winning court rulings that they couldn't achieve through the democratic and representative process of government. Every time there is a state Supreme Court election, these activists are on the prowl, seeking to restore those good old days. This year will be no exception! We cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11[th] hour sneak attack.
>
> I believe our Michigan Supreme Court is truly exceptional. We simply cannot risk a return to the days of legislating from the Bench. The court needs to keep Justice Corrigan, a proven, experienced, and thoughtful jurist. In the past you have contributed to the Supreme Court race. I ask that you consider making a similar contribution or as much of the maximum amount allowed by law for any individual which is $3,400. Please show your support by sending your contribution today.
>
> Your help in returning Justice Maura Corrigan to the Michigan Supreme Court will protect the growing reputation of Michigan's highest court.

in these campaigns, "independent opposition" campaigns have emerged, and substantial last-minute infusions of opposition campaign spending have appeared, on one occasion on an anonymous basis.[4]  In 2004, Mr. Fieger, by his own later admission in October 2005, orchestrated just such an anonymous campaign days before the election, spending $460,000 on opposition advertising.  Raising money to address such efforts is a new and critical focus of contemporary judicial campaigns.  The potential for significant, and well-funded, opposition requires fund-raising to offset the high costs of responding.  That a fund-raising letter from a supporter cites these relevant historical facts in order to make more persuasive a plea for campaign contributions does not prevent a judge from faithfully performing his or her sworn duties.

## IV. REFERRAL OF MR. FIEGER

Justice Weaver next cites the fact that one of us referred Mr. Fieger to the Attorney Grievance Commission in 1996.  In essence, she faults that justice for complying with attorney ethics rules.  The Michigan Rules of Professional Conduct provide that:

> A lawyer having knowledge that another lawyer has committed a significant violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty,

---

[4] Moreover, the fact that Mr. Fieger would wish to maintain his anonymity by failing to report a contribution, as occurred in the 2004 campaign, may suggest precisely why those who are the targets of his contributions would wish, as occurred during 2000, to identify Mr. Fieger as a contributor to their opponents.

trustworthiness, or fitness as a lawyer *shall* inform the Attorney Grievance Commission.  [MRPC 8.3(a) (emphasis added).]

In other words, a judge is obligated to inform the Attorney Grievance Commission about an attorney's perceived misconduct; to fail to do so is to violate an explicit ethics rule.  This rule does not distinguish between a judge who observes the alleged misconduct and a judge who is the object of it.  But, under Justice Weaver's reasoning, a judge must either turn a blind eye to attorney misconduct or risk disqualification.  This simply cannot be.  On the contrary, a judge who meets his or her ethical obligation to report attorney misconduct is not thereby assumed to be biased or unable to review impartially cases that come before him or her.[5]

Additionally, our Court—usually with Justice Weaver's participation—has at times directed our clerk of court to refer attorneys to the Attorney Grievance Commission and judges to the Judicial Tenure Commission for investigation.  No one has ever suggested that this practice, necessary when attorney or judicial conduct warrants further inquiry, bars justices from later considering either those

---

[5] Moreover, even if, for the sake of argument, an Attorney Grievance Commission referral may have required a judge's disqualification at some point in time—which we emphatically believe it does not—the thread running through Mr. Fieger's (and Justice Weaver's) analyses is that, once a judge has ever done something that may require his or her disqualification—utter a remark six years ago about a lawyer, refer a lawyer ten years ago to a disciplinary body—this effectively imposes a lifetime disability on that judge.  This is manifestly incorrect.  The proper inquiry is not whether a judge, *at some point in time* may have been unable to consider a person's case impartially, but whether the judge is *presently* unable to do so.

cases or other cases involving these attorneys or judges. By Justice Weaver's logic, because the mere act of referral displays actual bias, justices could never again sit whenever an attorney's or a judge's prior act had warranted a referral for investigation.

## V. FURTHER OBSERVATIONS

(1) Justice Weaver, until late in the consideration of this case, did not mention what she now cites as evidence of our actual "bias and prejudice," statements made during the 2000 campaign. Six years have passed, during which none of us has made any additional statements concerning Mr. Fieger, and during which Mr. Fieger has filed numerous disqualification motions in which he has referenced the same campaign statements from 2000.

(2) In concluding that we have actual "bias and prejudice" toward Mr. Fieger, Justice Weaver not only professes to read our minds, but intimates that she does so on the basis of access to information not generally available to the public. Neither is true.

(3) Justice Weaver here departs from her previous practice in which, in numerous cases, she adhered to exactly the rule the majority is maintaining—that a justice resolves his or her own disqualification. In fact, as Justice Weaver conceded in *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91, 96 n 1; 693 NW2d 358 (2005) (Weaver, J., *concurring*), she herself has elected not to participate in cases 251 times—a determination reached on each occasion without the participation of any other justice. As recently as June 1,

15

2006, she declined to decide Mr. Fieger's motions for disqualification directed at us in this case, deferring instead to our determinations as the justices targeted by these motions. *Grievance Administrator v Fieger,* 475 Mich 1211 (2006) (statement by Weaver, J.). Without explanation, she now abandons all her previous practices on this Court and asserts that she may participate in deciding disqualification motions directed at other justice, at her sole discretion.[6] (It is also noteworthy that Justice Weaver's particularized concerns about Mr. Fieger's disqualification motions began only after Mr. Fieger ceased targeting *her* with these motions.)

(4) Justice Weaver's concerns about alleged "bias and prejudice," grounded in large part on statements made in 2000 and a referral to the Attorney Grievance Commission made in 1996—neither of which has ever before been a concern of hers—is of a kind with other newfound concerns: (a) after 31 years on the bench, and, not surprisingly, never having uttered a word in favor of judicial term limits, and with the four of us having become a philosophical majority on the Court, Justice Weaver, after announcing her intention to resign, suddenly announces her

---

[6] Moreover, when, on rare occasion, Justice Weaver herself has been the object of a disqualification motion, as in *Graves v Warner Bros,* 469 Mich 853, 854 (2003), she has been comfortable to conclude, "I am neither biased nor prejudiced for or against any of the parties or their attorneys in this case, and plaintiff asserts no grounds supporting my recusal from participating in this appeal." Thus, as long as disqualification motions have been directed against her, Justice Weaver has been content to conform with the longstanding disqualification
(continued…)

16

intention to not resign, promising to use her position on this Court to garner legislative support for judicial term limits; (b) after 31 years on the bench, having never uttered a word concerning the disqualification procedures that this Court has followed since 1837, and with the four of us having become the exclusive subject of disqualification motions, overwhelmingly offered by Mr. Fieger, Justice Weaver has suddenly become a champion of altering disqualification procedures to make it easier to disqualify a justice for frivolous or political reasons; and (c) after 31 years on the bench, never having uttered a word about court rules that specify when judges may participate in cases involving parties that employ relatives, Justice Weaver suddenly demands a new standard applicable to a select group of her colleagues.

## VI. CONCLUSION

Each of us during our judicial service has sought to follow the highest standards of ethics and professionalism. We have sought to give faithful meaning to the law, to decide disputes fairly and impartially, and to approach each case without bias or prejudice. We are each proud of our records on this Court and, as long as we serve, are committed to conferring on every attorney and every litigant—Mr. Fieger not excepted—equal and evenhanded treatment under the law. And that is exactly what we have done in this case. A judge need not admire

---

(…continued)
practices of justices of this Court. When, however, such motions are directed toward other justices, she now advocates that her own involvement is required.

17

an individual, or respect his or her actions, in order to be able to accord the individual that which every party before this Court deserves—equal justice under law. We have looked into ourselves, as we must do whenever there is a motion for disqualification, and indeed even sometimes when there is not, and each of us has concluded that he or she is able to accord fair and impartial treatment to Mr. Fieger in this case. We believe that our individual records over the past eight years in addressing cases concerning Mr. Fieger personally, as well as his clients, clearly demonstrate this commitment.

The people of Michigan deserve better than they have gotten from Justice Weaver today, and so do we, her colleagues.

<div style="text-align: right">

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

</div>

STATE OF MICHIGAN

SUPREME COURT

GRIEVANCE ADMINISTRATOR,

      Petitioner-Appellant,

v                                      No. 127547

GEOFFREY N. FIEGER,

      Respondent-Appellee.

_____

CAVANAGH, J. (*dissenting*).

As the Attorney Discipline Board (ADB) has before explained, indeed, in the context of offensive remarks made by this very respondent,

> [f]ew if any members of the Michigan judiciary will be cowed by such outbursts. . . . [O]ur system of justice is not put at risk if these statements are not censored. The public and the profession can express their revulsion at such crudity, while at the same time feeling pride in belonging to a society that allows its expression. If we write rules governing speech to quell such antics, then we will have truly lost our bearings. The judiciary is not so fragile. It is the First Amendment that needs protection. [*Grievance Administrator v Fieger*, ADB No. 94-186-GA, opinion issued September 2, 1997 (*Fieger II*).]

Such protection has been lost today. The majority not only decides a question not before it, but, more troubling, its erroneous conclusions mark a sweeping expansion of the Michigan Rules of Professional Conduct. This expansion precipitates serious constitutional implications and, despite the majority's protestations to the contrary, does in fact impermissibly exalt the

protection of judges' feelings over the sanctity of the First Amendment's guarantee of freedom of speech. Thus, I respectfully dissent.

## I. The ADB Did Not Declare the Relevant Rules of Professional Conduct Unconstitutional, So the Issue Is Not Ripe For Review

Although this Court granted leave to consider whether the ADB can declare a rule of professional conduct unconstitutional, that issue is not ripe for review because the ADB did not declare a rule unconstitutional, a majority of the ADB did not opine that it had the authority to do so, and the ADB's dismissal of the complaint against respondent was not premised on the purported unconstitutionality of a rule. Thus, the majority errs in addressing this question.

In deciding respondent's appeal, the ADB issued a splintered opinion. Three of the eight participating board members wrote that respondent's conduct did not fall within the cited rules of professional conduct because the comments were not made "to" or "in" the tribunal. Framing it as an alternative basis for its holding, the lead opinion reasoned that the rules should be read narrowly to avoid constitutional problems. The lead opinion stated that even if remarks made outside the context of a pending case were actionable, the rules did not sufficiently inform a person "what statements might be deemed impermissibly discourteous or disrespectful by the Attorney Grievance Commission, or by a hearing panel, or this Board."

Two members concurred in part and dissented in part. They wrote that the rules did encompass respondent's statements, but the First Amendment protected

2

his right to make those statements. The three remaining members dissented, opining that the rules were constitutional and that respondent violated them.

Thus, there is no need to answer the question into which the majority delves because the ADB neither declared the rules unconstitutional nor purported authority to do so. Rather, the ADB's lead opinion first held that the rules did not cover respondent's comments. Only then did it mention the constitutional aspects of the rules, but instead of declaring the rules unconstitutional, it merely held that because of the constitutional principles of free speech, the rules should be read narrowly. It then concluded that under a narrow reading, respondent's comments did not violate the rules. Of course, this view did not garner a majority, and respondent was only vindicated because two of the five remaining board members believed that respondent's comments were protected by the First Amendment. But the true disagreement between those two factions was over whether respondent's conduct was even covered by the rules, not over whether the rules themselves were unconstitutional.[1] In other words, the rules survived the ADB's decision—the board did not purport to invalidate them. As such, any opinion by this Court regarding the ADB's power to declare rules of professional

---

[1] According to the majority, this is "tantamount" to declaring the rules unconstitutional. *Ante* at 6 n 6. This is a bizarre notion to say the least. A holding that the Constitution prohibits the board from punishing this respondent's conduct is, of course, in no way an excoriation of the *rules*. Rather, the board simply found that the rules, interpreted in light of constitutional principles, could not be applied to this respondent's *conduct*. The majority takes a severely contorted view of the ADB's opinions to justify reaching this issue and, by doing so, troublesomely dilutes the doctrine of ripeness.

conduct unconstitutional is purely advisory in nature and outside the bounds of our constitutionally imposed duty.

Nonetheless, because the majority persists in issuing its statement on this matter, it is necessary to illuminate the error in the majority's analysis, which analysis asserts that the ADB lacks the authority to render a rule unconstitutional. In carrying out our duty to regulate the legal profession in the state of Michigan, see Const 1963, art 6, § 5 and MCL 600.904, we created a governing body that operates as a court system reserved for attorney disciplinary matters, and which mirrors the ordinary trial and appellate system. See MCR 9.101 *et seq.* The attorney discipline system consists of a prosecutorial component (the Attorney Grievance Commission [AGC]), MCR 9.108; hearing panels composed of members who act as judges by conducting public, trial-like proceedings during which they receive evidence and after which they render any necessary discipline, MCR 9.111; and a review board (the ADB), which fulfills the judge-like appellate function should an attorney dispute a disciplinary order of a hearing panel, MCR 9.110.

Notably, MCR 9.110(A) describes the authority we bestowed on the ADB as follows: "The Attorney Discipline Board is the adjudicative arm of the Supreme Court for *discharge of its exclusive constitutional responsibility to supervise and discipline Michigan attorneys*." (Emphasis added.) The ADB is further charged with disciplining attorneys, MCR 9.110(E)(5), suspending and

4

disbarring attorneys, MCR 9.110(E)(6), and reviewing the AGC's final orders of discipline, MCR 9.110(E)(4).

It is indisputable, as Justice Kelly points out, that this Court is vested with authority to declare enactments unconstitutional. And it appears from the plain language of the court rule that we have delegated this power to the ADB. When we charged the AGC with "discharg[ing our] constitutional responsibility," we listed no restrictions in this delegation of power. And, importantly, it seems that had we intended to limit the delegation accordingly, we would have explicitly reserved that power unto ourselves when we undertook the task of delegating our constitutional power to another entity, which task was certainly not taken lightly.

Further, it makes little sense to charge the disciplinary board with carrying out this Court's duties and requiring it to discipline attorneys, reinstate them, and review final orders of discipline and dismissal in an appellate function without the benefit of deciding constitutional issues raised in that process. We have certainly not restricted trial or appellate courts from declaring enactments unconstitutional, and such rulings are always subject to this Court's review, just as are decisions regarding attorney discipline. Moreover, the fact that we created the attorney disciplinary rules or that there are nonattorneys on the ADB is of no moment—this Court remains the final authority on any action the ADB takes, and we can overturn any of its decisions we perceive as erroneous.

In carrying out its duties, and to render a just and complete decision, it is only logical that the ADB consider any and all arguments an attorney raises in his

5

or her defense. And constitutional issues will inevitably be raised during the attorney disciplinary process. Petitioner's assertion that the board can *consider* constitutional principles in its decision-making process, but is nonetheless restricted from finding a rule unconstitutional, is an odd one indeed. This would require our adjudicative arm, to which we gave full charge, to consider only half the question. This Court simply did not restrict the ADB in that way.

In any event, as already discussed, the board did not declare any rule unconstitutional. Rather, it merely considered the constitutional issues respondent raised and construed the rules narrowly in light of those principles, an exercise that the Grievance Administrator acknowledges is permitted. As the Sixth Circuit Court of Appeals has observed:

> Even if the Board could not declare a Rule of Professional Conduct unconstitutional—a proposition about which we are not convinced—"it would seem an unusual doctrine, and one not supported by the cited case[s], to say that the [Board] could not construe [the Rules of Professional Conduct] in the light of federal constitutional principles." *Ohio Civil Rights Comm'n v. Dayton Christian Sch.*, 477 U.S. 619, 629, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). The Board could, short of declaring a Rule unconstitutional, refuse to enforce it or, perhaps, narrowly construe it. [*Fieger v Thomas*, 74 F3d 740, 747 (CA 6, 1996).]

Thus, the ADB's actions were within its authority.

Moreover, for the reasons explained by Justice Kelly, the majority's reliance on *Wikman v Novi*, 413 Mich 617; 322 NW2d 103 (1982), *Lewis v Michigan*, 464 Mich 781; 629 NW2d 868 (2001), and Const 1963, art 3, § 2 are entirely misplaced because none of those authorities compels the majority's result.

6

Although, again, the question is not ripe, the majority errs in finding a restriction on the Court's power to delegate constitutional power and in holding that the ADB cannot declare a rule of professional conduct unconstitutional. The majority proffers no persuasive authority to justify its holding. Rather, considering that this Court created the ADB, delegated to it the power to carry out our duty of maintaining discipline in the legal profession, and did not otherwise restrict its authority, it should logically follow that the ADB can both consider constitutional questions and declare a rule of professional conduct unconstitutional.

## II. Respondent's Speech Did Not Violate the Rules of Professional Conduct Under Which He Was Charged

The lead opinion of the ADB correctly concluded that respondent's public, out-of-court comments, made after the conclusion of the case about which he spoke, did not violate either Rule 3.5(c) or 6.5(a) of the Michigan Rules of Professional Conduct. The rules alleged to be violated simply do not prohibit the type of speech at issue in this case. The majority's conclusions to the contrary are reached haphazardly and without any regard for the plain language, history, or context of the rules. In a melodramatic fashion, the majority misrepresents respondent as arguing that "there can be no courtesy or civility rules at all of this sort," *ante* at 8, and the dissents as arguing for a "repudiation of 'courtesy' and 'civility' rules," *ante* at 33. Further, the majority loftily declares that the "respect for the wisdom of those who have preceded us in the judiciary in this country and the traditions of the legal process counsel that *narrow and carefully tailored*

7

*regulations* of the sort set forth in MRPC 3.5(c) and MRPC 6.5(a) are necessary adjuncts to a responsible legal system," *ante* at 9 (emphasis added), but then proceeds to interpret these rules with a brush so broad as to now encompass *any offensive language used to criticize a judge*. The majority's troublesome expansion of those rules impermissibly silences harsh criticism of the judiciary about a concluded case, thus invading the purview of the First Amendment's guarantee of the right to speak freely.

A. Respondent Did Not Violate MRPC 3.5(c) Because His Comments Were Not Made "Toward The Tribunal"

MRPC 3.5(c) restrains attorneys from "engag[ing] in undignified or discourteous conduct toward the tribunal." At the core of the arguments here is the interpretation of the phrase "toward the tribunal." As is evident from the context of this rule, its historical evolution, and its plain language, this phrase pertains only to conduct that occurs in a tribunal or in the immediate environs of a tribunal, such as in judicial chambers.[2] Because respondent did not make his comments in that setting, but, rather, made them during a radio broadcast, he did not violate the rule.

While respondent does not appear to argue that his comments were particularly dignified or courteous, the crux of this rule is to prevent such

---

[2] A Texas court's description is also useful. There, contemptuous behavior is not permitted "in open court, or at least while the court was actively pursuing the business of dispensing justice in its immediate environs." *In re Bell*, 894 SW2d 119, 130 (Tex Spec Ct Rev, 1995).

8

comments in or in the immediate environs of a tribunal, *not at any time or in any space*. In other words, conduct in or near a courtroom, such as conduct in judicial chambers or possibly comments made in pleadings filed with the court can be said to be conduct "toward" the tribunal. The majority's removal of the proximate element of this rule does indeed result in "protecting the sensitivities of judges," *ante* at 9, while at the same time raising grave constitutional implications by restricting a lawyer's ability to speak *outside* the context of a judicial proceeding.[3] See part III of this opinion. Further, contrary to the majority's assertion otherwise, such a broad expansion of the rule can and will preclude criticism of the "most robust character," *ante* at 13, because it will prohibit attorneys from commenting on legal proceedings of which they have been a part. Notwithstanding the indisputable ability of this Court to prescribe ethical and disciplinary rules, see *ante* at 7-13, the majority's myopic focus on what we are permitted to do in the abstract eclipses the more critical question whether this particular ethics rule was crafted to apply to this particular conduct.

---

[3] Out of the multiple entries under "toward" in a dictionary, the majority selects the two definitions that it perceives as useful to its conclusion. This ignores, first, that there are other definitions of "toward" that do not support its conclusion and, second, that there are a substantial number of other sources and considerations that assist us with determining the scope of the ethics rule at issue. Notably, the majority's analysis unhelpfully ends with its selective citation of the first and fourth entries under "toward." See *ante* at 18. Further, discriminating readers will recognize that the majority's choice to use the definition "in the direction of" to support its conclusion is nothing but a truly strained application.

MRPC 3.5(c) was designed, as is evident from the placement of the rule in the entire set of professional conduct rules, a historic examination of the rule, and the way the rule has been applied, to control the conduct of attorneys in their interactions with the tribunal in their role as advocates for clients, not the conduct or speech of attorneys far removed from the tribunal and the advocatory process. The Michigan Rules of Professional Conduct are divided into eight chapters, each with a descriptive title. Within those chapters, each rule also has a descriptive heading. Notably, Rule 3.5(c) appears in chapter 3, entitled "Advocate," and has a heading entitled "Impartiality and Decorum of the Tribunal."[4] This arrangement is but the first indication that the rules within chapter 3 are meant to govern attorneys in their active role as advocates and that the rules within the subsections of Rule 3.5 are directed toward behavior that affects the decorum of the forum involved, which in turn connotes a required nexus between the conduct and the actual forum.

In keeping with that theme, the other two subsections of Rule 3.5 prohibit an attorney from seeking to influence judges, jurors, prospective jurors, or other officials, MRPC 3.5(a), and prohibit ex parte communications, MRPC 3.5(b). And the remaining provisions in chapter 3 governing the attorney as advocate clearly pertain to an attorney's direct dealings with the court system and the

_____

[4] For comparison purposes, the remaining chapters are "Client-Lawyer Relationship," "Counselor," "Transactions With Persons Other Than Clients," "Law Firms and Associations," "Public Service," "Information About Legal Services," and "Maintaining the Integrity of the Profession."

dispensation of justice. Those rules are headed "Meritorious Claims and Contentions," "Expediting Litigation," "Candor Toward the Tribunal," "Fairness to Opposing Party and Counsel," "Trial Publicity," "Lawyer as Witness," "Special Responsibilities of a Prosecutor," and "Advocate in Nonadjudicative Proceedings." None of these rules, by its heading or its content, purports to govern conduct that is unrelated to a potential or ongoing proceeding before a tribunal.

Importantly, the rules appearing in other chapters of the Michigan Rules of Professional Conduct do govern the conduct of attorneys outside of a tribunal. Specifically, chapter 8, "Maintaining The Integrity of the Profession," contains two rules that are eminently more suited to curtailing the speech of attorneys outside the context of a legal proceeding than MRPC 3.5(c). For instance, MRPC 8.2(a) forbids an attorney from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicative officer, or public legal officer, or of a candidate for election or appointment to judicial or legal office." And MRPC 8.4, which sets forth the rules regarding "Misconduct," expressly forbids attorneys from engaging in behavior "that is prejudicial to the administration of justice[.]" MRPC 8.4(c). It would be difficult to say that the broad sweep of MRPC 8.2 and 8.4 does not extend to conduct that shares no physical nexus with a tribunal. In fact, instances too numerous to mention here exist in which an attorney who acted questionably *outside* the context of a tribunal was charged

11

with violating the rules of chapter 8, but, notably, not Rule 3.5(c). Clearly, then, comments about judges made outside the context of a tribunal are governed elsewhere in the rules, lending further credence to the conclusion that the more precise scope of Rule 3.5(c) encompasses only behavior in or in connection with a tribunal.

Moreover, the comment accompanying this rule sustains the conclusion that the rule is directed only toward conduct that occurs in the tribunal or in the immediate environment of a tribunal.[5] The comment on MRPC 3.5 states as follows:

> Many forms of improper influence upon a tribunal are proscribed by criminal law. Others are specified in the Michigan Code of Judicial Conduct, with which an advocate should be familiar. . . .
>
> The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

Clearly, this comment envisions conduct in the context of tribunal proceedings. The comment speaks of "improper[ly] influenc[ing a] tribunal," "present[ing] evidence and argument," deciding a case, "speak[ing] on behalf of

---

[5] The comments on the Michigan Rules of Professional Conduct were written by Supreme Court staff and are an "aid to the reader" in determining the
(continued…)

12

litigants," "stand[ing] firm against abuse by a judge," "present[ing] the cause," "protect[ing] the record for . . . review," and using patience in place of "belligerence" and "theatrics." Each of these phrases is clearly connected with tribunal behavior or behavior with respect to an ongoing proceeding (see Rule 3.5[a], which governs improper influence, and Rule 3.5[b], which prohibits ex parte communication), and the comment does not refer to, and cannot be interpreted to govern, attorney conduct that occurs outside the context of a tribunal proceeding or the tribunal itself.

Further, when interpreting MRPC 3.5(c), the rule's genesis, which can be traced to the American Bar Association's (ABA) former Model Code of Professional Responsibility Rule 7-106(C)(6), is also instructive. That rule, tellingly titled "Trial Conduct," provided that "[i]n appearing in his professional capacity before a tribunal, a lawyer shall not . . . [e]ngage in undignified or discourteous conduct which is degrading to a tribunal." Our former disciplinary rule, DR 7-106(C)(6), was identical. Subsequently, the ABA instituted its Model Rules of Professional Conduct, retaining the following concept from DR 7-106(C)(6): "A lawyer shall not . . . engage in conduct intended to disrupt a

_____

(…continued)
meaning of the rules. See *Grievance Administrator v Deutch*, 455 Mich 149, 164 n 15; 565 NW2d 369 (1997).

13

tribunal." ABA Model Rule 3.5(d).[6] We also replaced our former disciplinary code with rules of professional conduct, and our current MRPC 3.5(c) was fashioned from the new ABA rule as well as the corresponding former disciplinary rules. But despite minor wording changes to the rule, nothing about the current wording of the rule ("toward the tribunal") nor its placement within the rules (under the "Advocate" chapter) suggests any intent of this Court to broaden the scope of the rule to situations beyond the context of tribunal proceedings.

As Justice Kelly explains, the revisions to MRPC 3.5(c), which deviated from the ABA's revisions to its similar rule, merely eliminated the inquiry into an attorney's intent that the ABA retained. Our rule instead focuses purely on whether the conduct can be said to be "undignified" or "discourteous," without respect to whether the lawyer intended it to be so. But both our rule and the ABA's rule contextually and textually preserved the condition that, to be punishable, the conduct must occur in a tribunal or its immediate environs. The overwhelming contextual evidence of this nexus is the placement of both rules among other rules governing conduct in a tribunal or its environs and under chapter headings referring to the decorum of a tribunal. And the textual evidence

---

[6] The comment on the ABA's rule is similar to that concerning our own rule, although it takes the additional step of explaining that conduct during a deposition is also regulated by the rule.

14

of the nexus derives from the ABA's language, "disrupt a tribunal," and the Michigan rule's language, "toward a tribunal."

Of course, it is also important to remark that there has been no warning to the bar that the transformation of DR 7-106(C)(6) into MRPC 3.5(c) allegedly served to extend the reach of the latter to conduct occurring outside a tribunal and removed from the active legal process. Although there is compelling evidence that the new rule was not, in fact, so extended, to the extent that any gray area exists, it is preferable to resolve the question most favorably to respondent. See *State Bar Grievance Administrator v Corace*, 390 Mich 419, 434; 213 NW2d 124 (1973). The inherent fairness of this approach not only is self-evident, but also serves to avoid any precarious trespass over the boundaries of the First Amendment by requiring notice of what type of conduct will be prohibited before punishing it.[7]

---

[7] Due process requires a person to have notice of conduct that is prohibited, and lack of notice can render an enactment unconstitutionally vague. See, e.g., *United States v Wunsch*, 84 F3d 1110, 1119 (CA 9, 1996) (declaring the term "offensive personality" too vague to inform a reasonable attorney what conduct will be sanctioned). The reader is referred to Justice Kelly's dissent for a fuller explanation of vagueness. But rules of professional conduct that teeter on the edge of vagueness have been saved when it can be said that although the language would ordinarily be too vague to pass constitutional muster, it has been subject to enough interpretation that it provides the notice that is not inherent in the language itself. See, e.g., *In re Frerichs*, 238 NW2d 764 (Iowa, 1976); *In re Beaver*, 181 Wis 2d 12; 510 NW2d 129 (1994). See also *Comm on Legal Ethics of the West Virginia State Bar v Douglas*, 179 W Va 490; 370 SE2d 325 (1988). In *Douglas*, the court was faced with an attorney who posed for a newspaper photograph dressed as Rambo, complete with bow and arrow, a knife, and ammunition, above a caption that read, "'Just like Rambo I'll defend against the judges alone if necessary.'" *Id.* at 492. In an article, he was quoted as saying, among other
(continued…)

15

Significantly, this Court has not had occasion to interpret MRPC 3.5(c) in its present form before today. Nor has research revealed any ethics opinions regarding this rule—save, critically, one. That ethics opinion involved this same respondent who found himself in quite the same situation as the present case. *Fieger II*, *supra*. There, it was claimed that respondent publicly made "knowingly false or reckless statements about various judges and a county prosecutor," and he was likewise charged with violating MRPC 3.5(c), along with other rules. Both the hearing panel and the ADB refused to find that respondent's statements violated Rule 3.5(c). The ADB agreed with the panel's finding that Rule 3.5(c) is intended to govern only conduct directed to the tribunal in a pending matter. The panel had found that because respondent's comments were made "about judges, and not to them in pending matters," respondent had not violated the rule. The ADB agreed, concluding as follows:

> We agree with the panel that the intent of the rule is to preserve the decorum of the tribunal so that proceedings may be conducted in an orderly fashion. Rude and undignified behavior can detract from the respect an adjudicator must possess in order to

---

(…continued)
things, that the judges were "'power-jockeying,'" that they "'drew first blood,'" and "that he would 'rise to the challenge.'" *Id.* The attorney also compared the ongoing trial proceeding to the Salem witch trials. *Id.* at 492 n 6. Afterward, he was charged with violating the disciplinary rule prohibiting conduct prejudicial to the administration of justice. Although the court recognized that this language had been routinely upheld as constitutionally sufficient, *id.* at 493, it reasoned that because the complexities of the subject had not been thoroughly analyzed in that state, neither the committee nor the parties had enough guidance to decide the matter, *id.* at 498. After providing that guidance, the court remanded the case for further consideration.

16

effectively manage a courtroom. The rule is obviously directed at preventing proceedings from devolving into chaos because of lack of respect for the judge. [*Fieger II*, *supra* at 31.]

Thus, respondent has already been subject to disciplinary proceedings for speaking out publicly in criticism of the judiciary. Yet he was explicitly absolved of the allegation that public comments about judges violated Rule 3.5(c) by both the hearing panel and the review board. And we denied the Grievance Administrator's application for leave to appeal that decision. 469 Mich 1241 (2003).[8] Today, the majority abruptly changes the rule using a cursory and incomplete analysis that pays no heed to history, context, or even plain text. Those who admire the majority for its professed adherence to textualism may be surprised. Respondent probably will not be.

Under a scrupulous reading of the rule and the comment, and considering their evolution, there should be no other conclusion but that the rule governs only conduct that occurs in or near the tribunal in the context of litigation. Respondent's comments, made during a radio broadcast, were not made in a

_____

[8] As the majority points out, I concurred in the denial of leave, but wrote a statement to convey my belief that respondent's remarks were at the edge of what types of remarks might merit sanction. It is important to note, however, that the statements in that case were allegedly libelous or slanderous, which calls for an entirely different analysis than the one required in this case. Comments with no hint of libel or slander, such as the ones at issue here, are in a different, and more protected, category of speech. Thus, I still believe that the order in that case should not be construed "as signaling any reduced interest on the part of this Court in upholding standards of professional civility . . . ." See 469 Mich at 1241 (Cavanagh, J., concurring). However, the comments in this case, which cannot be remotely characterized as libel or slander, merit even more protection than those

(continued…)

17

tribunal, near a tribunal, or in any context remotely related to the litigation process or the dispensation of justice. As such, just as respondent did not violate Rule 3.5(c) in *Fieger II*, he did not violate it in this case.

Justice Kelly also correctly points out the deficiency in the majority's assertion that limiting the rule's application to tribunal environs would make the rule "superfluous" in light of a trial court's contempt powers. See *ante* at 19-20; MCL 600.1711(1). The most flagrant error in the majority's assertion is its obliviousness to the fact that Rule 3.5(c) applies not just to courts and courtrooms, but to *all* tribunals. Only courts have contempt power. Thus, because not all "tribunals" have contempt power, the disciplinary rule is in no way duplicative of the contempt statute.

Moreover, MRPC 3.5(c), like the rule from which it was adopted, "carries with it the option of a disciplinary sanction as a *supplement* to the traditional power of judges to punish disruptive behavior as contempt of court." *Office of Disciplinary Counsel v Breiner*, 89 Hawaii 167, 173; 969 P2d 1285 (1999) (emphasis added), citing 1 Hazard & Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, § 3.5:401 (2d ed). Further, because only a court has contempt powers, MRPC 3.5(c) provides an avenue for others who may be offended by an attorney's conduct to seek redress

---

(…continued)
made in *Fieger II*. Thus, to the extent that I believed the statements in *Fieger II* were not sanctionable, that is all the more my belief in this case.

18

by filing a grievance. And MRPC 3.5(c) allows the body charged with regulating attorney conduct to impose a far more consequential range of discipline on an attorney for violating the rule, from public censure to disbarment. Thus, the rule is in no way rendered "superfluous" by MCL 600.1711(1), and the majority's contention otherwise is irrational.

And I, like Justice Kelly, dispute the majority's assertion that construing MRPC 3.5(c) to limit its application to tribunals "fails to accord consideration to the importance the courtesy and civility rules serve as a vehicle for preserving the public's confidence in the integrity of the legal process." See *ante* at 20. "[A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." *Bridges v California*, 314 US 252, 270-271; 62 S Ct 190; 86 L Ed 192 (1941).

Read in its proper context, which the majority's conclusory analysis fails to do, it is evident that MRPC 3.5(c) applies only to statements and conduct in a tribunal or its immediate environs. Had this Court intended its changes to this rule, which before indisputably governed conduct in a tribunal, to broadly expand the rule to prohibit statements *about* tribunals, it would have used the phrase "*about* a tribunal." And, undoubtedly, such a broad expansion, with such weighty constitutional implications, would have been widely noticed, discussed within the bar, and probably challenged long before now. But this Court did not expand the rule in that manner, as is clear under any fair analysis. Such a change

19

was not needed because other rules govern conduct that occurs elsewhere. Because respondent's comments were far removed from the setting to which the rule applies, he did not violate it.

## B. Respondent Did Not Violate MRPC 6.5(a) Because He Did Not "Treat" the Judges with Discourtesy by Criticizing Their Decision

Respondent correctly contends that his conduct did not violate MRPC 6.5(a) because the rule does not apply to "a lawyer's out-of-court, public criticism of the judiciary." The rule states as follows:

> A lawyer shall treat with courtesy and respect all persons involved in the legal process. A lawyer shall take particular care to avoid treating such a person discourteously or disrespectfully because of the person's race, gender, or other protected personal characteristic. To the extent possible, a lawyer shall require subordinate lawyers and nonlawyer assistants to provide such courteous and respectful treatment.

An issue similar to that discussed with respect to Rule 3.5(c) inheres in this rule. Specifically, just as Rule 3.5(c) contemplates conduct in a courtroom, Rule 6.5(a) is attendant to lawyers' interactions with clients and others with whom the lawyer comes into contact in the course of the legal process. Both the comment to this rule, which illuminates the overarching principles behind the rule's requirements, and the consistent way in which the rule has been applied, support this conclusion. In relevant part, the comment states:

> A lawyer is an officer of the court who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the

obligation to treat persons properly. It is increased when the obligation is met.

A lawyer must pursue a client's interests with diligence. This often requires the lawyer to frame questions and statements in bold and direct terms. The obligation to treat persons with courtesy and respect is not inconsistent with the lawyer's right, where appropriate, to speak and write bluntly. Obviously, it is not possible to formulate a rule that will clearly divide what is properly challenging from what is impermissibly rude. A lawyer's professional judgment must be employed here with care and discretion.

\* \* \*

A judge must act "[a]t all times" in a manner that promotes public confidence in the impartiality of the judiciary. Canon 2(B) of the Code of Judicial Conduct. See also Canon 5. By contrast, *a lawyer's private conduct is largely beyond the scope of these rules*. See Rule 8.4. However, a lawyer's private conduct should not cast doubt on the lawyer's commitment to equal justice under the law. [Emphasis added.]

Again, it is clear from the comment that Rule 6.5(a) is circumscribed to an attorney's treatment of persons with whom the attorney encounters in the legal process. This, of course, accords with the rule's usage of the term "treat." "Treat" means "[t]o act or behave in a specified manner toward." *The American Heritage Dictionary, New College Edition* (1981). Just as respondent did not conduct himself "toward" the tribunal for purposes of Rule 3.5(c), he likewise did not conduct himself "toward" the tribunal for purposes of Rule 6.5(a). To hold otherwise contorts the plain meaning of the word "treat" and culminates in the curious conclusion that when a person speaks disrespectfully about another person outside that other person's presence, the speaker is somehow "treating" that person in a certain manner.

21

Indeed, our disciplinary arm has sharply limited its application of the rule to instances of direct contact and has neither interpreted nor applied the rule in any other manner. Violations of the rule have been found only in instances of, for example, improper sexual conduct, *Grievance Administrator v Neff*, ADB No. 95-94-GA, notice of suspension issued April 30, 1996; *Grievance Administrator v Bowman*, ADB No. 95-95-GA, notice of reprimand issued January 3, 1996; *Grievance Administrator v Childress*, ADB No. 95-146-GA, notice of suspension issued December 6, 1996; *Grievance Administrator v Childress,* ADB Nos. 97-169-GA and 97-183-FA, notice of suspension issued June 9, 1998; *Grievance Administrator v Williams*, ADB No. 98-203-GA, notice of suspension issued February 1, 2000; *Grievance Administrator v Gold*, ADB No. 99-350-GA, opinion issued May 16, 2002; *Grievance Administrator v Kohler*, ADB No. 01-49-GA, notice of suspension issued December 10, 2001; physical altercations with opposing counsel, *Grievance Administrator v Lakin*, ADB No. 96-166-GA, notice of reprimand issued November 13, 1997; *Grievance Administrator v Golden*, ADB No. 96-269-GA, opinion issued May 14, 1999; *Grievance Administrator v McKeen*, ADB No. 00-61-GA, opinion issued May 7, 2003; vulgar and profane comments that interfered with a deposition, *Grievance Administrator v Farrell*, ADB No. 95-244-GA, notice of reprimand issued December 3, 1996; and threatening statements made directly to another person, *Grievance Administrator v Warren*, ADB No. 01-16-GA, opinion issued October 2, 2003; *Grievance Administrator v Sloan*, ADB Nos. 98-106-GA and 98-176-

22

GA, notice of suspension issued April 1, 1999. Further, in some instances in which the only conduct at issue was name-calling in the course of *direct* communication, the rule was found *not* to be violated. See, e.g., *Grievance Administrator v Szabo*, ADB No. 96-228-GA, opinion issued February 11, 1998; *Grievance Administrator v MacDonald*, ADB No. 00-4-GA, opinion issued January 25, 2001.

As the lead opinion of the ADB correctly observed:

MRPC 6.5(a), like MRPC 3.5(c), seems clearly to extend to discourtesy toward and disrespect of participants in the legal system when such conduct interferes or has the potential to interfere with the orderly administration of justice. To apply this rule in this case, we would have to hold that "treat" means to make comments about a person outside their [sic] presence, after the conclusion of the proceedings. This would sweep in any comment critical of a participant's role in the justice system even after that role had been concluded. In this country, many trials or other proceedings are subject to discussion and analysis after their conclusion. Nothing in Rule 6.5 suggests that "persons involved in the legal process" may not ever be criticized for their role in that process, not even after the involvement has ceased.

Nor is the majority's treatise on our duty to oversee the legal profession and foster rules geared toward maintaining respect for the judiciary persuasive justification for the broad-reaching interpretation it adopts. As the United States Supreme Court has explained:

We recognize the importance of leaving States free to select their own bars, but it is equally important that the State not exercise this power in an arbitrary or discriminatory manner nor in such way as to impinge on the freedom of political expression or association. A bar composed of lawyers of good character is a worthy objective but it is unnecessary to sacrifice vital freedoms in order to obtain that goal. It is also important both to society and the bar itself that lawyers be unintimidated—free to think, speak, and act as members

23

of an Independent Bar. [*Konigsberg v State Bar of California*, 353 US 252, 273; 77 S Ct 722; 1 L Ed 2d 810 (1957).]

Further, as we explained in *In re Chmura*, 461 Mich 517, 540; 608 NW2d 31 (2000), "the state's interest in preserving public confidence in the judiciary does not support the sweeping restraints imposed by Canon 7(B)(1)(d)."[9] Likewise here, the directive of Rule 6.5(a) that attorneys must treat others involved in the legal process with courtesy and respect cannot be interpreted as a sweeping restraint on attorney comment regarding concluded cases.

Reading the rule in its proper context and affording the term "treat" its common and ordinary meaning, it is again clear that respondent, by his comments, did not "treat" anyone involved in the legal process. Rather, his comments were permitted public criticism of Court of Appeals judges. Just as is the case with Rule 3.5(c), an interpretation of this rule that enlarges the realm of sanction to public criticism unrelated to the process of administering justice treads dangerously in the waters of the First Amendment's protections of free speech. Respondent's speech was not prohibited by Rule 6.5(a) and cannot be found to have violated it.

### C. Respondent's Comments Did Not Pertain to a Pending Case, Further Diminishing Any Justification For Expanding Rules 3.5(c) and 6.5(a) Beyond Their Intended Meanings

---

[9] That canon prohibited candidates for judicial office from using any form of communication that the candidate knew or reasonably should have known was false, fraudulent, misleading, or deceptive or that contained a misrepresentation, omitted certain facts, or created unjustified expectations.

The majority observes that restraints on speech can be more encompassing if the speech pertains to an ongoing matter. See *ante* at 15; *Gentile v State Bar of Nevada*, 501 US 1030, 1070; 111 S Ct 2720; 115 L Ed 2d 888 (1991). It concludes that the matter about which respondent spoke (*Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278; 602 NW2d 854 [1999]) was indeed pending and posits that this justified stricter curtailment of respondent's right to speak publicly about it. Notwithstanding that the rules did not apply to respondent because they were not comments "toward" the tribunal and respondent did not "treat" the tribunal discourteously, the majority is quite misguided in concluding that the *Badalamenti* case was "pending."

As Justice Kelly observes, legal and lay dictionaries define "pending" in much the same way: "[r]emaining undecided; awaiting decision <a pending case>," Black's Law Dictionary (8th ed), and "awaiting decision or settlement." *Random House Webster's College Dictionary* (1997). Because of the similarity, it is unnecessary to determine whether the term "pending" has acquired a peculiar meaning in the law. The outcome is identical despite which dictionary is used. A "pending" matter is an undecided matter awaiting decision, which the *Badalamenti* case clearly was not.

The majority points to several court rules and, because they are inapplicable, engages in an exercise of lexical gymnastics to reach its erroneous conclusion. Specifically, the majority cites MCR 7.215(F)(1)(a), which explains when Court of Appeals opinions become "effective." That rule states that an

25

opinion becomes "effective after the expiration of the time for filing an application for leave to appeal to the Supreme Court, or, if such an application is filed, after the disposition of the case by the Supreme Court[.]" Notably, the rule does not use or define the term "pending" and is in no way referenced by or connected to the disciplinary rule at issue. As such, it is a poor source by which to interpret when a case might be "pending" for purposes of restricting attorney comment, particularly when the word's common and legal meanings are flatly ignored.

Similarly unhelpful is the majority's striving attempt to support its position by citing various other procedural rules, specifically MCR 7.302(C)(2)(a), (b), and (c), MCR 7.210(H), and MCR 7.317(C) and (D), that govern filing applications for leave to appeal to this Court and returning the record to the lower court. See *ante* at 15-16 & n 14. Of course, those rules say nothing about when a Court of Appeals opinion is either "effective" or still pending. But more importantly, the majority fixates on our procedural mechanisms to the complete disregard of the constitutional framework within which the question must be examined. The bounds of free speech are not a function of procedural court rules, as discussed later. Rather, the inquiry must center on whether the type of harm sought to be prevented is imminent if the speech is not curtailed. When a record is returned to the lower court is completely irrelevant to a discussion regarding whether speech about a case can be silenced.

The majority also "reveals" that respondent ultimately moved for rehearing and for leave to appeal as if this were damning evidence of the pendency of the *Badalamenti* case. *Ante* at 17 & n 17. It is not. Nothing the majority points to, and nothing uncovered in an exhaustive jurisdictional search, supports the novel notion that speech can be restricted until the time when no further relief from a judgment can ever be sought.

Just as strangely, the majority states that the *Badalamenti* case was "'begun, but not yet completed'" because the Court of Appeals, "by granting a motion for reconsideration or rehearing, could still have affected the substantial rights" of respondent's client. *Ante* at 17. It further opines that the case was still "awaiting rendition of a final judgment" because "Mr. Fieger filed an application for leave to appeal in this Court . . . ." *Ante* at 18 n 17. This is faulty logic at its core. When respondent made his statements, *there was no motion for reconsideration*. When respondent made his statements, the case was not "awaiting rendition of a final judgment" because *respondent had not, in fact, filed an application for leave to appeal in this Court*. It cannot be said any more simply: *nothing that had begun lacked completion.*

Further, without support, the majority decides that the opposite of "pending" is "final." *Ante* at 17 n 17. Proffering a purported antonym, with nothing more, to divine the meaning of a word is certainly a novel approach, but in any event, the attempted correlation does not withstand scrutiny because the court rules on which the majority relies explain when a judgment is "effective"

27

and when the Court of Appeals should return the record to the lower court. The uncomplicated task the majority confounds is deciphering the meaning of the word "pending." Rather than conduct a simple application of the plain meaning of the word to the facts at hand, the majority circumscribes its assessment of the word "pending" to unrelated court rules, short-shrifting respondent—and any other attorney who wishes to engage his or her right to free speech—and resulting in a contorted analysis.

Further, while MCR 7.302 discusses applications for leave to appeal to this Court, it does not address when a trial court judgment, a matter from this Court, or a matter from any other judicial or administrative agency is "pending." And while the majority does not assert that MRPC 3.5(c) curtails only speech about Court of Appeals opinions, its analysis regarding when a Court of Appeals case is "pending," which focuses only on when the judgment is "effective," fails to consider any potential incongruities that may arise with respect to when it is "safe" to speak about non-Court of Appeals cases. In other words, by failing to apply in a straightforward manner either the common or the legal meaning of "pending," the majority allows for vastly different rules in similar scenarios. And, oddly, the majority suggests that a different rule may apply when a court has accepted a case on appeal. *Ante* at 16 n 15. To suggest that a case is pending after a final judgment is rendered and while no motions for reconsideration or appeal have been filed, but that it may not be pending after the case has been accepted on appeal, is counterintuitive logic to say the least.

28

Last, it is paramount to observe that when an enactment threatens to encroach on a person's constitutional guarantees, "'every reasonable construction must be resorted to, in order to save [the enactment] from unconstitutionality.'" *Edward J DeBartolo Corp v Florida Gulf Coast Bldg & Constr Trades Council*, 485 US 568, 575; 108 S Ct 1392; 99 L Ed 2d 645 (1988), quoting *Hooper v California*, 155 US 648, 657; 15 S Ct 207; 39 L Ed 297 (1895). Interpreting the word "pending" in a way that restricts respondent's First Amendment guarantees and casts constitutional doubt on the conduct rule is contrary to this "cardinal principle" of construction. *Id.* Faced with alternative ways to construe when a case is "pending," this Court is obligated to choose the interpretation that poses the least danger of silencing speech. See part III of this opinion. This the majority fails to do.

Were the meaning of "pending" given proper import here, rather than being contorted or ignored, it would be plain that a matter that has been decided by the Court of Appeals is no longer "pending." As such, the majority's analysis is incomplete and, ultimately, incorrect. Given the proper construction, which includes accounting for the constitutional implications, it is evident that the *Badalamenti* case was not "pending" when respondent spoke publicly about it. Thus, the majority not only unjustifiably expands the meaning of the otherwise plain language of the rules at issue, it also compounds its error by misusing our authority to limit speech that pertains to a pending case because the case was not, in fact, pending.

29

## III.  Respondent's Political Comments Were Protected By the First Amendment Right to Free Speech

"There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile*, *supra* at 1034. This case, like *Gentile*, involves "classic political speech." *Id.* The incorrectness of the majority's assertion otherwise is easily exposed. Tellingly, the majority purports to acknowledge respondent's argument that he engaged in "political" speech, but it then proceeds to totally misunderstand the nature of political speech and disregard the entire body of law pertaining to it. By this paucity of reasoning, the majority completely guts the First Amendment and renders an alarming—and, no doubt, singular—holding that speech critical of public officials is prohibited unless the public official is facing reelection at the time the speech is made[10] or the speech uttered is palatable to the majority's sense of civility. Neither precept can be found in our First Amendment jurisprudence.

To provide the needed jurisprudential background the majority omits, political speech protection encompasses not only statements about current electoral candidates, but extends to all "expression of editorial opinion on matters

---

[10] Because the majority suggests that respondent's speech was not "campaign speech" because the judges about whom he spoke were not running for reelection, it might be helpful for it to explain exactly how close in time a person can speak uninhibitedly about an elected public official. Must the official be running in the year the comments are made? Must the official have already announced his candidacy? And what of appointed public officials who need not run in elections—are they always shielded from criticism because criticisms about them will *always* be made outside the context of a campaign?

of public importance . . . ." *FCC v League of Women Voters of California*, 468 US 364, 375; 104 S Ct 3106; 82 L Ed 278 (1984). "'Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" *Burson v Freeman*, 504 US 191, 196; 112 S Ct 1846; 119 L Ed 2d 5 (1992), quoting *Mills v Alabama*, 384 US 214, 218; 86 S Ct 1434; 16 L Ed 2d (1966). Respondent's comments fall easily into this closely protected category of speech: he made critical statements about what he perceived as an errant decision that unjustly divested his seriously injured client of a jury verdict. The judges who overturned the jury verdict were, of course, part of our judicial system, which "play[s] a vital part in a democratic state" and in which "the public has a legitimate interest in [the] operation[]." *Gentile*, *supra* at 1035.

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v Louisiana*, 379 US 64, 74-75; 85 S Ct 209; 13 L Ed 2d 125 (1964). Thus, the United States Supreme Court has "repeatedly explained [that] communication of this kind is entitled to the most exacting degree of First Amendment protection." *League of Women Voters*, *supra* at 375-376. Stated another way, political speech "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v Myers*, 461 US 138, 145; 103 S Ct 1684; 75 L Ed 2d 708 (1983), quoting *NAACP v Claiborne Hardware Co*, 458 US 886, 913; 102 S Ct

31

3409; 73 L Ed 2d 1215 (1982). Thus, when a government ventures into the perilous realm of restricting political speech, it must produce evidence of a state interest so significant that it fully justifies the otherwise forbidden endeavor of silencing those who desire to publicly find fault with the way in which the government conducts its affairs. See *Bridges*, *supra* at 270-271. Moreover, the government must show that the rule is so narrowly tailored that there is *no unnecessary interference* with First Amendment freedom. *Sable Communications of California, Inc v FCC*, 492 US 115, 126; 109 S Ct 2829; 106 L Ed 2d 93 (1989). Rules inhibiting unhampered comment, thus shackling the right to freely express opinion, must be justified, "[i]f they can be justified at all, . . . in terms of some *serious substantive evil* which they are designed to avert." *Bridges*, *supra* at 270 (emphasis added); see also *id.* at 262 ("[T]he likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press."). And protecting the judiciary or other public actors from derision, however crudely or distastefully expressed, has consistently been rejected as a "serious substantive evil" that would justify restrictions on speech.

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect. [*Id.* at 270-271.]

Consider also the following:

32

More fundamentally, although the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights. Even if that were the case, we are unpersuaded that undignified behavior would tend to recur so often as to warrant a prophylactic rule. [*Zauderer v Office of Disciplinary Counsel of the Ohio Supreme Court*, 471 US 626, 647-648; 105 S Ct 2265; 85 L Ed 2d 652 (1985).]

Rather, restrictions on public comment in this context have normally been validated only when the voicing of opinion threatens to wreak *serious* prejudice on the orderly administration of justice. See *Bridges*, *supra* at 271. And even then the right to speak is closely guarded. The case must be pending, and comment about it cannot be suppressed unless the "*substantive* evil of unfair administration of justice" is a "*likely* consequence" or punished unless "the degree of likelihood was sufficient to justify summary punishment." *Id.* (emphasis added). And again, once an interest is validated, a substantive evil is identified, and the substantive evil is found to be a likely consequence,

> [t]he Government may serve this legitimate interest, but to withstand constitutional scrutiny, "it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." [*Sable Communications*, *supra* at 126 (citations omitted).]

Significantly, the majority omits any meaningful discussion regarding whether the rules it interprets to encompass respondent's conduct were *narrowly tailored*, stating in conclusory fashion only that the rules are narrowly drawn. See *ante* at 30.

Critically, again, the determination whether a case is pending cannot be conducted without affording serious weight to the constitutional principles involved. In this sense, a rule restricting speech that is questionable in the constitutional respects of vagueness or overbreadth can be interpreted in such a manner that it upholds the rule as a whole but nonetheless declares it inapplicable to particular conduct. See n 7 of this opinion. This, of course, is precisely what the ADB's lead opinion accomplished. It interpreted the rules narrowly in light of governing constitutional principles to avoid invalidating them completely. Allowing constitutional principles to guide and inform the analysis is yet another undertaking the majority neglects in its opinion.

In addition to what has already been stated in part II(C) of this opinion, in determining whether a case is pending in light of the constitutional right to speak freely, it is informative to examine Justice Frankfurter's words written in dissent to the majority's finding that the speech in *Bridges*, which occurred between trial and sentencing, did not prejudice the administration of justice. While the majority did not conclude that the case was not pending, but, rather, that the speech did not pose a threat serious enough to the administration of justice to be punishable, Justice Frankfurter believed that the majority did not give proper accord to the status of the case, which, by any estimation, had not concluded. In his vigorous dissent, Justice Frankfurter distinguished cases that are no longer awaiting decision from those in which a decision has not yet been rendered:

> The question concerning the narrow power we recognize always is—was there a real and substantial threat to the impartial

decision by a court of a case actively pending before it? The threat must be close and direct; it must be directed towards a particular litigation. The litigation must be immediately pending. When a case is pending is not a technical, lawyer's problem, but is to be determined *by the substantial realities of the specific situation*.[8] Danger of unbridled exercise of judicial power because of immunity from speech which is coercing is a figment of groundless fears. In addition to the internal censor of conscience, professional standards, the judgment of fellow judges and the bar, the popular judgment exercised in elections, the power of appellate courts, including this Court, there is the corrective power of the press and of public comment free to assert itself fully *immediately* upon completion of judicial conduct. Because courts, like other agencies, may at times exercise power arbitrarily and have done so, resort to this Court is open to determine whether, under the guise of protecting impartiality in specific litigation, encroachments have been made upon the liberties of speech and press.

_____

[8] The present cases are very different from the situation that evoked dissent in *Craig* v. *Hecht*, 263 U.S. 255, 281[ 44 S Ct 103; 68 L Ed 293 (1923)]: *"It is not enough that somebody may hereafter move to have something done*. There was nothing then awaiting decision when the petitioner's letter was published." And see *Glasgow Corporation* v. *Hedderwick & Sons* (1918) Sess. Cas. 639. Compare *State ex rel. Pulitzer Pub. Co* v. *Coleman*, [347 Mo 1238] 152 S. W. 2d 640 (Mo. 1941).

_____

[*Bridges*, *supra* at 303-304 (Frankfurter, J., dissenting) (emphasis added).][11]

_____

[11] The *Coleman* court, referring to another case that recognized the power of a court to reinstate a case after a *nolle prosequi*, stated:

But this holding does not necessarily mean that after a case has been dismissed it is still to be considered pending during the entire term at which the order of dismissal was made within the meaning of the contempt rule above set out. . . . To rule otherwise would be to narrow the limits of permissible criticism so greatly that

(continued…)

As is clear from these statements, there is much more to consider than a court rule governing when a Court of Appeals case becomes "effective" before a case, in furtherance of speech restrictions, can be declared "pending." It is the *practical* nature of the proceedings to be given due accord, not the hypertechnicality of an unrelated court rule. It is whether speech has true potential to influence the manner in which justice is dispensed, not whether in some abstract sense a decided case is temporarily limited from having full effect.

Applying these precepts, as the majority fails to do, the Kansas Supreme Court determined that an attorney's comments to a reporter, made in the afternoon on November 7, 1970, and printed on November 8, 1970, about a decision issued on November 7, 1970, were not made about a pending case. *Kansas v Nelson*, 210 Kan 637; 504 P2d 211 (1972). The court reasoned: "Since our decision on November 7, 1970, terminated the case referred to by respondent in his interview, we do not believe a violation of DR 1-102(A)(5)[12] is clearly shown. . . . Since the case was terminated, respondent's statements can not serve as harassment or intimidation for the purpose of influencing a decision in the case

---

(…continued)
> the right to criticize would cease to have practical value. [*Coleman, supra* at 1261.]

The majority's conclusion that the *Badalamenti* matter was pending until the time for filing an application for leave to appeal to this Court had expired very much divests the right to criticize of any practical value.

[12] The referenced rule addressed conduct prejudicial to the administration of justice.

involved." *Id*. at 641 (citation omitted). Presumably, the *Nelson* respondent could have still moved for reconsideration. But the court did not fixate on the procedural technicalities; rather, it considered the real-world purpose of the rules proscribing speech and whether the speech, in that context, would have the potential to influence a *pending* case.

When the realistic, rather than abstract, concerns are heeded, as they must be in a constitutional analysis, it is acutely clear that the case about which respondent spoke was not pending. A verdict had been rendered, appeal had been taken, and an appellate opinion had been written and released to the public. The case was not "immediately pending" or "actively pending." See *Bridges*, *supra* at 303 (Frankfurter J., dissenting). There was no "real and substantial" or "close and direct" threat to the impartial decision of the Court of Appeals. See *id.* What the majority fails to account for is that its new speech prohibition does nothing to actually accomplish what rules prohibiting public, out-of-court speech about pending matters are intended to do, i.e., prevent prejudice to the administration of justice. Stated another way:

> Forbidden comment is generally such as may throw psychological weight into the scales which the judge is immediately balancing. Where the scales have already come to rest, the criticism is of that which the judge has seen fit to place on them to cause such balance, and hence has no effect upon the weighing of the elements of justice involved. [*In re Bozorth*, 38 NJ Super 184, 191; 118 A2d 430 (1955).]

The red herring the majority inserts into this case is that respondent was still entitled to move for reconsideration and to petition this Court for leave to

37

appeal. As discussed in part II(C) of this opinion, respondent had not so moved, so there was nothing at all left to be decided. It is of no consequence that respondent *later* invoked his client's right to petition for further review. Respondent was entitled at the time he spoke to speak freely about the *Badalamenti* case. Not only was there no "serious substantive evil" at play, there simply was no risk at all of prejudicing the administration of justice. The scales of justice had come to rest. The majority's failure to address whether the case was truly pending in light of the "substantial realities" of this specific situation is a disservice to members of the bar and, critically, takes an enormous bite out of the First Amendment.

But even if one were to accept the majority's precarious conclusion that the *Badalamenti* case was pending, its end result that the comments were not protected is irreconcilable with the basic truth that even restrictions on speech regarding *pending* cases merit the most careful scrutiny. *Bridges, supra* at 268-269. Protections for speech about pending cases are no less vital because pending cases are "likely to fall not only at a crucial time but upon the most important topics of discussion," and "[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." *Id.* Indeed, public interest in a pending matter and the importance of disseminating information in a timely manner are at a pinnacle while the matter is ongoing. Moreover, negating constitutional restraints on limiting speech about

38

pending matters would disregard, at the expense of free speech, that cases, especially in today's overburdened legal system, frequently remain unresolved for extended periods. See *id.* at 269. And attorneys, who stand in an unrivaled position of familiarity with the justice system's complexities, "hold unique qualifications as a source of information about pending cases." *Gentile*, *supra* at 1056. "'Without publicity, all other checks [on the government's conduct] are insufficient: in comparison of publicity, all other checks are of small account.'" *Id.* at 1035, quoting *In re Oliver*, 333 US 257, 271; 68 S Ct 499; 92 L Ed 682 (1948), which, in turn, had quoted 1 Bentham, Rationale of Judicial Evidence, p 524 (1827).

Not only does the public's right to be informed of the workings of the judiciary transcend the judiciary's right to shield itself from even the basest of criticisms, but the judiciary, upon which is conferred unique powers, significant influence, and considerable insulation, must not be so shielded that the public is denied its right to temper this institution. As eloquently explained by Justice Frankfurter:

> There have sometimes been martinets upon the bench as there have also been pompous wielders of authority who have used the paraphernalia of power in support of what they called their dignity. Therefore judges must be kept mindful of their limitations and of their ultimate public responsibility by a vigorous stream of criticism expressed with candor however blunt. [*Bridges*, *supra* at 289 (Frankfurter, J., dissenting).]

Further, it is paramount to stress, when assessing the danger of prejudicing justice by speaking about pending matters, that "neither 'inherent tendency' nor

'reasonable tendency' [to prejudice the administration of justice] is enough to justify a restriction of free expression." *Id.* at 273 (majority opinion). Nor is it enough to merely assert a substantial likelihood of causing material prejudice; rather, the disciplinary board or reviewing court must put forth credible evidence of such a threat. See *Gentile*, *supra* at 1038. In *Bridges*, the petitioners were accused of threatening the orderly administration of justice by publishing comments before an upcoming sentencing that criticized the possible outcome of probation. See *Bridges*, *supra* at 272 n 17, 274 n 19. The strongly worded editorials were replete with frightening descriptions of the defendants that seemed to be designed to instill fear in the public and intimidate the sentencing judge into imprisoning the defendants. *Id.* In deciding that the comments merited First Amendment protection and responding to the state's argument that the comments threatened to prejudice the administration of justice, the Court duly noted that given the petitioner's stance on labor issues in the past, it would be "inconceivable that any judge in Los Angeles would expect anything but adverse criticism from it in the event probation were granted." *Id.* at 273. The Court held, "To regard it, therefore, as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor,— which we cannot accept as a major premise." *Id*.

It is no small irony that the same could be said about this respondent and his comments. Respondent is no stranger to the disciplinary system, although not once have his comments been found punishable until today, and respondent is

likely quite accustomed to accusations that he attempts to unfairly influence trial proceedings by his disposition as an advocate. See, e.g., *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 777-778; 685 NW2d 391 (2004). Indeed, respondent has many times been the target of criticism by members of this very majority. See *id.*; see also Justice Weaver's dissent in this case. To now opine that respondent's unsurprising response to losing a jury verdict on appeal was prejudicial to the administration of justice fails to account for both his well-known "long-continued militancy" in the field of litigation for injured plaintiffs and the "firmness, wisdom, or honor" of the judges about whom he speaks. *Bridges, supra* at 273.[13]

With the majority's attempt to maintain that the *Badalamenti* case was pending discredited, and any potential assertion that respondent's conduct prejudiced justice that had already been administered, or, in the alternative, influenced either the Court of Appeals decision on the motion for reconsideration or this Court's decision on the application for leave to appeal, discarded as implausible, the only remaining justification asserted for punishing respondent is

---

[13] This is certainly not to say that establishing oneself as a controversial, vocal proponent of a cause affords one license to engage in unfettered public criticism or invariably places one beyond reproach. Rather, this is simply to point out that it would be disingenuous, while being well-accustomed to respondent's renowned crusade and the manner in which he furthers it, to then attempt to divest him of his First Amendment rights by claiming that the administration of justice is gravely prejudiced by his unsurprising rejoinders. Reasonably expected criticism does not—or should not—prejudice the administration of justice. See *Bridges, supra* at 273.

41

that his remarks engendered public disrespect for the judiciary. While it can hardly be argued either that this Court does not have the authority to foster rules of professional conduct or that there is not legitimacy to the proffered state interest of protecting the integrity of the judiciary, the majority's feverish invocation of these principles again overshadows the pivotal question involved in this case: Does application of the rules in question to the conduct in question infringe the guarantees of the First Amendment when the justification for punishing the conduct is the protection of the judiciary?

Several aspects of the majority's characterization of the interest at issue must be noted. For instance, in one portion of its opinion, the majority states that we have an interest in a system "in which the public is not misled by name calling and vulgarities from lawyers who are held to have special knowledge of the courts . . . ." *Ante* at 10. I find this statement to be presumptuous and insulting to the intellect of our citizenry. The majority must believe that our citizens, unable to think for themselves and unable to engage in critical thinking when faced with divergent viewpoints, need the state to protect them from what the *majority* perceives may mislead them.[14] The majority thus makes a

---

[14] Notably, such a view seems surprisingly inconsistent with the position recently taken by Justice Markman in *Michigan Civil Rights Initiative v Bd of State Canvassers*, ___ Mich ___; 2006 Mich LEXIS 1420 (Docket No. 130342, issued July 13, 2006) (Markman, J., concurring), in which he charged our citizens with the duty of informing themselves in the face of potential misrepresentations. Justice Markman stated,

(continued…)

frightening judgment that speech itself is inherently misleading, and, as such, it elevates some misguided sense of protectionism over the constitutional right of free speech.

The majority also presumes that a process in which it is assured that judges can "mete out evenhanded decisions" without being "undermined by the fear of vulgar characterizations of their actions" is a desirable goal that overrides First Amendment rights. *Ante* at 10. This view is a sad and, presumably, misguided commentary on the ability of our judges to elevate their duties over their feelings and to maintain neutrality in the face of inevitable criticism. The majority discounts that "judges must have thick skins and do not require protection from criticism unless there is malicious defamation." *In re Westfall*, 808 SW2d 829, 845 (Mo, 1991) (Blackmar, C.J., dissenting), citing *Bridges*, *supra*, *Pennekamp v Florida*, 328 US 331; 66 S Ct 1029; 90 L Ed 1295 (1946), and *Craig v Harney*, 331 US 367; 67 S Ct 1249; 91 L Ed 1546 (1947). As the ADB lead opinion in this case recognized, "It is fair to say that judges, particularly appellate judges, will not be swayed by a lawyer's brickbats."

---

(…continued)

> In carrying out the responsibilities of self-government, "we the people" of Michigan are responsible for our own actions. In particular, when the citizen acts in what is essentially a legislative capacity by facilitating the enactment of a constitutional amendment, he cannot blame others when he signs a petition without knowing what it says. It is not to excuse misrepresentations, when they occur, *to recognize nonetheless that it is the citizen's duty to inform himself about the substance of a petition before signing it, precisely in order to combat potential misrepresentations.* [Emphasis added.]

43

Even the Michigan Code of Judicial Conduct, by which the judiciary is governed and which we swear to honor, alerts us that this institution is not a self-serving one designed for our protection, but exists for the people of this state. "A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary." Code of Judicial Conduct, Canon 1. And Canon 2 provides fair warning that "[a] judge must expect to be the subject of constant public scrutiny." Code of Judicial Conduct, Canon 2(A).

Although the majority purports to recognize that "lawyers have an unquestioned right to criticize the acts of courts and judges," and that "there is no prohibition on a lawyer's [sic] engaging in such criticism even during the pendency of a case," it nonetheless asserts that there exist "limitations . . . on the form and manner of such criticism . . . ." *Ante* at 32. A systematic review of the majority's sources dismantles its broad claim and reveals its holding for what it truly is: an attorney cannot use choice language to criticize a judge, ever.

Of particular note are the majority's citations for this proposition. In misleading fashion, the majority states the following:

> In discussing the scope of this obligation in the 19th century, the United States Supreme Court stated that attorneys are under an implied "obligation . . . to maintain at all times the respect due to courts of justice and judicial officers. This obligation . . . includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts." [*Ante* at 11, quoting *Bradley v Fisher*, 80 US (13 Wall) 335, 355; 20 L Ed 646 (1872).]

Even a cursory reading of *Bradley* reveals three important facts. First, the attorney in *Bradley* criticized the judge *in the courtroom in the context of*

44

*litigation*. Second, the entire *Bradley* opinion was devoted to whether the judge, who thereafter struck the attorney from the rolls, was entitled to immunity for that act. Third, the statement the majority quotes was quintessential dicta; the Court decided that the judge was entitled to absolute immunity for his act, and, thus, no commentary on the attorney's behavior was necessary or relevant to the holding. See *id.* at 357 (Davis, J., dissenting).

Tellingly, the proposition the majority extracts from *Bradley* has never been tested in the constitutional framework of an ethical rule that purports to prohibit rude speech that lacks a defamatory component made about judges after a case has concluded. To rely on such a statement for the sweepingly broad proposition that attorneys cannot utter rude remarks in that situation is misleading at best.

Of similar precariousness is the majority's citation of *In re Mains*, 121 Mich 603; 80 NW 714 (1899). Although, the majority again attempts to fashion a broad rule by isolating a comment, a quick glance at *Mains* exposes the majority's loose methodology. The majority cites *Mains* for the proposition that "an attorney has no right to so conduct himself or herself as to dishonor his or her profession or to bring the courts of this state into disrepute." *Ante* at 31 n 31. This Court in *Mains* considered an attorney's accusations, made in letters to a judge, that the judge was engaging in corruption and conspiracy. Thus, this Court did not test the statement cited by the majority in the context of out-of-

court, nondefamatory criticisms of the judiciary outside the context of pending litigation.

The same is true for the majority's citation of *In re Thatcher*, 80 Ohio St 492, 669; 89 NE 39 (1909). That opinion was written before the state's rules of professional conduct had been established, see *In re Harper*, 77 Ohio St 3d 211 225; 673 NE2d 1253 (1996), and, thus, is an insufficient test of whether the broad concept that an attorney should be respectful of the judiciary can be codified as a speech restriction and survive First Amendment scrutiny. But in any event, the respondent in *Thatcher* publicly asserted that a particular judge could be bought for the right price, so the speech at issue there was defamatory rather than merely rude criticism.

The majority repeats its error in citing *Attorney General v Nelson*, 263 Mich 686, 701; 249 NW 439 (1933). See *ante* at 32. The majority again attempts to draw unbelievably broad concepts from a vastly distinguishable situation. In *Nelson*, it took this Court 12 pages to catalog the conduct at issue, which consisted of, to be brief, an attorney making accusations in pleadings, petitions, and circulated letters that a judge and other attorneys were extensively abusing the legal process. So again, when this Court stated that an attorney "should be at all times imbued with the respect which he owes to the court before whom he is practicing," *Nelson*, *supra* at 701, we in no way issued a blanket statement from which a rule that an attorney must not ever speak rudely of a judge can be derived.

In the same searching method, the majority cites *Cantwell v Connecticut*, 310 US 296; 60 S Ct 900; 84 L Ed 1213 (1940), in claiming that respondent's comments, because of their graphic content, were not political speech because "'[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . . .'" *Ante* at 25, quoting *Cantwell*, *supra* at 309-310. The reader should first be informed that *Cantwell* was not a case involving political speech. Rather, the *Cantwell* plaintiffs were engaged in religious proselytizing, and one plaintiff was accused of breaching the peace by communicating propaganda that criticized the religion of others. The majority takes its chosen quote completely out of context. No more need be said than reproducing the full words of the Court on the subject:

> Cantwell's conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the peace. One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument. [*Id.* at 309-310.]

Likewise useless is the majority's reliance on *Chaplinsky v New Hampshire*, 315 US 568; 62 S Ct 766; 86 L Ed 1031 (1942). *Chaplinsky* also involved the dissemination of religious ideas that offended the listeners. Further, *Chaplinsky* concerned itself with "fighting words" and held that the statute at

47

issue was sufficiently narrowly tailored so as to prevent only "specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace." *Id.* at 573.

One can only surmise that it must be this clear misunderstanding of *Cantwell* and *Chaplinsky* that prompts the majority to make the following conclusion: "There is no reasonable construction of Mr. Fieger's remarks that could lead to the conclusion that these were *mere comment on the professional performance* of these three judges of the Court of Appeals." *Ante* at 30 (emphasis added). Even accepting the majority's subjective assessment that respondent's remarks were not "comment" on the judges' performance,[15] the majority has failed remarkably to provide any sound citation of authority that would support its assertion that an attorney is precluded from uttering remarks that are something other than "comment" on a judge's performance, or, for that matter, rude comment about a judge not made in the context of truly pending litigation.

Notwithstanding the majority's failure to connect the rules at issue with respondent's conduct and its inability to base in any law a blanket curtailment on offensively worded criticism, the majority astoundingly opines that a conception of the First Amendment that protects offensive attorney speech "has never been a

---

[15] Unlike the majority, most would probably conclude that respondent's words were very clearly comment, however colorfully expressed, on how he believed the judges performed in deciding the *Badalamenti* appeal.

part of our actual Constitution." *Ante* at 10. In fact, its "glimpse into the likely future" footnote, *ante* at 34 n 35, is nothing more than a scare tactic designed to conceal the fact that the ADB's decision merely maintained the status quo and did not, in fact, "usher" some "Hobbesian legal culture" into our jurisprudence. See *ante* at 33. Stripped of irrelevant authority, the majority's conclusion is nothing more than an unsupportable notion that attorneys must not speak in an undefined "rude" manner in criticism of a judge's role in a concluded case.

For the reasons I have stated, I strongly disagree with the majority's erroneous conclusion that respondent's conduct is punishable for any of the reasons the majority asserts. Because, although the majority believes otherwise, it is not enough to claim that the statements were crass, disgusting, or even discourteous and uncivil. Nor it is constitutionally sufficient to declare the rules of professional conduct violated, for "First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law." *Gentile*, *supra* at 1054.[16] And it cannot be dispositive merely that an attorney is an "officer of the court" without some persuasive explanation of how his public statements are irreconcilable with that role. See *id.*

---

[16] This idea can be culled from a variety of United States Supreme Court opinions. See *Westfall*, *supra* at 844 (Blackmar, C.J., dissenting) ("Lawyers do not surrender their First Amendment rights when they accept their licenses."), citing *Bates v State Bar of Arizona*, 433 US 350; 97 S Ct 2691; 53 L Ed 2d 810 (1977), *In re RMJ*, 455 US 191; 102 S Ct 929; 71 L Ed 2d 64 (1982), rev'g *In re RMJ*, 609 SW2d 411 (Mo, 1980), *NAACP v Button*, 371 US 415; 83 S Ct 328; 9 L Ed 2d 405 (1963), and *In re Primus*, 436 US 412; 98 S Ct 1893; 56 L Ed 2d 417 (1978).

at 1056. "'[A] lawyer is a person and he too has a constitutional freedom of utterance and may exercise it to castigate courts and their administration of justice.'" *Comm for Lawyer Discipline v Benton*, 980 SW2d 425, 430 (Tex, 1998) (citations omitted). See also *In re Ronwin*, 136 Ariz 566, 573; 667 P2d 1281 (Ariz, 1983) (commenting that the respondent attorney had an "absolute" First Amendment right "to speak and write as he wishes and to say anything which he believes to be true," but the right "must be exercised somewhere other than the courtroom").

These ideas are far from novel, and a broad survey of this nation's jurisprudence confirms that attorneys can publicly criticize the judiciary and cannot be punished for such speech, no matter how crass, when the criticisms do not affect the decorum of the tribunal or substantially prejudice the administration of justice. Unless and until an unassailable connection can be made between respondent's speech and prejudice to the administration of justice, which connection has not been made here, respondent's comments, offensive as they may have been, cannot be suppressed or punished without seriously offending the First Amendment.[17]

---

[17] Because respondent's comments neither violated the rules in question nor were subject to restrictions as substantially prejudicial or impermissibly damaging to the integrity of the judiciary, I would not reach the question whether the rules are constitutionally void for vagueness or overbreadth. When there are other legitimate ways to resolve an issue, as there are here, declaring the rules unconstitutional is unnecessary. Further, while I do not join in the fray between the majority and my colleague Justice Weaver, I take this opportunity to note that three alternate proposals, two of which have been crafted by this majority,

(continued…)

The same can be said now as was said in *Westfall*, in which the dissent challenged the majority's overly broad holding: "Make no mistake about it. The principal opinion chills lawyers' speech about judicial decisions. . . . This language portends further disciplinary proceedings against lawyers . . . who express themselves too freely. Many will conclude that it is wise to keep quiet." *Westfall*, *supra* at 849 (Blackmar, C.J., dissenting.)

IV. Conclusion

It is ridiculous to conclude, as does the majority, that respondent's speech fell within the narrow bounds of the rules of professional conduct with which he was accused of violating. The majority's holding is reached only by distorting the language of the rules and ignoring the fundamental guarantees of the First Amendment. Because respondent's conduct was not governed by the rules in question, and because his right to freely criticize a decision rendered by elected members of the judiciary is safeguarded by both the United States and Michigan

---

(…continued)

regarding how this Court should handle disqualification motions have been languishing in this Court's conference room for a substantial period of time. In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court's timely attention to the important matter of disqualification motions. I take my colleagues at their word that the issue of disqualification will be handled in a prompt manner in the coming months.

Constitutions, respondent merits no discipline. I would uphold the decision of the ADB and dismiss the complaint in its entirety.

<div style="text-align:right">

Michael F. Cavanagh
Elizabeth A. Weaver

</div>

STATE OF MICHIGAN

SUPREME COURT

GRIEVANCE ADMINISTRATOR,

        Petitioner-Appellant,

v                                                No.  127547

GEOFFREY N. FIEGER,

        Respondent-Appellee.

_____

WEAVER, J. (*dissenting*).

I dissent from the majority's decision to remand this case for the imposition of the agreed-to professional discipline, a reprimand of Mr. Fieger, and join Justice Cavanagh's opinion on the substantive issues in this case.

I write separately to dissent from the participation of Chief Justice Taylor and Justices Corrigan, Young, and Markman in this case.

Statements made during their respective judicial campaigns displaying bias and prejudice against Mr. Fieger require Chief Justice Taylor and Justices Corrigan, Young, and Markman to recuse themselves from this case in which Mr. Fieger is himself a party.[1]  Further, Chief Justice Taylor and Justices Corrigan

---

[1] *Republican Party of Minnesota v White,* 536 US 765; 122 S Ct 2528; 153 L Ed 2d 694 (2002), suggests that if campaign statements display a bias for or against an individual, the statements could raise due process concerns for future litigants.  See also *State ex rel La Russa v Himes,* 144 Fla 145; 197 So 762 (1940),

(continued…)

and Markman have become so "enmeshed" in matters involving Mr. Fieger as to make it inappropriate for them to sit in a case in which Mr. Fieger is a party.[2] Thus, the participation in this case of Chief Justice Taylor and Justices Corrigan, Young, and Markman violates respondent's rights to due process under the Fifth and Fourteenth Amendment. Chief Justice Taylor and Justices Corrigan, Young, and Markman should have recused themselves from participating in this case.

In their joint opinion, Chief Justice Taylor and Justices Corrigan, Young, and Markman mischaracterize my dissent and motives. Further, their criticisms and personal attacks in the joint opinion of the majority justices are misleading, inaccurate, irrational, and irrelevant to the issues in this case.[3] The majority

---

(…continued)
holding that a judge's campaign statements about a specific individual disqualified the judge from presiding over a subsequent trial of that person.

[2] Due process violations may arise where a judge has been so personally "enmeshed in matters" concerning one party that the judge is biased against the party. See *Johnson v Mississippi*, 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971) (judge had been "a defendant in one of petitioner's civil rights suits and a losing party at that").

[3] For example, the joint opinion of the majority justices is misleading when it states that this dissent is largely grounded in "statements that occurred between six and ten years ago." *Ante* at 2. Less than 6 months ago, Justice Corrigan's campaign committee mailed a fund-raising letter saying, "We cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11th hour sneak attack." Less than 7 months ago, Justice Markman, who is currently a defendant in a federal lawsuit initiated by Mr. Fieger, filed a motion for sanctions under FR Civ P 11 against Mr. Fieger.

Further, the joint opinion of the majority justices inaccurately says that my concern over this Court's disqualification procedures began "only after Mr. Fieger ceased targeting *her* with these motions." *Ante* at 16. As I explain in part D of this opinion, since May 2003 I have consistently called for this Court to address
(continued…)

2

appears to be attacking the messenger rather than addressing the genuine issue of

due process created by the displays of bias and prejudice in this case. [4]

This Court has long recognized that a litigant has a right to an unbiased

court:

> One of the fundamental rights of a litigant under our judicial system
> is that he shall be entitled to a hearing before a court to which no
> taint of prejudice is attached. This is so firmly established as to
> regularly constituted courts as to need no comment.[5]

Further, an unbiased judge is essential to the due process guarantees of the

Fifth and Fourteenth Amendment.[6] In order to protect due process, when a judge

is sufficiently biased, the judge must be removed from the case in which the bias

arises.[7]

---

(…continued)

the need for clear, fair disqualification procedures for justices, including in two cases in which Mr. Fieger had requested that I recuse myself.

[4] To paraphrase Shakespeare, it seems the majority "doth protest too much." *Hamlet,* act 3, sc 2.

[5] *Talbert v Muskegon Constr Co*, 305 Mich 345, 348; 9 NW2d 572 (1943).

[6] *Johnson, supra* at 215-216 (judge violated due process by sitting in a case in which one of the parties was previously a successful litigant against him); *Tumey v Ohio*, 273 US 510, 532; 47 S Ct 437; 71 L Ed 749 (1927) (judge violated due process by sitting in a case in which it would be in his financial interest to find against one of the parties); *Crampton v Dep't of State,* 395 Mich 347, 351; 235 NW2d 352 (1975) ("A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process.").

[7] *Johnson, supra* at 215; *Mayberry v Pennsylvania,* 400 US 455, 466; 91 S Ct 499; 27 L Ed 2d 532 (1971). See also *Tumey v Ohio*, *supra* at 532 ("Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.").

(continued…)

Disqualification for personal bias against a party may be required in order to protect the party's due process rights. When a judicial candidate has made a campaign statement displaying extreme animosity toward a specific individual, once on the bench, the judge should be disqualified from hearing cases in which that individual is a party. If a judge has become so embroiled in conflicts with a defendant as to demonstrate hostility toward the defendant, the judge must be disqualified.

<div align="center">A</div>

Here, the statements about Mr. Fieger made during their respective judicial campaigns require Chief Justice Taylor and Justices Corrigan, Young, and Markman to recuse themselves from this case in which Mr. Fieger is a party. "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law."[8] A judge who has bias against one of the parties appearing before him could be tempted "not to hold the balance

---

(…continued)

The United States Supreme Court has since extended this principle to civil cases. *Aetna Life Ins Co v Lavoie*, 475 US 813, 825; 106 S Ct 1580; 89 L Ed 2d 823 (1986). See also *Ponder v Davis*, 233 NC 699, 704; 65 SE2d 356 (1951) ("A fair jury in jury cases and an impartial judge in all cases are prime requisites of due process.").

[8] *Tumey v Ohio, supra* at 532.

<div align="center">4</div>

nice, clear and true."[9] To avoid this possibility, due process requires that a judge who has made campaign statements demonstrating extreme antagonism toward an individual recuse himself or herself from a case in which that individual is a party. Friedland, *Disqualification or suppression: Due process and the response to judicial campaign speech,* 104 Colum L R 563 (2004).

Numerous cases of the United States Supreme Court hold that due process requires a lack of bias for or against a party.[10] *Republican Party of Minnesota v White* suggests that if campaign statements display a bias for or against a particular individual, the statements could raise due process concerns for future litigants. The Court recognized that "lack of bias for or against either *party* to the proceeding" is the root meaning of "impartiality" in the judicial context.[11] The Court said that impartiality in this sense "assures equal application of the law" or "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party."[12] The Court confirmed that this

---

[9] See *id*.

[10] *Id.* at 523, 531-534; *Aetna Life Ins Co v Lavoie, supra* at 822-825; *Ward v Village of Monroeville*, 409 US 57, 58-62; 93 S Ct 80; 34 L Ed 2d 267 (1972); *Johnson, supra* at 215-216; *In re Murchison*, 349 US 133, 137-139; 75 S Ct 623; 99 L Ed 942 (1955).

[11] *Republican Party of Minnesota v White, supra* at 775 (emphasis in original).

[12] *Id.* at 776.

5

meaning of impartiality has been used by numerous cases recognizing that an impartial judge is essential to due process.[13]

In *Republican Party of Minnesota v White*, the Court stated that it is speech for or against *parties* that raises problems of impartiality or the appearance of impartiality:

> We think it plain that the announce clause [restricting judicial campaign speech] is not narrowly tailored to serve impartiality (or the appearance of impartiality) in this sense. Indeed, the clause is barely tailored to serve that interest *at all*, inasmuch as it does not restrict speech for or against particular *parties*, but rather speech for or against particular *issues*.[14]

In so holding, the Court recognized that speech for or against particular parties in a case does implicate impartiality or the appearance of impartiality.

The Florida Supreme Court held that a judge who uttered campaign statements directed at a particular individual should be disqualified from presiding over a case involving that individual.[15] In *State ex rel La Russa v Himes,* a judicial candidate made the following statements during an election campaign: "'[T]he people are shot down in cold blood; the people are assaulted and their homes broken into, and what the people want is a judge who will put people like Philip La Russa and his associates away in Raiford [a state penitentiary],'" and "'[P]eople like Philip La Russa and his associates cannot

---

[13] *Id*.

[14] *Id.* (emphasis in original).

[15] *State ex rel La Russa v Himes,* 144 Fla 145; 197 So 762 (1940).

6

come into Court and get a license for gambling by a fine or to violate the lottery laws by a fine, but [I] would put them in Raiford where they belong[].'"[16]

The Florida Supreme Court held that these campaign statements disqualified the judge from subsequently presiding over a trial of Philip La Russa for violating lottery laws. The Court stated:

> Fear that [La Russa] will not have a fair trial may in some cases be a mental attitude but if the conduct of the judge has been such as to create it, the law requires that he recuse himself. It may ultimately be as devoid of reality as the cenotaph is the remains of the hero it commemorates but if conclusively shown that the seed of fear was planted and the facts related give a reasonable man ground for belief that the judge is prejudiced, that is sufficient. It is contrary to all human experience to contend that a judge under the circumstances stated may single out one charged or that may be charged with crime and talk to the public about sending him to Raiford (State penitentiary) and then contend that the one singled out when hailed before the judge for trial had no ground for belief that the latter was prejudiced.[17]

Similarly, the campaign statements made by Chief Justice Taylor and Justices Corrigan, Young, and Markman against Mr. Fieger would "give a reasonable man ground for belief" that they are prejudiced. Because their campaign statements display prejudice against Mr. Fieger, they should be disqualified from sitting in this case.

For example, on February 20, 2006, while this case was pending before this Court, the Committee to Re-elect Justice Maura Corrigan sent out a fund-

---

[16] *Id.* at 146.

[17] *Id.* at 147.

raising letter from former Governor John Engler stating that "[w]e cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11th hour sneak attack." Former Governor John Engler may make any statements about Mr. Fieger with impunity, as long as he does not violate libel or slander laws. But Justice Corrigan cannot do so without potentially disqualifying herself from sitting in a case in which Mr. Fieger is a party. Justice Corrigan adopted former Governor Engler's statement as her own when she had her campaign committee pay for and send out the former governor's letter.[18] Justice CORRIGAN'S adoption of this statement identifying Mr. Fieger as a possible threat to Justice CORRIGAN'S reelection campaign as her own displays a bias against Mr. Fieger.

This display of bias is of special concern because this case, in which Mr. Fieger is a party, was pending at the time the letter was sent. On May 27, 2005, this Court granted leave to appeal in this case; on February 14, 2006, oral argument in this case was scheduled; on February 20, 2006, Justice Corrigan's campaign issued the fund-raising letter; and 16 days later, on March 8, 2006, this case was argued before the Court. Now Justice Corrigan is deciding against Mr. Fieger, a party in this case, fewer than six months after her campaign committee

---

[18] The letter was one of the grounds listed in Mr. Fieger's April 20, 2006, motion for disqualification requesting that Justice Corrigan recuse herself from this case. That motion was denied. *Grievance Administrator v Fieger*, 475 Mich 1211 (2006).

sent the letter using the threat of a "sneak attack" by attorneys such as Mr. Fieger as a fund-raising tool for her 2006 election campaign.

Regarding Chief Justice Taylor, it was reported that, during his 2000 campaign, he made statements at a fund-raiser about the cases that Mr. Fieger had pending in the appellate courts: "Geoffrey Fieger apparently has $90 million of lawsuit awards pending in the state Court of Appeals."[19] The majority's joint opinion asserts that "it shows no 'bias or prejudice' to identify the number of cases Mr. Fieger had on appeal . . . ." *Ante* at 7. But then-Justice Taylor was not identifying the *number* of cases that Mr. Fieger had on appeal; he was emphasizing the amount of money that was at stake—$90 million—and implying that the awards would be overturned if then-Justice Taylor were retained in office.

Justice Young, in a speech at the Republican Party state convention in August 26, 2000, said that "Geoffrey Fieger, and his trial lawyer cohorts hate this court. There's honor in that."[20]

---

[19] *Justice Visits County*, The Sunday Independent, September 3, 2000, p 3. This statement was one of the grounds listed in Mr. Fieger's December 17, 2004, motion for disqualification requesting the recusal of Chief Justice Taylor from this case. That motion was denied. *Grievance Administrator v Fieger*, 472 Mich 1244 (2005).

[20] This statement was one of the grounds listed in Mr. Fieger's December 17, 2004, motion for disqualification requesting that Justice Young recuse himself from this case. That motion was denied. *Id.*

Yet another display of bias occurred in a campaign ad paid for by "Robert Young for Justice," "Stephen Markman for Justice," and "Clifford Taylor for Justice." The campaign ad included the following language:

> Opponents continue to attack Michigan's Supreme Court, but now they've gone too far. *The Detroit News* calls the opponents' ads truly vicious, saying the charges are false and silly. The *Grand Rapids Press* admonishes Detroit area trial lawyer Marietta Robinson's smear campaign, writing **"**Robinson's hard-edged campaign has been degrading to the court and to the public's confidence in [the] Michigan judiciary.**"** Some people will do anything to get elected. No wonder Geoffrey Fieger, Jesse Jackson and the trial lawyers support Robinson, Fitzgerald and Thomas [who ran against Chief Justice Taylor and Justices Young and Markman in the 2000 Supreme Court election].[21]

By displaying bias and prejudice against an individual, attorney Geoffrey Fieger, during their judicial campaigns, Chief Justice Taylor and Justices Corrigan, Young, and Markman have disqualified themselves from hearing this case in which Mr. Fieger is a party.

<p style="text-align:center">B</p>

In addition, Chief Justice Taylor and Justices Corrigan and Markman have become so "enmeshed" in matters involving Mr. Fieger as to make it inappropriate for them to sit in a case in which Mr. Fieger is a party. See *Johnson v Mississippi.*[22]

---

[21] This statement was one of the grounds listed in Mr. Fieger's December 17, 2004 motion for disqualification requesting that Chief Justice Taylor and Justices Young and Markman recuse themselves from this case. That motion was denied. *Id.*

[22] 403 US 212, 215; 91 S Ct 1778; 29 L Ed 2d 423 (1971).

In *Johnson,* Robert Johnson, a civil rights worker who was at the time a defendant in a criminal proceeding, allegedly disobeyed a trial judge's instructions directing him where to walk in the courtroom. The trial judge had Johnson removed from the courtroom and instituted contempt proceedings against Johnson two years later. In the meantime, Johnson and others had filed a successful suit in federal court to enjoin the state trial judge from conducting "trials of either Negroes or women . . . until such time as Negroes and women were not systematically excluded from juries."[23] The trial judge convicted Johnson of contempt and gave him a four-month sentence. The United States Supreme Court reversed the contempt conviction, holding that due process required that the contempt hearing take place before a different judge.[24] The Court stated that Johnson should have had a contempt hearing and that the trial judge should have recused himself from presiding over that hearing.[25] The Court explained that not only was there evidence that the trial judge had made "intemperate remarks . . . concerning civil rights litigants," but

> immediately prior to the adjudication of contempt [the trial judge] was a defendant in one of [Johnson's] civil rights suits and a losing party at that. From that it is plain that he was so enmeshed in matters involving [Johnson] as to make it most appropriate for another judge to sit. Trial before **"an unbiased judge"** is essential to due process.[26]

---

[23] *Id.* at 214.

[24] *Id.* at 215-216.

[25] *Id.* at 215.

[26] *Id.* at 215-216 (citation omitted).

11

Mr. Fieger has criticized Chief Justice Taylor's and Justice Corrigan's prior actions as Court of Appeals judges, and both justices have been involved in prior grievance actions relating to Mr. Fieger's criticism of their actions. Therefore, both Chief Justice Taylor and Justice Corrigan are "so enmeshed" in matters involving Mr. Fieger that due process requires that they not participate in cases in which Mr. Fieger is a party.

In 1994, complaining about two then-recent Court of Appeals cases, Mr. Fieger publicly insulted Chief Justice (then-Court of Appeals Judge) Clifford TAYLOR, calling him "amazingly stupid" and saying:

> Cliff Taylor and [Court of Appeals Judge E. Thomas] Fitzgerald, you know, I don't think they ever practiced law, I really don't. I think they got a law degree and said it will be easy to get a – they get paid $120,000 a year, you know, and people vote on them, you know, when they come up for election and the only reason they keep getting elected [is] because they're the only elected officials in the state who get to have an incumbent designation, so when you go into the voting booth and it says **"Cliff Taylor"**, it doesn't say failed Republican nominee for Attorney General who never had a job in his life, whose wife is Governor Engler's lawyer, who got appointed when he lost, it says **"Cliff Taylor incumbent judge of the Court of Appeals,"** and they vote for him even though they don't know him. The guy could be Adolf Hitler and it says **"incumbent judge"** and he gets elected.

Mr. Fieger said more about Chief Justice (then-Court of Appeals Judge) Taylor:

> [T]his guy has a political agenda . . . . I knew in advance what he was going to do . . . . We know his wife is Governor Engler's Chief Counsel. We know his wife advises him on the law. We know—we knew—what he was going to do in advance, and guess what, he went right ahead and did it. Now you can know somebody's political agenda affects their judicial thinking so much that you can predict in advance exactly what he's going to do[,] . . . his political agenda translating into his judicial decisions.

12

Although the Grievance Administrator charged Mr. Fieger with professional misconduct, on the basis of this statement and others, Mr. Fieger was never disciplined for these public slurs on then-Judge Taylor.[27]

That Justice Corrigan is too enmeshed in matters involving Mr. Fieger is revealed by the fact that on March 25, 1996, then-Judge Corrigan filed a request for an investigation of Mr. Fieger with the Attorney Grievance Administrator. This request for investigation was filed by then-Judge Corrigan in response to statements alleging a conspiracy between her and the Oakland County Prosecutor's office to improperly influence the outcome of Jack Kevorkian's criminal trial. That request for investigation was dismissed by the Attorney Grievance Commission in 2002.[28] This case involves the identical issue (criticism of an elected judge by Mr. Fieger) as the 1996 situation in which then-Judge Corrigan was both the judge being criticized and the complainant requesting an investigation.

---

[27] The Attorney Discipline Board dismissed the charge involving these remarks about Chief Justice Taylor. The Grievance Administrator appealed the matter to this Court; this Court remanded the matter to the Attorney Discipline Board for reconsideration in light of *In re Chmura,* 461 Mich 517; 608 NW2d 31 (2000). *Grievance Administrator v Fieger,* 462 Mich 1210 (2000). Chief Justice Taylor did not participate in that decision.

[28] This request for investigation was one of the grounds listed in Mr. Fieger's December 17, 2004, motion for disqualification requesting the recusal of Justice Corrigan from this case. That motion was denied. *Grievance Administrator v Fieger*, 472 Mich 1244 (2005).

These events support the conclusion that Chief Justice Taylor and Justice Corrigan have become so "enmeshed" in matters involving Mr. Fieger's comments towards judges, the subject of this case before us, as to make it inappropriate and a violation of due process for them to sit in this case in which Mr. Fieger is a party.

Justice Markman has also been so enmeshed in matters involving Mr. Fieger as to make it inappropriate for him to sit in a case in which Mr. Fieger is a party. In *Johnson,* immediately before the adjudication of a contempt charge, the trial judge was a defendant in one of plaintiff Johnson's civil rights suits. Here, Justice Markman is currently a defendant in a federal suit by Mr. Fieger. Mr. Fieger has brought a 42 USC 1983 suit against Justice Markman in the United States District Court for the Eastern District of Michigan, accusing Justice Markman of being part of a conspiracy to violate Mr. Fieger's civil rights. On January 4, 2006, Justice Markman filed a motion seeking Rule 11[29] sanctions against the plaintiff, Mr. Fieger. Justice Markman's motion cites the "numerous motions to disqualify Defendant Markman . . . from participating in appeals in which Plaintiff Fieger is a party or counsel" as supporting grounds for the Rule 11 sanctions.

While Justice Markman did not instigate that suit, he did file the motion seeking Rule 11 sanctions, using as background the fact that Mr. Fieger had

---

[29] FR Civ P 11.

14

previously filed numerous "frivolous" motions against him. Given that fact, Justice Markman has become so "enmeshed" in controversial affairs with Mr. Fieger that due process requires that he not participate in this case, in which Mr. Fieger is a party.

<center>C</center>

Chief Justice Taylor and Justices Corrigan, Young, and Markman may argue that they have no actual bias or prejudice against Mr. Fieger. But regardless of what their innermost feelings may be, their displays of bias and animosity toward Mr. Fieger, as demonstrated by the aforementioned examples, require them to recuse themselves. Actions speak louder than words, and a judge may be the last person to perceive actual bias against the party accusing the judge of bias. As the United States Supreme Court said in *In re Murchison*:[30]

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally high between contending parties. But to perform its high

---

[30] 349 US 133, 136; 75 S Ct 623; 99 L Ed 942 (1955).

<center>15</center>

function in the best way **"**justice must satisfy the appearance of justice.**"** [Citations omitted.]

This Court has previously recognized that "there may be situations in which the appearance of impropriety on the part of a judge or decisionmaker is so strong as to rise to the level of a due process violation."[31]  This is such a case.

Chief Justice Taylor and Justices Corrigan, Young, and Markman have recently attempted to rewrite how the rules of conduct that govern judges, including the justices of this Court, are applied by questioning and rejecting the application of the appearance of impropriety standard in Canon 2 of the Code of Judicial Conduct.[32]  The joint opinion of the majority justices relies on a statement by Chief Justice Taylor and Justice Markman in *Adair* for the proposition that

> if a judge does that which the law and the standards of conduct permit, such action cannot ordinarily serve as the basis for disqualification.  To hold otherwise would be to make the law into a **"**snare**"** for those who are operating well within its boundaries. [*Ante* at 8-9.]

The justices of the majority miss the point.  The question is not whether their actions were legal.  The question is whether those actions display extreme antagonism toward and bias against a party in a case, or demonstrate that judges have become so "enmeshed" in matters involving a person as to make it a violation of due process for them to sit in a case in which that person is a party.

---

[31] *Cain v Dep't of Corrections,* 451 Mich 470, 513 n 48; 548 NW2d 210 (1996).

[32] See *Adair v Michigan*, 474 Mich 1027 (2006).

16

Disqualification may be required for actions that are within the law when those legal actions violate a party's rights to due process under the Fifth and the Fourteenth Amendment.

<div align="center">D</div>

The broader issue concerning disqualification of justices has repeatedly presented itself in cases before this Court for more than three years. Chief Justice Taylor and Justices Corrigan, Young, and Markman inaccurately suggest in their joint opinion that my concern over this Court's disqualification practices began "only after Mr. Fieger ceased targeting *her* with these motions."[33] This speculation is untrue.

During this Court's deliberations in *In re JK,* 468 Mich 202; 661 NW2d 216 (2003), a case involving termination of parental rights, my participation in the case became an issue and led me to research the procedures governing the participation and disqualification of justices.[34] Since that time, I have repeatedly called for this Court to address the need for clear, fair disqualification procedures for justices.

In September 2003, I denied Mr. Fieger's motion for my recusal in *Gilbert v DaimlerChrysler Corp.*[35] In requesting my recusal from that appeal, Mr. Fieger

---

[33] *Ante* at 16.

[34] For an explanation of this history, see my statement of nonparticipation in *In re JK, supra* at 219.

[35] 469 Mich 883 (2003).

asserted only that the Michigan Chamber of Commerce, who had filed a brief as amicus curiae in *Gilbert,* had contributed to my campaign for reelection to the Michigan Supreme Court and had aired advertisements advocating my reelection. I included in the order denying the motion a detailed statement explaining my reasons for denying the motion.

I noted in my statement in *Gilbert* that my reelection campaign records showed that it had received a $200 contribution from Mr. Fieger.[36] This was a clerical error. Records from the Secretary of State show that Mr. Fieger contributed $400 to my reelection campaign committee. To the best of my knowledge, this is the only "support" that Mr. Fieger gave my campaign committee in the 2002 election, despite the concurring statement's insinuations to the contrary, *ante* at 2.[37]

---

[36] My statement in *Gilbert, supra* at 884, noted that my reelection campaign had received contributions from both sides in that case. Besides the contribution from the plaintiff's counsel, Mr. Fieger, I listed contributions from the defendant and the defendant's attorneys: $2,000 from DaimlerChrysler's political action committee; $250 from Daimler-Chrysler's assistant general counsel, Steven Hantler; $375 each from DaimlerChrysler's attorneys Elizabeth Hardy and Thomas Kienbaum; and $500 from retired Justice Patricia Boyle, of counsel for DamilerChrysler in that case. Those amounts were correct.

[37] As I said in that statement three years ago, Michigan's current system of selecting Supreme Court justices, which combines statewide elections and appointments by the Governor to fill vacancies, needs to be examined. I have developed and am promoting plans for an alternative selection system for Michigan Supreme Court justices, still retaining elections, but for one term only. The joint opinion's discussion of the problems with the expensive, rancorous, statewide elections, *ante* at 12-13, underscores this need.

For more than three years, since May 2003, I have called for this Court to recognize, publish for public comment, place on a public hearing agenda, and address the procedures concerning the participation or disqualification of justices in at least 11 published statements in cases.[38] Since that time, when a motion has been filed asking for my recusal from a particular case, I have given detailed reasons for my decision whether or not to recuse myself. For example, in *Graves v Warner Bros,* 469 Mich 853, 854 (2003), when I denied Mr. Fieger's motion requesting my recusal, my statement explained that the motion did not assert any grounds for my recusal in that case:

> Plaintiff's motion for recusal is based on the same grounds alleged in the April 16, 2003 motion filed in *Gilbert v DaimlerChrysler,* Docket No. 122457 to recuse the same justices. But plaintiff recognizes that the allegations pertaining to the Michigan Chamber of Commerce participating as amicus curiae in *Gilbert v DaimlerChrysler* do not apply in this case.

---

[38] See, e.g., *In re JK, supra* at 220-221, *Graves v Warner Bros*, 469 Mich 853 (2003), *Graves v Warner Bros,* 469 Mich 853, 854-855 (2003), *Gilbert v DaimlerChrysler Corp*, 469 Mich 883, 889 (2003), *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91, 96; 693 NW2d 358 (2005), *Harter v Grand Aerie Fraternal Order of Eagles,* 693 NW2d 381 (2005), *Grievance Administrator v Feiger*, 472 Mich 1244, 1245 (2005), *Scalise v Boy Scouts of America*, 473 Mich 853 (2005), *McDowell v Detroit,* 474 Mich 999, 1000 (2006), *Stamplis v St John Health Sys*, 474 Mich 1017 (2006), *Heikkila v North Star Trucking, Inc,* 474 Mich 1080, 1081 (2006), and *Lewis v St John Hosp,* 474 Mich 1089 (2006).

Since May 2003, there have been nine public hearings on other administrative matters in which the rules governing the disqualification of justices could have been addressed: September 23, 2003, January 29, 2004, May 27, 2004, September 15, 2004, January 27, 2005, May 26, 2005, September 29, 2005, January 25, 2006, and May 24, 2006.

In requesting my recusal from the appeal in *Gilbert v DaimlerChrysler,* plaintiff asserted only that the Michigan Chamber of Commerce, which filed a brief as amicus in that case, contributed to my campaign for reelection to the Michigan Supreme Court in 2002 and aired advertisements advocating my reelection. There are no allegations in either *Gilbert v DaimlerChrysler* or this case that I made or caused to be published any statements about any of the parties, their attorneys, the amicus, or issues in the case that would raise the issue of bias or prejudice on my part.

The joint opinion's suggestion, *ante* at 16 n 6, that I merely issued a conclusory statement denying the recusal motion in *Graves* is both inaccurate and misleading. Since I responded to these two motions for my recusal with detailed statements explaining my decisions not to recuse myself from these cases, Mr. Fieger has not moved for my recusal in any subsequent cases.

Currently, justices of the Michigan Supreme Court sometimes follow unwritten traditions when deciding a motion for disqualification. At other times, justices follow portions of the current court rule on disqualification, MCR 2.003.[39] Mr. Fieger filed three motions for recusal of various justices in this case;

---

[39] There has been inconsistency by some justices regarding the applicability of MCR 2.003 to Supreme Court justices. At times they have applied the rule to themselves, and at times they have not. Indeed, Chief Justice Taylor and Justices Corrigan and Markman have each at times availed themselves of MCR 2.003. In *Adair v Michigan,* 474 Mich 1027, 1043 (2006), Chief Justice Taylor and Justice Markman specifically recognized that they were required to comply with MCR 2.003, stating that "[p]ursuant to MCR 2.003(B)(6), we would each disqualify ourselves if our respective spouses were participating as lawyers in this case, *or if any of the other requirements of this court rule were not satisfied*." [Emphasis added.] Justice YOUNG concurred in their statement, saying that he supported their joint statement and fully concurred in the legal analysis of the ethical questions presented in it. *Id.* at 1053. Similarly, for *Grosse Pointe Park v Michigan Muni Liability & Prop Pool,* 473 Mich 188

(continued…)

the motions were decided by the individual justices, and there was no possibility of review of that justice's individual decision not to recuse himself or herself.[40]

This helter-skelter approach of following "unwritten traditions" that are secret from the public is wrong. There should be clear, fair, orderly, and public procedures concerning the participation or disqualification of justices.

CONCLUSION

Had any one of the four justices in the majority—Chief Justice Taylor or Justice Corrigan, Justice Young, or Justice Markman—recused himself or herself from participating in the case, the Attorney Discipline Board's decision to dismiss

---

(…continued)
(2005), Justice Corrigan used the remittal of disqualification process of MCR 2.003(D).

But at other times, these four justices have not followed the provisions of MCR 2.003. For example, in *Gilbert v DaimlerChrysler Corp,* 469 Mich 883, 889 (2003), then-Chief Justice Corrigan and Justices Taylor, Young and Markman denied a motion for reconsideration of the Court's order denying the motion for disqualification and did not refer the motion to the State Court Administrator for the motion to be assigned to another judge for review de novo, as would be proper under MCR 2.003(C)(3).

[40] Although MCR 2.003(C)(3) gives a party the right to have a judge's decision not to recuse himself or herself reviewed (by the chief judge or a judge assigned by the State Court Administrator), when Mr. Fieger asked for reconsideration of then-Chief Justice Corrigan's and Justices Taylor's, Young's and Markman's decisions not to recuse themselves in *Gilbert,* those four justices simply denied the motion themselves and did not refer the motion to another judge for review de novo.

21

the charges against Mr. Fieger would have been affirmed by equal division. MCR 7.316(C).[41]

Chief Justice Taylor and Justices Corrigan, Young, and Markman have displayed extreme antagonism toward and bias against the respondent, Mr. Fieger, by statements made in their respective judicial campaigns; Chief Justice Taylor and Justices Corrigan and Markman have become so "enmeshed" in matters involving Mr. Fieger as to make it inappropriate for them to sit in a case in which Mr. Fieger is himself a party. Accordingly, the participation of Chief Justice Taylor and Justices Corrigan, Young, and Markman in this case violates Mr. Fieger's rights to due process under the Fifth and the Fourteenth Amendment.

I declined to participate in the various motions requesting the disqualification of Chief Justice Taylor and Justices Corrigan, Young, and Markman when Mr. Fieger appeared as an attorney representing a party. In doing so, I stated that those motions and cases should not be decided until the Court published for public comment and public hearings and adopted clear, fair, orderly, and public procedures concerning the participation or disqualification of justices.[42] But now that this case is being decided, and Mr. Fieger is a *party*,

---

[41] MCR 7.316(C) provides in pertinent part: "Except for affirmance of action by a lower court or tribunal by even division of the justices, a decision of the Supreme Court must be made by concurrence of a majority of the justices voting."

[42] See, e.g., *Graves v Warner Bros*, 469 Mich 853, 854-855 (2003), *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003), *Harter v Grand Aerie Fraternal*

(continued…)

22

rather than an attorney representing a party, I can no longer withhold my opinion that Chief Justice Taylor and Justices Corrigan, Young, and Markman should not be participating in the decision of this case.

<div align="right">Elizabeth A. Weaver</div>

---

(…continued)

*Order of Eagles,* 693 NW2d 381, 382 (2005), *McDowell v Detroit,* 474 Mich 999, 1000 (2006), *Stamplis v St John Health Sys*, 474 Mich 1017 (2006), *Heikkila v North Star Trucking, Inc,* 474 Mich 1080, 1081 (2006), and *Lewis v St John Hosp,* 474 Mich 1089 (2006).

# STATE OF MICHIGAN

## SUPREME COURT

GRIEVANCE ADMINISTRATOR,

      Petitioner-Appellant,

v                                                            No. 127547

GEOFFREY N. FIEGER,

      Respondent-Appellee.

_____

KELLY, J. (*dissenting*).

We granted leave to appeal in this case to determine (1) whether the Attorney Discipline Board (ADB) can answer constitutional questions, (2) whether comments made by respondent concerning three Court of Appeals judges during a radio broadcast violated certain of the Michigan Rules of Professional Conduct (MRPC), and (3) whether those rules violate the freedoms provided by the First Amendment of the United States Constitution or article 1, § 5 of our state constitution. US Const, Am I; Const 1963, art 1, § 5.

I agree with the majority of the ADB that the ADB has the authority to decide constitutional questions because, inherently, this Court has delegated that authority to it. I would hold, also, that respondent did not violate MRPC 3.5(c) or 6.5(a) because his statements were proscribed by neither rule. And, even if respondent had violated either rule, the rules are unconstitutionally vague and

infringe on respondent's free speech protected by the First Amendment of the federal constitution.

THE ADB CAN DECIDE CONSTITUTIONAL QUESTIONS

The issues presented in this case are questions of law involving attorney discipline, which we review de novo. *Grievance Administrator v Lopatin,* 462 Mich 235, 247; 612 NW2d 120 (2000). Our responsibility to regulate and discipline members of the State Bar of Michigan is found in our state constitution at Const 1963, art 6, § 5,[1] and in our statutes at MCL 600.904.[2] To fulfill this responsibility, we created by court rule the Attorney Grievance Commission and the Attorney Disciplinary Board. MCR 9.108[3] and MCR 9.110.[4] Through these

---

[1] Article 6, § 5 provides:

The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state. The distinctions between law and equity proceedings shall, as far as practicable, be abolished. The office of master in chancery is prohibited.

[2] MCL 600.904 provides:

The supreme court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, the discipline, suspension, and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar.

[3] MCR 9.108 provides:

(A) Authority of Commission. The Attorney Grievance Commission is the prosecution arm of the Supreme Court for

(continued…)

2

discharge of its constitutional responsibility to supervise and discipline Michigan attorneys.

\* \* \*

(E) Powers and Duties. The commission has the power and duty to:

\* \* \*

(2) supervise the investigation of attorney misconduct, including requests for investigation of and complaints against attorneys[]

[4] MCR 9.110 provides:

(A) Authority of Board. The Attorney Discipline Board is the adjudicative arm of the Supreme Court for discharge of its exclusive constitutional responsibility to supervise and discipline Michigan attorneys.

\* \* \*

(E) Powers and Duties. The board has the power and duty to:

(1) appoint an attorney to serve as its general counsel and executive director;

(2) appoint hearing panels and masters;

(3) assign a complaint to a hearing panel or to a master;

(4) on request of the respondent, the administrator, or the complainant, review a final order of discipline or dismissal by a hearing panel;

(5) discipline and reinstate attorneys under these rules;

(6) file with the Supreme Court clerk its orders of suspension, disbarment, and reinstatement;

(7) annually write a budget for the board and submit it to the Supreme Court for approval;

rules, we have delegated the initial phases of our constitutional responsibility to supervise and discipline Michigan attorneys. Just as no one contests that the Court has the power to hear constitutional questions, no one cites authority that limits the Court's power to delegate this power to the ADB.

The majority holds that the ADB cannot answer constitutional questions because of its mere quasi-judicial status. It bases that decision on *Wikman v Novi*,[5] *Lewis v Michigan*,[6] and Const 1963, art 3, § 2. But, none of these authorities answers the question. Neither *Wikman* nor *Lewis* involved a delegation of judicial power to a judicially created entity. *Wikman* dealt with a legislative delegation of power to the Michigan Tax Tribunal. *Lewis* dealt with the constitutional power of

---

(…continued)

> (8) report to the Supreme Court at least quarterly regarding its activities, and to submit a joint annual report with the Attorney Grievance Commission that summarizes the activities of both agencies during the past year; and

> (9) submit to the Supreme Court proposed changes in these rules.

[5] 413 Mich 617; 322 NW2d 103 (1982).

[6] 464 Mich 781; 629 NW2d 868 (2001).

4

the Legislature to implement equal protection provisions.[7]  Article 3, § 2 of the state constitution is the Separation of Powers Clause.[8]

*Lewis* had nothing to do with the delegation of authority to decide constitutional questions.  *Wikman* discussed the authority of the Legislature to delegate to one of its agencies the power to determine a constitutional question.  It inferred that the Legislature cannot make this delegation because the authority to answer a constitutional question resides in the judicial branch.

By contrast, this case involves the power of the Supreme Court to delegate authority to opine on a constitutional question to one of its own agencies.  It does not follow that, because a legislatively created quasi-judicial agency may not decide a constitutional question, a quasi-judicial agency of the Supreme Court cannot do so.  Rather, the opposite result should obtain.  If this Court makes a broad delegation of authority to its own quasi-judicial agency and does not expressly exempt from it the determination of constitutional questions, the agency has that power.

---

[7] The majority correctly states that the ability to answer constitutional questions is a core judicial function.  However, standing alone, the statement does not explain why this Court lacks the power to delegate its authority to a body that it created.  Perhaps the majority is confusing the ability with its perception of the advisability of such a delegation.

[8] "The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."  Const 1963, art 3, § 2.

5

There being no restriction on the Court's power to delegate constitutional power and none on the ADB's delegated authority, I would hold that the ADB may answer constitutional questions involving attorney discipline.

RESPONDENT DID NOT VIOLATE MRCP 3.5(c)

A. PENDING CASES

MRCP 3.5(c) reads: "A lawyer shall not . . . engage in undignified or discourteous conduct toward the tribunal."

In order to determine whether respondent violated MRCP 3.5(c), it is necessary first to address whether statements were made during a "pending" case. Respondent's statements were uttered after the Court of Appeals opinion in the underlying case had been issued and before any party made a motion for reconsideration or appealed.

The word "pending" is not defined by the Michigan Court Rules. Therefore, it is appropriate to consult other sources to verify the word's ordinary meaning. MCL 8.3a. Black's Law Dictionary (8th Ed) defines "pending" as "[r]emaining undecided; awaiting decision <a pending case>." *Random House Webster's College Dictionary* similarly provides that "pending" means "awaiting decision or settlement." Applying these definitions, I find no support for a finding that respondent's statements were made during a pending case. Nothing remained undecided at the time the statements were made.

The majority also uses a legal dictionary. Applying it to several court rules, the majority concludes that the Court of Appeals opinion was still pending because

it was not effective at the time respondent made his comments. The majority states that MCR 7.215(F)(1)(a) and MCR 7.302(C)(2)(a) and (b) show that Court of Appeals opinions do not become effective until (1) after expiration of the time for filing an application for leave to appeal to this Court or (2) until this Court decides the case, if leave is granted. However, the date when a Court of Appeals decision becomes "effective" is not the same as the date when a matter is no longer "pending" before that Court.

When respondent made his statement, there were no issues unresolved or motions left to be decided Although the opinion was not yet final, it had been released and nothing remained to be done by the Court of Appeals; nothing was "pending." The majority's analysis does not apply the common meaning of "pending." Instead, it creates a world where cases theoretically can be pending for an indeterminate length of time.[9]

In light of the above, I am not persuaded by the majority's analysis. Rather, I find that the underlying case was not "pending" at the time respondent made his comments.

---

[9] Under MCR 2.612(C)(2), a motion for relief from judgment may be made "within a reasonable time" after judgment is entered. There is no other time limit on such a motion if it is not based on mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or fraud. However, I do not believe that a case could be said to be "pending" until such time as no motion could be brought under this court rule.

7

## B. IN-COURT STATEMENTS

MRPC 3.5(c) provides that a lawyer shall not engage in undignified or discourteous conduct toward the tribunal. The "Comments" on the rule, while not binding, are persuasive in determining its meaning and reflect the thoughts of this Court on the rule's true meaning. The comments on MRPC 3.5 provide, in relevant part:

> The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

When subsection c is read in the context of the entire rule and the comment, its intent becomes apparent. It is aimed at prohibiting conduct that is directed "toward the tribunal" only during oral argument or trial. Everything in the comment refers to activity that transpires in a courtroom. The comment is quiet about an attorney's conduct anywhere else or after a proceeding is no longer pending.

When interpreting MRPC 3.5(c), it is instructive to look at the American Bar Association's (ABA) Model Rules of Professional Conduct 3.5. It provides that "[a] lawyer shall not . . . (d) engage in conduct intended to disrupt a tribunal." MRPC 3.5(c) was fashioned from ABA Model Rule 3.5. Also, the ABA's former DR 7-106(C)(6) and our former DR 7-106(c)(6) were identical. DR 7-106 is

8

another source of MRPC 3.5(c).  It stated, "In appearing in his professional capacity before a tribunal, a lawyer shall not . . . engage in undignified or discourteous conduct which is degrading to a tribunal."  DR 7-106(c)(6)(e).

As ADB members Theodore J. St. Antoine, William P. Hampton, and George H. Lennon noted in their opinion in this case:

> In terms of the structure of Rule 3.5 versus the comparable Code provision, we note that the former Code's DR 7-106 dealt entirely with "Trial Conduct," and subparagraph (C) contained seven prohibitions applicable when a lawyer was "appearing in his professional capacity before a tribunal." Michigan and Model Rules 3.5 involve not only rules regarding conduct during a proceeding, but also rules which had previously been located elsewhere in the Code, such as prohibitions against influencing judges and other officials. Thus, the introductory paragraph of Rule 3.5 reflects a different, broader, scope than that of the comparable Code provision. That is, instead of saying (as the Code did), "In appearing in his professional capacity before a tribunal, a lawyer shall not . . . ," MRPC 3.5 says simply, "*A lawyer shall not . . . .*" The ABA focused Model Rule 3.5(c) on conduct related to pending proceedings by prohibiting "conduct *intended to disrupt* a tribunal." Michigan's Rule, as we have mentioned, is different. Although Michigan largely adopted the ABA Model Rules, the text of MRPC 3.5(c) was modified so that it proscribes "*undignified or discourteous conduct toward* the tribunal." [Emphasis in original.]

As these members of the ADB properly explained, MRPC 3.5(c) eliminated the inquiry into the lawyer's intent, choosing instead to focus on whether the conduct was (1) undignified or discourteous, and (2) "conduct toward the tribunal."  Because respondent concedes, and I agree, that his statements were disrespectful and discourteous, the issue becomes whether the conduct was "toward the tribunal."

9

Respondent made the statements on a radio program. He did not make them in a court of law. I would limit MRPC 3.5(c) to statements and conduct that take place in a courtroom. Accordingly, I would find that respondent did not violate MRPC 3.5(c) because the conduct in question was not "toward a tribunal" as envisioned by the rule.

I am unpersuaded by the majority's conclusion that limiting the rule's application to a courtroom would make it superfluous in light of the contempt powers of courts. MCL 600.1711(1). Rather, MRPC 3.5(c) provides an alternative to the power of the court to find an attorney in contempt. There are situations where a reprimand or other discipline not involving a contempt of court citation is appropriate. MRPC 3.5(c) expands a judge's range of options.

I also disagree with the majority that a construction of MRPC 3.5(c) that limits its application to courtrooms "fails to accord consideration to the importance the courtesy and civility rules serve as a vehicle for preserving the public's confidence in the integrity of the legal process." *Ante* at 20. Confidence in our courts is best served when an attorney is free to comment on what the attorney perceives as the deficiencies of our judges and of our legal system. Extending the rule beyond the courtroom necessarily chills comment.

I would read MRPC 3.5(c) together with its comment and hold that it applies only to statements and conduct in a courtroom. Therefore, I would find that respondent did not violate the rule.

10

Respondent Did not Violate MRCP 6.5(a)

MRCP 6.5(a) reads:

> A lawyer shall treat with courtesy and respect all persons involved in the legal process. A lawyer shall take particular care to avoid treating such a person discourteously or disrespectfully because of the person's race, gender, or other protected personal characteristic. To the extent possible, a lawyer shall require subordinate lawyers and nonlawyer assistants to provide such courteous and respectful treatment.

Respondent argues that MRPC 6.5(a) does not apply to the statements complained of in this case. This rule provides that "[a] lawyer shall treat with courtesy and respect all persons involved in the legal process." The comments on the rule provide in part:

> A lawyer is an officer of the court who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly. It is increased when the obligation is met.

> A lawyer must pursue a client's interests with diligence. This often requires the lawyer to frame questions and statements in bold and direct terms. The obligation to treat persons with courtesy and respect is not inconsistent with the lawyer's right, where appropriate, to speak and write bluntly. Obviously, it is not possible to formulate a rule that will clearly divide what is properly challenging from what is impermissibly rude. A lawyer's professional judgment must be employed here with care and discretion.

When read in conjunction with the comments, the rule reveals an underlying intent that lawyers display civility towards parties, witnesses, and third

11

parties involved in the legal process. Because the rule focuses on the legal process, its application should be to pending litigation or other pending "legal matters." To read it otherwise would be to extend its application beyond any identifiable time limit. An attorney could be subject to sanctions under the rule years after a legal matter was no longer pending. I agree with the reasoning of ADB members St. Antoine, Hampton, and Lennon that "[n]othing in Rule 6.5 suggests that 'persons involved in the legal process' may not ever be criticized for their role in that process, not even after the involvement has ceased."

As explained above, respondent's comments were not made while the case was pending. The Court of Appeals had decided the matter, and no postjudgment motions or appeals had been filed. Therefore, I would find that respondent's conduct did not violate MRPC 6.5(a) because the rule is not intended to apply to comments made about the participants in a legal action when the matter is not pending.

<center>MRPC 3.5(c) and 6.5(a) Are Unconstitutional</center>

Respondent argues that, if his words did violate MRPC 3.5(c) and 6.5(a), the rules are unconstitutionally vague and violate his right to free speech under both the Michigan Constitution and the First Amendment to the federal constitution.

<center>A. Vagueness</center>

Due process requires that an enactment be held void for vagueness if it is worded so that someone of ordinary intelligence cannot readily identify what does

<center>12</center>

and does not violate the law. *United Food & Commercial Workers Union, Local 1099 v Southwest Ohio Regional Transit Auth*, 163 F3d 341, 358-359 (CA 6, 1998); *Grayned v City of Rockford*, 408 US 104, 108; 92 S Ct 2294; 33 L Ed 2d 222 (1972). Vague laws not only trap innocent persons, they "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *United Food, supra* at 359, quoting *Grayned, supra* at 108-109. The United States Supreme Court has determined that

> [i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. [*Grayned, supra* at 108.]

Moreover, the absence of clear standards invites abuse by enabling an official to use impermissible facts to administer the policy. *United Food, supra* at 359. The danger of "abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd v Conrad*, 420 US 546, 553; 95 S Ct 1239; 43 L Ed 2d 448 (1975). The vagueness doctrine mandates that the limits that the government claims are implicit in a law "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of*

13

*Lakewood v Plain Dealer Publishing Co*, 486 US 750, 770; 108 S Ct 2138; 100 L Ed 2d 771 (1988).

> The United States Supreme Court has informed us that

> [t]he [vagueness] doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement." Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts. [*Smith* v *Goguen*, 415 US 566, 572-573; 94 S Ct 1242; 39 L Ed 2d 605 (1974).]

But, an ethical rule that would normally be void for vagueness will escape invalidation if a state court has offered a clarifying interpretation explaining what conduct the rule encompasses. See *Gentile v State Bar of Nevada*, 501 US 1030, 1048; 111 S Ct 2720; 115 L Ed 2d 888 (1991).

Therefore, an enactment violates the First Amendment when it does not provide fair notice of what conduct will violate the law[10] or when it gives a public official "'unbridled discretion' such that the official's decision to limit speech is not constrained by objective criteria, but may rest on 'ambiguous and subjective reasons.'" *United Food, supra* at 359, quoting *Desert Outdoor Advertising, Inc v City of Moreno Valley*, 103 F3d 814, 818 (CA 9, 1996).[11]

---

[10] *Grayned, supra* at 108.

[11] The majority argues that MRPC 3.5(c) and MRPC 6.5(a) should not be found void for vagueness because arbitrary enforcement is possible with any professional rule or penal statute. It ignores the fact that, even if arbitrary

(continued…)

14

Normally one whose conduct clearly violates the law may not challenge the law for vagueness. However, a challenge may be brought when First Amendment rights are implicated. *United States v Mazurie*, 419 US 544, 550; 95 S Ct 710; 42 L Ed 2d 706 (1975). See also *United States v Powell*, 423 US 87, 92-93; 96 S Ct 316; 46 L Ed 2d 228 (1975); *United States v Nat'l Dairy Products Corp*, 372 US 29, 32-33, 36; 83 S Ct 594; 9 L Ed 2d 561 (1963). The rules at issue here impede the First Amendment right to free speech. Hence, respondent properly asserts his vagueness claims.

When assessing the merits of respondent's claim, it is important once again to consider the language of MRPC 3.5(c) and 6.5(a). MRPC 3.5(c) proscribes attorneys from engaging in conduct that is either undignified or discourteous. These words do not provide adequate notice to attorneys to explain in all situations what conduct will violate the rule. It is undignified to use slurred speech or to wear a filthy coat. It is also disrespectful to use foul language or to make an obscene gesture to a judge. There are numerous examples of conduct that could arguably violate the rule. A person of ordinary intelligence cannot readily identify which violate the rule and which do not. Not only are the parameters of the rule

---

(…continued)
enforcement were not an issue, the statute still violates vagueness principles because it does not provide fair warning.

15

undefined, the ambiguity of the rule permits the possibility of selective or discriminatory enforcement.[12]

The majority's inclusion in the rule of statements and conduct that take place outside a courtroom significantly enhances the rule's vagueness. This is because the rule, so interpreted, sets no limits on when or where an attorney is free to speak his or her mind to another person. Arguably, under the majority's interpretation, no time, place, or medium is safe because any unprivileged, discourteous observation about a judge communicated to another person could lead to sanctions. The possibility of selective or discriminatory enforcement occurring is enhanced when an attorney represents unpopular clients or presents controversial issues. Therefore, the rule must fall to the First Amendment.

MRPC 6.5(a) suffers from a similar lack of clarity. It requires an attorney to treat all persons "involved in the legal process" with "courtesy and respect." Any number of actions or inactions could violate this rule. Ultimately, the rule's ambiguity and uncertainty condemn it.

---

[12] The majority argues that discriminatory enforcement is not of concern because the Attorney Grievance Commission's actions can be reviewed on a case-by-case basis. However, the United States Supreme Court knew and considered this argument before writing its vagueness jurisprudence. It realized that every discriminatory application of the law may be correctable at some point, but the idea behind the vagueness doctrine is to prevent discriminatory enforcement in the beginning. Therefore, standing alone, this argument is insufficient to save vague rules from being found unconstitutional.

The majority argues that we should not expect that the rule's parameters could be defined with "'mathematical certainty.'" *Ante* at 23 (citation omitted). But this approach begs the questions whether there are parameters and what they are. Instead of offering answers, the majority merely states its belief that MRPC 3.5(c) and 6.5(a) do not violate the constitution. The absence of analysis for this conclusion suggests that it has no basis in the law.

I agree with the majority that there should be flexibility in our ethical rules, but I maintain that the flexibility should not stretch beyond our basic constitutional rights. Unfortunately, MRPC 3.5(c) and 6.5(a) have no conceivable parameters, and this Court has provided no guidance that would save them from constitutional invalidation. As they stand, these rules leave ordinary persons vulnerable to possible discipline and sanction without proper constitutional safeguards.

These rules do not permit persons of ordinary intelligence to readily identify the applicable standard for their conduct. They allow for the strong possibility of discriminatory enforcement. Accordingly, I would find them unconstitutionally vague.

## B. Freedom of Speech

Respondent also argues that, if the rules are not unconstitutionally vague, they are an unconstitutional abridgement of his right to free speech. His argument is based on the premise that his comments were political, rhetorical hyperbole and satire protected by the First Amendment.

17

The initial step in a First Amendment analysis is to determine whether the comments under consideration constitute protected speech. The Grievance Administrator argues that the respondent's statements are not protected because they were a resort to epithets or personal abuse. Essentially his argument is that respondent's comments are not protected because they are offensive.

It is true that the United States Supreme Court has stated that "'[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'" *Chaplinsky v New Hampshire,* 315 US 568, 572; 62 S Ct 766; 86 L Ed 1031 (1942), quoting *Cantwell v Connecticut,* 310 US 296, 309-310; 60 S Ct 900; 84 L Ed 1213 (1940). *Chaplinsky* concerned a New Hampshire statute that provided:

> "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation." [*Chaplinsky, supra* at 569.]

The Court's opinion was based on the belief that Chaplinsky's statements were "fighting words." As the Court stated, "fighting words" are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572. In fact, the Court does not mention political speech or hyperbole despite the fact that Chaplinksy's statements were directed toward his

18

local government. *Id.* at 569. Because the case was decided on the "fighting words" doctrine, it is of little guidance to us in deciding this case.

Moreover, *Chaplinsky* and *Cantwell,* on which *Chaplinsky* was based, must be considered in light of the decision 36 years later in *FCC v Pacifica*, 438 US 726; 98 S Ct 3026; 57 L Ed 2d 1073 (1978). In *Pacifica,* the Court addressed whether the FCC could sanction a broadcaster for speech that was not obscene but was offensive. The Court cited *Chaplinsky,* but stated that some words, although lacking in literary, political, or scientific value, "are not entirely outside the protection of the First Amendment." *Id.* at 746.[13] The Court specified that First Amendment protection would be required if what made the radio monologue offensive "could be traced to its political content . . . ." *Id.*

Contrary to petitioner's assertion, several decisions have given offensive speech First Amendment protection. One that is especially pertinent is *Watts v United States,* 394 US 705; 89 S Ct 1399; 22 L Ed 2d 664 (1969). There, the defendant was convicted of violating a statute that made it a criminal offense to threaten the life of the President of the United States. At an antiwar rally, the defendant stated that "'[i]f they ever make me carry a rifle the first man I want in

---

[13] See *Cohen v California,* 403 US 15; 91 S Ct 1780; 29 L Ed 2d 284 (1971), in which the defendant walked into a courthouse wearing a jacket reading "F*** the Draft." The Supreme Court held that the words on the jacket constituted protected political speech.

my sights is L.B.J. [Lyndon Baines Johnson]'" *Id.* at 706. The defendant argued that the statement was political opposition to the President. *Id.*

The Supreme Court reversed his conviction and held that the political hyperbole used by the defendant did not amount to a violation of the statute. In reaching its decision, the Court stated:

> [W]e must interpret the language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 US 254, 270 [84 S Ct 710; 11 L Ed 2d 686] (1964). The language of the political arena, like the language used in labor disputes, see *Linn v United Plant Guard Workers of America,* 383 U.S. 53, 58 [86 S Ct 657; 15 L Ed 2d 582] (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise. [*Id.* at 708.]

In the instant case, respondent is situated similarly to the defendant in *Watts.* He made offensive and crude comments about three Court of Appeals judges to show his opposition to their decision in a court case. Just as in *Watts,* when taken in context, respondent's statements were, in essence, satire, and hyperbole. In fact, respondent's statements declaring war on the judges and suggesting that they be sodomized were less troublesome than the defendant's statement in *Watts* suggesting that he would shoot the President.

This Court has expressly recognized that political hyperbole, parody, and vigorous epithets are permissible in the course of a judicial campaign. *In re*

20

*Chmura* (*After Remand*)*,* 464 Mich 58; 626 NW2d 876 (2001) (*Chmura II*). The majority argues that *Chmura II* does not apply to respondent because respondent's statements were not made in a political context. The majority also notes that no campaign was under way at the time respondent made his statements. *Ante* at 24. But the decisions in cases such as *Cohen* and *Watts* illustrate that "political speech" is not as neatly defined as the majority would like to believe. The incidents in *Cohen* and *Watts* did not occur during a political campaign.

I do not agree with the majority's narrow interpretation of "political speech," nor do I believe that political hyperbole and satire should be limited to a campaign setting. Respondent's comments were about three public figures concerning their character and the manner in which they perform their public duties.[14] While it is without doubt that respondent's comments were crude, it is inescapable that they were political.

The majority also argues that the statements were made during a pending case, subjecting them to less constitutional protection. As I have explained, I disagree with the majority's conclusion that the comments were made during a "pending" case. While situations exist when a court may constitutionally limit an attorney's speech, the facts of this case do not fall into that line of cases for several

---

[14] The majority stresses that respondent referred to the judges as "Hitler," "Goebbels," and "Eva Braun." But, offensive though it is, reference to political figures as Nazis is a common form of political satire. See <http://semiskimmed.net/bushhitler.html> (accessed May 18, 2006).

reasons. Even if I were to apply the lower standard the majority adopts, I would find that MRCP 3.5(c) and 6.5(a) unconstitutionally abridge the right to freedom of speech.

In *Gentile v State Bar of Nevada,*[15] the United States Supreme Court granted certiorari to determine whether Nevada Supreme Court Rule 177, governing pretrial publicity, violated the First Amendment. The Court addressed whether attorneys may be subject to greater restrictions on their speech during a pending case. It held:

> It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. *Sacher* v. *United States*, 343 U.S. 1, 8 [72 S Ct 451; 96 L Ed 717] (1952) (criminal trial); *Fisher* v. *Pace*, 336 U.S. 155 [69 S Ct 425; 93 L Ed 569] (1949) (civil trial). Even outside the courtroom, a majority of the Court in two separate opinions in the case of *In re Sawyer*, 360 U.S. 622 [79 S Ct 1376; 3 L Ed 2d 1473] (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. There, the Court had before it an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. [*Gentile, supra* at 1071.]

Using these standards, the Court adopted a balancing test. Under the test, a court must weigh the state's interests underlying the ethical rule at issue and the

_____

[15] 501 US 1030; 111 S Ct 2720; 115 L Ed 2d 888 (1991).

22

attorney's First Amendment rights. The Court also held that the rule must be narrowly tailored to meet the state's interest.[16] *Id.* at 1076.

To fully understand the applicability of *Gentile* and *Sawyer* to this case, it is essential to look at their facts. As stated above, *Gentile* concerned pretrial publicity. *Sawyer* concerned comments made during a pending trial. It is noteworthy that neither case is directly on point. *Sawyer* concerned comments made by an attorney about a judge, but the attorney's actions took place while a trial was pending. In fact, in *Gentile* the Court upheld the rule because "it merely postpone[d] the attorneys' comments until after *the trial.*" *Id.* (emphasis added). Neither case is applicable here, because respondent's statements were made after his client's case had been decided in the Court of Appeals and no trial or other legal proceeding was pending.

By deciding that respondent's statements are subject to less First Amendment protection because they were made during a pending matter, the majority stretches the holdings in *Gentile* and *Sawyer*. I cannot join in that distortion.

Attorneys must be free to speak about a case after it has been decided. Stifling speech while memories of the case are freshest is a disservice to the parties as well as to the public. Because of the majority's extension of *Gentile,* it

---

[16] The majority makes conclusory statements only. It offers a complete lack of legal analysis regarding whether the rules at issue are narrowly tailored. Merely stating that the rules are narrowly tailored does not make it so.

could be years before an attorney could finally express his or her opinion about the judges that sat in a case. Even though the majority states that attorneys still may offer disagreement with a court decision, the ruling in this case will have a chilling effect on attorneys' free speech.

Even if I were to apply the lower standard expressed in *Gentile,* I would find that MRPC 3.5(c) and MRPC 6.5(a) are unconstitutional because they are not narrowly tailored. I agree with the majority that the state's interest in maintaining a well-respected judiciary is an important one. But whether that interest outweighs an attorney's right to criticize a judge is not the paramount question. The rules in question cannot satisfy the third prong of *Gentile* because there are no reasonable and definite standards that an official can follow in applying them. *Niemotko v Maryland*, 340 US 268, 271; 71 S Ct 325; 95 L Ed 267 (1951).

The pretrial publicity rule in *Gentile* was written to apply only to speech that is substantially likely to have a materially prejudicial effect. *Gentile*, *supra* at 1076. The rules at issue here lack that narrow tailoring. They are so vague that a person of reasonable intelligence could not decipher their boundaries. Nothing limits their application. Because they are not narrowly tailored, even under *Gentile*, MRCP 3.5(c) and 6.5(a) must fall to the First Amendment.[17]

---

[17] The majority's discussion of the First Amendment rights of judges is obiter dictum. The issues in this case involve attorney speech. Whatever challenges to the Michigan Code of Judicial Conduct that may arise in the future have nothing to do with whether the comments made by respondent and complained of here are protected speech.

(continued…)

24

The majority asserts that the holdings of *Cohen* and *Watts* are inapplicable here because they involve the rights of everyday citizens, as contrasted with those of attorneys. I disagree. *Cohen* and *Watts* sought to define protected political speech. Neither limited its holding to everyday citizens or nonlawyers. Rather, both stand for general principles that outline the landscape of protected political speech. The majority's statement that *Gentile* overrode *Cohen* and *Watts* on the matter of defining political speech by attorneys is inaccurate. *Gentile* did not define political speech for lawyers or anyone else. Rather *Gentile* set parameters for determining whether an ethical rule may properly abridge rights protected by the Constitution.

In response to the legal analysis I have provided, the majority advances yet another parade of horribles.[18] Certainly the First Amendment and the rights it

---

(…continued)

It should be noted, in passing, that the majority, in its joint opinion, overstates the holding in *Republican Party of Minnesota v White*, 536 US 765, 781-782; 122 S Ct 2528; 153 L Ed 2d 694 (2002). *White* does not allow judges or judicial candidates to attack a third party by name, even if the third party supports the candidate's opponent. The holding in *White* is that judicial candidates may speak on disputed legal and political issues. *Id.* at 776-777. In fact, *White* implies that speech that implicates a particular person may show bias and is properly sanctioned. *Id.*

The majority's treatment of *White* is yet another instance of the mischaracterization of case law made thoroughout the majority's opinions. For a full discussion of this pattern see Justice Cavanagh's dissent, *ante* at 43-49.

[18] This is a tired tactic. The majority has turned to such arguments in other cases in which the decision was not grounded soundly in the law. See *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 649-650; 684

(continued…)

embodies are too precious to jettison on the basis of hypothetical situations. I have too much faith in the quality and integrity of our judiciary and our bar to believe them unable to handle capably the great responsibilities that come with free speech. I would rather risk living in the society envisioned by the majority than in one where the mere utterance of dissatisfaction could subject an attorney to harmful sanctions.

Recently, this Court held that courts should not ascribe meaning to statutes unintended by the Legislature because they fear what will develop if they interpret the language as written. *Wexford Med Group v City of Cadillac,* 474 Mich 192, 220 n 10; 713 NW2d 734 (2006). I believe that the majority should apply the principle stated in *Wexford* here when interpreting the Constitution in this case.

As I have before, I find solace now in the words of Benjamin Franklin: "Any society that would give up a little liberty to gain a little security will deserve neither and lose both."[19] Here the majority is ready to give up liberty in the hope that some hypothetical future horror will not occur. We must not permit the rights protected by the First Amendment to be whittled away in this manner.

---

(…continued)
NW2d 800 (2004), and *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich 508; 684 NW2d 847 (2004).

[19] <http://www.brainyquote.com/quotes/authors/b/benjamin_franklin.html> (accessed July 12, 2006).

Conclusion

I would hold that the Attorney Grievance Commission has the authority to declare unconstitutional a rule of professional conduct by virtue of this Court's delegation of authority to it. I would hold, also, that respondent did not violate MRPC 3.5(c) or 6.5(a) because the comments in question were not made in court or while the case was pending. Finally, I would hold that, even if respondent violated them, the rules in question are unconstitutionally vague and infringe on speech protected by the First Amendment. Therefore, I would not sanction respondent.

Marilyn Kelly